1  **COTCHETT, PITRE & McCARTHY, LLP**
MARK C. MOLUMPHY (SBN 168009)
2  *mmolumphy@cpmlegal.com*
GINA STASSI (SBN 261263)
3  *gstassi@cpmlegal.com*
TYSON REDENBARGER (SBN 294424)
4  *tredenbarger@cpmlegal.com*
San Francisco Airport Office Center
5  840 Malcolm Road, Suite 200
Burlingame, California  94010
6  Telephone:   (650) 697-6000
Facsimile:    (650) 697-0577
7

8  *Counsel for Plaintiff City of Providence*

9  [Additional Counsel on Signature Page]

10

11                     **UNITED STATES DISTRICT COURT**

12                    **NORTHERN DISTRICT OF CALIFORNIA**

13

| | |
|---|---|
| CITY OF PROVIDENCE, derivatively on behalf of Oracle Corporation, | Case No. |
| Plaintiff, | **VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT** |
| v. | |
| LAWRENCE ELLISON, SAFRA CATZ, MARK HURD, and THOMAS KURIAN, | **DEMAND FOR JURY TRIAL** |
| Defendants, | |
| -and- | |
| ORACLE CORPORATION, | |
| Nominal Defendant | |

24

25

26

27

28

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

# TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................................. 1

JURISDICTION AND VENUE ........................................................................................... 4

PARTIES .............................................................................................................................. 4

    A.    Plaintiff ...................................................................................................... 4

    B.    Nominal Defendant .................................................................................. 5

    C.    Defendants ................................................................................................ 5

    D.    Relevant Non-Party Directors ................................................................. 7

SUBSTANTIVE ALLEGATIONS ...................................................................................... 8

I.    SUMMARY OF THE FRAUD ............................................................................... 8

    A.    Oracle Falls Behind in The Cloud Services Race .................................. 8

    B.    The Officer Defendants Deny Rumors That Oracle Generates Cloud Revenue Through Improper Sales Tactics ............................................. 12

    C.    The Officer Defendants Report Astonishing Cloud Growth Attributed to Oracle's Purportedly Superior Cloud Products and Business Practices .............. 17

II.    WHILE TOUTING CLOUD GROWTH, THE OFFICER DEFENDANTS CAUSE THE COMPANY TO REPURCHASE ORACLE COMMON STOCK DURING THE RELEVANT PERIOD .......................................................... 21

III.    THE TRUTH: ORACLE'S EXPLOSIVE CLOUD GROWTH WAS ACTUALLY FUELED BY EXTORTIONATE AND COERCIVE SALES PRACTICES ...................................................................................................... 23

    A.    Oracle Fuels Its Cloud Growth By Coercing Customers To Subscribe To Cloud Products Under Threat Of Audit Penalties ................................ 24

    B.    The Officer Defendants Also Caused Oracle To Use "Attached Deals" To Disguise Legacy On-Premise Revenue As All-Important Cloud Revenue And Pad The Company's Cloud Growth .............................................. 29

    C.    Regulator Findings And Industry Experts Confirm Use Of "Audits" To Generate Cloud Revenues From Customers Who Do Not Actually Want Oracle's Cloud Services ....................................................................... 31

IV.    THE TRUTH ABOUT ORACLE'S CLOUD REVENUE GROWTH EMERGES ........ 34

    A.    On December 14, 2017, Oracle Reports Stagnating Cloud Growth .................... 34

    B.    On March 19, 2018, Oracle Reports That Its Cloud Growth Slowed Even More Significantly ................................................................................. 36

C.      On June 14, 2018, JPMorgan Releases a Large-Scale CIO Survey Showing That Oracle Is "Trailing In Cloud Computing Plans" ........................ 38

D.      On June 19, 2018, the Officer Defendants Cause Oracle to Report Additional Cloud Slowdowns And Stun Investors By Announcing the Company Will No Longer Report Cloud Business Financial Results ................ 39

V.      THE OFFICER DEFENDANTS ACTED WITH SCIENTER ........................................ 42

A.      The Officer Defendants Knew And Had Access To Information Undermining Their Statements to Investors ............................................ 42

B.      Prior To Making Their Misstatements And Omissions, the Officer Defendants Were Informed Of Allegations That Oracle Generated Artificial Cloud Revenues Through Coercive Audits And Sales Tactics ........... 43

C.      The Officer Defendants Specifically Denied The Allegations That They Were Using Audits To Close Cloud Sales ............................................ 44

D.      The Officer Defendants' Use Of Engineered Deals To Drive Cloud Sales Was Widespread Throughout The Company, Occurring Across Continents And In Multiple Different Business Units ............................................ 46

E.      Oracle Repeatedly Changed The Way It Reported Cloud Revenue During The Relevant Period, Underscoring Its Efforts To Obscure Declining Growth ................................................................................ 47

F.      Statements Touting Oracle's Cloud Growth Concerned The Single Most Important Issue Facing The Company During The Relevant Period ................. 48

G.      The Officer Defendants Stated That They Were Deeply Focused On Oracle's Cloud Revenues ............................................................... 50

H.      The Officer Defendants Had a Unique Financial Incentive ............................... 50

I.      Defendant Kurian Sold Hundreds Of Millions Of Dollars' Worth Of Oracle Stock During The Relevant Period ............................................ 52

J.      The Officer Defendants Had An Additional Motive to Artificially Inflate the Performance of Oracle's Cloud Business: the NetSuite Transaction ............ 54

K.      The Officer Defendants Were Directly And Extensively Involved In Developing And Maintaining Oracle's Cloud Business ....................................... 55

VI.     WHILE BUYING BACK ORACLE'S STOCK, THE OFFICER DEFENDANTS MADE AND DISSEMINATED MATERIALLY FALSE AND MISLEADING STATEMENTS.................................................................................. 58

A.      Materially False and Misleading Statements and Omissions During Oracle's Fiscal Third Quarter 2017 ...................................................... 58

B.      Materially False And Misleading Statements And Omissions During Oracle's Fiscal Fourth Quarter 2017.................................................... 64

C.      Materially False And Misleading Statements And Omissions During Oracle's Fiscal First Quarter 2018 ...................................................... 68

D.     Materially False And Misleading Statements And Omissions During Oracle's Fiscal Second Quarter 2018 ................................................ 73

E.     Materially False And Misleading Statements And Omissions During Oracle's Fiscal Third Quarter 2018 ................................................. 77

VII.    IN REPURCHASING STOCK, ORACLE RELIED ON THE OFFICER DEFENDANTS' FALSE OR MISLEADING STATEMENTS ......................... 78

VIII.   NEITHER THE STATUTORY "SAFE HARBOR" NOR THE "BESPEAKS CAUTION" DOCTRINE APPLIES TO THE OFFICER DEFENDANTS' MISREPRESENTATIONS ................................................................. 80

IX.    THE GROUP PLEADING DOCTRINE APPLIES TO THE OFFICER DEFENDANTS' MISSTATEMENTS AND OMISSIONS ........................... 81

X.     THE MISSTATEMENTS AND OMISSIONS CAUSED DAMAGE TO ORACLE ................................................................................ 82

DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS ............................ 86

A.     Demand Is Futile Against the Officer Defendants ............................. 86

B.     Demand Is Futile Against A Majority of the Board Who Are Not Officer Defendants Due To A Lack of Independence ..................................... 87

1.     Ellison Controls Oracle and Its Board ..................... 87

2.     A Majority of Directors Have Material Ties to Ellison Rendering Them Incapable of Assessing Demand Against the Officer Defendants ............................................................ 91

3.     Director Henley ................................................. 93

4.     Director James ................................................. 93

5.     Director Seligman ............................................. 94

6.     Director Conrades ............................................. 96

7.     Director Berg ................................................... 97

8.     Director Boskin ................................................ 98

9.     Director Chizen ................................................ 99

10.    Director Garcia-Molina ....................................... 100

11.    Director Panetta ............................................... 101

CLAIMS FOR RELIEF ................................................................. 102

PRAYER FOR RELIEF ................................................................ 108

JURY DEMAND ....................................................................... 109

Plaintiff City of Providence ("Plaintiff"), by and through its undersigned counsel, brings this action derivatively on behalf of Oracle Corporation ("Oracle" or the "Company"), pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), U.S. Securities and Exchange Commission ("SEC") Rule 10b-5 promulgated thereunder ("Rule 10b-5"), and Delaware common law.

Plaintiff alleges the following based upon personal knowledge as to itself and its own acts and upon information and belief as to all other matters. Plaintiff's information and belief is based on the ongoing investigation of its undersigned counsel, including from the following sources: (i) Oracle's public filings with the SEC; (ii) research reports from market analysts; (iii) Company press releases and reports; (iv) Company website and marketing materials; (v) news and media reports concerning the Company and other facts related to this action; (vi) price and volume data for Oracle securities; (vii) public filings in *In re Oracle Corporation Securities Litigation*, No. 5:18-cv-04844-BLF (N.D. Cal.), including Lead Plaintiff Union Asset Management's Amended Complaint (Dkt. 40) (the "Securities Class Complaint"); and (viii) additional materials and data concerning the Company and industry as identified herein. Counsel's investigation into the factual allegations continues, and many of the relevant facts are known only by the Defendants or are exclusively within their custody or control. Plaintiff believes that substantial additional evidentiary support is likely to exist for the allegations set forth herein after a reasonable opportunity for discovery.

## INTRODUCTION

1.     This is a derivative action brought on behalf of Oracle against Defendant Larry Ellison ("Ellison") – Oracle's controlling stockholder, current chairman of the Oracle board of directors (the "Board"), and Chief Technology Officer ("CTO") – as well as Safra Catz ("Catz") and Mark Hurd ("Hurd")[1], Oracle's CO-CEOs and current directors, and Thomas Kurian, Oracle's former President of Product Development, arising from materially false and misleading statements made and disseminated regarding the Company's cloud business and the simultaneous repurchase

---

[1] Defendants Ellison, Catz, and Hurd are collectively referred to herein as the "Officer Defendants."

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

1

of the Company's common stock at inflated values between March 15, 2017, and June 19, 2018, (the "Relevant Period").

2.      Prior to the Relevant Period, Larry Ellison, Oracle's founder and strategic visionary, drastically underestimated the future growth and importance of cloud services, which would have serious implications for Oracle's database technology and, as a result, Oracle's revenue growth.  In numerous public appearances, Defendant Ellison downplayed industry shifts towards cloud services, ignoring the reality that customers were moving away from Oracle's on-premises software platforms to hosting software platforms on the cloud.  By the time the Officer Defendants recognized Defendant Ellison was wrong, Oracle had fallen far behind its competitors in creating and selling cloud technologies, causing its revenues to stagnate.

3.      Playing a game of catch-up, the Officer Defendants took several important steps to mask the Company's stagnating growth and artificially boost the Company's cloud sales, revenues, and growth.  Most importantly, the Officer Defendants caused the Company to execute over ***$14 billion in stock repurchases*** within less than two years.  While company repurchase programs are often benign, *i.e.*, returning capital to investors, Oracle's stock repurchase program was used to mask the Company's stagnating growth.  Specifically, market commentators repeatedly flagged Oracle's stock repurchase program as "financial chicanery" because it was being used as a way for the Company to meet or exceed Wall Street's earnings per share guidance despite Oracle's lack in growth.

4.      At the same time the Officer Defendants' caused the Company to repurchase billions of dollars in Oracle stock, they also publicly touted Oracle's impressive sales and revenue growth in its cloud business.  The Officer Defendants attributed this growth to supposedly legitimate factors, such as the superiority of Oracle's products and sales teams, while rebuffing any questions about whether Oracle engaged in aggressive sales tactics to boost its new revenue stream.  But the Officer Defendants were not telling the truth.

5.      According to news reports, market commentators, and analysts, the Officer Defendants hid from the market the truth that Oracle's cloud growth was predicated on systematically coercing and bribing Oracle's existing customers into making phony "purchases"

of its new cloud product line.   Throughout the Relevant Period, Defendants concealed these Company-wide sales practices from the market, and publicly reported explosive, but artificial, growth in Oracle's critical new cloud segment.

6.     The truth, however, eventually emerged.   By the end of the Relevant Period, customers were refusing to renew the Company's short-term subscriptions that had been pushed on them under duress, and other customers were resisting Oracle's strong-arm tactics.   Oracle's sales growth in cloud services declined precipitously, revealing to the market that the Company's previously-reported explosive sales growth was neither genuine nor sustainable.   In response, the Company's stock price fell substantially.    Shortly thereafter, the Officer Defendants announced that they would no longer disclose critical information regarding Oracle's faltering cloud business, causing the stock price to further decline.

7.     In the aftermath of these disclosures, on August 10, 2018, an Oracle stockholder filed a securities class action lawsuit in this Court on behalf of investors against Oracle and certain executives, including the Officer Defendants, alleging violations of the federal securities laws relating to the Company's misrepresentations regarding its cloud sales and revenue growth. Subsequently, the court appointed Union Asset Management as lead plaintiff ("Lead Plaintiff") and Bernstein Litowitz Berger & Grossmann LLP as lead counsel ("Lead Counsel").  On April 10, 2019, Lead Plaintiff filed an amended complaint (the "Securities Class Complaint").

8.     The Securities Class Complaint seeks to recover damages on behalf of investors who purchased or sold Oracle securities during the Relevant Period.  This action, on the other hand, seeks to redress harm to the Company arising from the federal securities class action, primarily because Oracle is not a member of the class as defined in the Securities Class Complaint.

9.     In short, as a result of the Officer Defendants' misrepresentations and the Company's simultaneous repurchase of Oracle stock, the Company substantially overpaid for its common stock during the Relevant Period and the Officer Defendants are liable to the Company pursuant to Sections 10(b) and 20(a).  Further, the Officer Defendants also breached their fiduciary duties to Oracle by causing the Company to be named in a federal securities action arising from

1 similar facts, and therefore the Officer Defendants are personally liable for all damages paid to

2 investors in that action.

3       10.     Demand is futile against Oracle's 14-member Board because a majority of the

4 directors are either interested in the claims asserted herein or lack independence from the Officer

5 Defendants.

6 **JURISDICTION AND VENUE**

7       11.     This Court has jurisdiction over the subject matter of Plaintiff's Exchange Act

8 claims in accordance with 28 U.S.C. §§ 1331 and 1337, as well as Section 27 of the Exchange Act,

9 15 U.S.C. § 78aa, and has jurisdiction over Plaintiff's state law claims in accordance with 28

10 U.S.C. § 1367.

11       12.     This Court has jurisdiction over each of the Defendants because each Defendant is

12 either a resident of California or otherwise has sufficient minimum contacts with California (or, in

13 the case of Plaintiff's Exchange Act claims, with the United States as a whole) to render the

14 exercise of jurisdiction by this Court permissible under California Code of Civil Procedure

15 § 410.10 as well as the United States and California Constitutions.  Additionally, in connection

16 with the misconduct alleged in this Complaint, Defendants, directly or indirectly, used the means

17 and instrumentalities of interstate commerce, including the United States mails, interstate

18 telephone communications, and the facilities of the national securities markets.

19       13.     Venue is proper in this District pursuant to Section 27 of the Exchange Act.  Venue

20 is also proper under 28 U.S.C. § 1391 (b) because (i) Oracle maintains its principal place of

21 business in this District; and (ii) many of the acts and conduct that constitute the violations of law

22 complained of herein, including the preparation and dissemination to the public of materially false

23 and misleading information, occurred in this District.

24 **PARTIES**

25     **A.**     **Plaintiff**

26       14.     Plaintiff City of Providence, the capital city of the State of Rhode Island and

27 Providence Plantations, is a beneficial owner of Oracle common stock and has beneficially owned

28 Oracle common stock at all relevant times.

---

**B.    Nominal Defendant**

15.    Nominal Defendant Oracle is a Delaware corporation with its principal executive offices located at 500 Oracle Parkway, Redwood City, California.

**C.    Defendants**

16.    Defendant Lawrence J. Ellison ("Ellison") is, and was at all relevant times, Oracle's Chief Technology Officer, as well as the Chairman of the Company's Board of Directors.  Ellison co-founded Oracle in 1977, was its CEO until 2014, and served as the Company's Chairman of the Board of Directors from May 1995 to January 2004. The Company's proxy statements state that Ellison "continues to lead and oversee our product engineering, technology development and strategy" and his "familiarity with and knowledge of [Oracle's] technologies and product offerings are unmatched."  According to Defendant Safra A. Catz, Defendant Ellison "led the transformation to the cloud," and is still "in charge" at Oracle even after becoming the Company's Chief Technology Officer in 2014, noting, "don't let titles fool you."[2]

17.    Defendant Safra A. Catz ("Catz') has been an executive of Oracle since January 2004 and has served as a director since October 2001. Catz has been co-CEO of Oracle (with Hurd) since September 2014.  The Company admits that Catz is not an independent director.  Previously, Catz served as the Company's President from January 2004 until September 2014; Chief Financial Officer from April 2011 to September 2014 and November 2005 to September 2008; and interim Chief Financial officer from April 2005 to July 2005. She served as Executive Vice President from November 1999 to January 2004 and Senior Vice President from April 1999 to October 1999. Prior to joining Oracle, Catz worked at the investment bank of Donaldson, Lufkin & Jenrette ("DLJ") from 1986 to 1999.  During her time at DLJ, Catz worked on several engagements for Oracle and struck up a friendship with Ellison.  Ellison personally recruited Catz to leave DLJ and join Oracle in 1999.  As detailed more fully below, Catz is a close and loyal aide to Ellison who has been described in the media as Ellison's "secretive but effective right hand" and "Ellison's ultra-effective consigliere."  In September 2014, Ellison described Catz as "[v]ery details-

---

[2] *https://www.youtube.com/watch?v=rh0denX3Bks*

1    oriented," "the No. 2 person for some time," and "our first-ever, de facto chief operating officer."[3]

2    Catz signed and certified each of the Company's quarterly and annual SEC filings, attesting to

3    their purported accuracy. Catz also regularly spoke to investors about Oracle's business and cloud

4    growth, professing to be knowledgeable about these matters.

5           18.    Defendant Mark Hurd ("Hurd") has been an executive of Oracle and has served as

6    a director since September 2010.  Hurd has been Oracle's co-CEO (with Catz) since September

7    2014 and was President from September 2010 until September 2014.  The Company admits that

8    Hurd is not an independent director.  As stated on Oracle's website, Hurd "manages corporate

9    direction and strategy at Oracle, facilitating company activity in consulting, sales, marketing,

10   alliances and channels, and support." Hurd's personal webpage profile states that he "helped shift

11   the long-term strategy of the company toward the cloud."  Hurd signed and certified each of the

12   Company's quarterly and annual SEC filings, attesting to their purported accuracy.  Hurd also

13   regularly spoke to investors about Oracle's business and cloud growth, professing to have detailed

14   knowledge of those matters. Hurd has publicly touted how he "stay[s] close to the action,"[4] earning

15   him the description as an executive that "digs into details and is a hands on manager that examines

16   every alternative."[5]

17          19.    Defendant Thomas Kurian ("Kurian") served as Oracle's President, Product

18   Development from January 2015 to September 2018.  Kurian started working at Oracle in 1996,

19   holding various product management and development positions. Beginning in 2008, Kurian

20   reported directly to Ellison.  According to his personal webpage profile, Kurian was responsible

21   for "[l]ead[ing] [the] transformation of Oracle's products with [the] introduction of [a] leading

22   suite of Cloud Services over 10 years." Kurian also spoke to investors about Oracle's business and

23   cloud growth, professing to know what he was speaking about.  Kurian's colleagues described him

24   as a hands-on manager, stating that he "likes to get involved in the minutia of various projects"

25

26   _____

     [3] Chronical Staff, "On The Record: Larry Ellison," *San Francisco Chronical* (September 18,
27   2014).
     [4] Barb Darrow, "So, huge changes at Oracle with Ellison stepping down right? Wrong!"
28   Gigaom, (September 18, 2014).
     [5] Paul R. La Monica, "HP's Hurd mentality," *CNN Money* (March 29, 2005).

1   and "does not sufficiently delegate responsibility."[6]  On September 5, 2018, Oracle announced that

2   Defendant Kurian was taking a voluntary "leave of absence," after which he resigned from the

3   Company.

4       20.     Defendant Kurian, together with the Officer Defendants, are collectively referred

5   to herein as "Defendants."

6       **D.    Relevant Non-Party Directors**

7       21.     Director Jeffrey O. Henley ("Henley") is Vice Chairman of Oracle Corporation.

8   Henley served as Oracle's Chief Financial Officer and an Executive Vice President from 1991 to

9   2004, and has been a member of Oracle's board of directors since 1995.  Henley was Chairman of

10  Oracle from 2004 until 2014. Henley also serves on Oracle's Executive Management Committee.

11  The Company admits that Henley is not an independent director.

12      22.     Director Jeffrey S. Berg ("Berg") has served as a director of Oracle since February

13  1997, as a member of the Governance Committee since October 2001, a member of the

14  Independence Committee since July 2012, and the Chairman of the Independence Committee since

15  November 2016.

16      23.     Director Michael J. Boskin ("Boskin") has served as a director since April 1994, as

17  a member of the F&A Committee since July 1994 (Chairman since November 2016), and as a

18  member of the Governance Committee from July 1994 through November 2016 (Chairman from

19  July 2012 until November 2016).

20      24.     Director Bruce R. Chizen ("Chizen") has served as a director since July 2008, as

21  an alternate member of the F&A Committee from October 2008 until July 2012, a member of the

22  F&A Committee since July 2012, and a member and Chairman of the Governance Committee

23  since fiscal year 2016.

24      25.     Director George H. Conrades was a member of the Special Committee, has served

25  as a director since January 2008, as a member of the Compensation Committee since January 2011

26  and as a member of the Independence Committee since fiscal year 2016.

27

28      ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
        [6] Nadia Damouni, "Ellison's backing helps Kurian's star to rise at Oracle," *Reuters* (January 11, 2015).

26.     Director Hector Garcia-Molina ("Garcia-Molina") has served as a director since October 2001 and as a member of the Independence Committee since August 2005.

27.     Director Renee J. James has served as a director since December 2015 and as a member of the Compensation Committee since fiscal year 2016.

28.     Director Leon Panetta has served as a director since January 2015 and as a member of the Governance Committee since fiscal year 2016.

29.     Director Naomi O. Seligman ("Seligman") has served as a director since November 2005 and as a member of the Compensation Committee since June 2006 (Vice Chairman as of November 2015).

30.     Director William G. Parrett ("Parrett") has been a director since May 2018.

31.     Director Charles W. Moorman IV has been a director since May 2018.

## SUBSTANTIVE ALLEGATIONS

I.      **SUMMARY OF THE FRAUD**

A.      **Oracle Falls Behind in The Cloud Services Race**

32.     Oracle has long been a leader in the development and marketing of database software and technology.  Its success was borne out of selling licenses for Oracle's "on-premises" database software and products.  "On-premises" software – in contrast with "cloud-based" software, discussed immediately below – is installed locally, on a licensee's own computer and maintained on the user's own infrastructure and platforms.  Through its sale of on-premises products, Oracle became one of the most successful and powerful database technology and software companies in the world.

33.     Over the last decade, however, the market for database technology and software witnessed a substantial shift towards "cloud-based" services, which threatened to strip market share away from Oracle.  In contrast with "on-premises" software, "cloud-based" software allows licensees to store and access data over the internet.  Cloud-based products have certain attractive features, including that its users do not need to build and maintain expensive "on-premises" infrastructure and platforms.

34.     From 2006 to 2010, Amazon, Google, and Microsoft launched cloud-based software to compete with Oracle.  Each of Oracle's competitors' unveiled cloud-based services to much fanfare, as numerous market commentators and analysts viewed the moves positively.  While Oracle's competitors were developing cloud-based software products to satisfy growing demand and snatch up market share, Defendant Ellison was stubbornly (or intentionally) refusing to acknowledge that customers were increasingly shifting towards cloud technology.

35.     Even though the cloud model posed such an existential threat to Oracle's core business, Oracle's leadership, particularly Defendant Ellison, publicly ridiculed the new technology.  For instance, at a September 2008 OpenWorld Conference, Oracle's annual business and technology conference, Ellison called cloud computing "complete gibberish" and wondered aloud when this "idiocy [was] going to stop."[7]  Again, in October 2009, Ellison referred to cloud-based software as "water vapor" and "nonsense," noting that "cloud computing" does not threaten Oracle.

36.     While not a substantive issue in this litigation, Defendant Ellison's insistence that cloud-based services were "complete gibberish" is difficult to square with his investment in NetSuite, a cloud-based provider of back office software applications.  In fact, as of 2008, Defendant Ellison held a significant ownership interest in NetSuite.  Thus, while Defendant Ellison denied the importance of cloud-based services in his capacity as a director and officer of Oracle, he simultaneously held a massive personal investment in a cloud-company, NetSuite, which company, as discussed herein, Defendant Ellison would ultimately cause Oracle to purchase in 2016.

37.     Despite Defendant Ellison purportedly misconstruing its significance, cloud-based technology became a force in the computing industry that could no longer be ignored.  For instance, on October 17, 2009, an *Economist* article noted that "the rise of cloud computing is … changing the nature of competition within the computer industry."  Then, in a November 11, 2010 white paper, Microsoft's chief strategist Rolf Harms observed that "[c]omputing is undergoing a seismic shift from client/server to the cloud, a shift similar in importance and impact to the transition from

---

[7] Dan Farber, "Oracle's Ellison nails cloud computing," *CNET* (Sept. 26, 2008).

1   mainframe to client/server."[8]  Likewise, *Forbes* recognized in a September 27, 2011 article that

2   cloud-based software was the "ultimate disruptive innovation" and "spell[ed] very big trouble for

3   the traditional enterprise software leaders who plainly know they need to make the leap, but don't

4   have the business models, DNA, or dire necessity to support the change today."

5        38.   Oracle's competitors, as well as NetSuite, quickly began to reap the benefits of their

6   investments in cloud-based infrastructure and generate substantial revenues from these products.

7   By 2015, Amazon reported $2 billion each quarter in revenue and dramatic year-over-year growth

8   of 70-80% from its cloud-based software.  Likewise, by the start of the Relevant Period, Google

9   reported substantial cloud revenue each quarter and a growth rate in excess of 80%, and Microsoft

10  reported billions in revenue each quarter and a growth rate of 93% for its cloud-based product,

11  Azure.

12       39.   The Officer Defendants were left with a choice: become a declining on-premises

13  company or reshape Oracle into a cloud-based business with prospects for significant growth.

14  *Fortune* correctly framed the issue: "What do you do when you are the best company in your

15  industry but your industry is mired in a slump of mediocre performance? That's the dilemma faced

16  by Oracle," adding that the "meaty revenue pie that is the enterprise-tech market… is shrinking

17  slowly" due to cloud competition.[9]   Industry-watchers referred to Oracle's situation as an

18  "innovator's dilemma," which "describes how successful companies that fail to adopt new

19  technology or business models to meet customers' future needs can quickly fall behind," noting

20  that Oracle was "reluctant to make any wholesale shift away from the on-premises model."[10]

21  Analysts believed the Company needed "an even more radical and rapid organizational and

22  cultural shift to 'cloud-first,'" rather than holding onto its legacy businesses during the industry's

23  shift to the cloud.[11]

24

25

---

26      [8] Rolf Harms and Michael Yarmartino, "The Economics of the Cloud" (Nov. 11, 2010).
        [9] Kevin Kelleher, "What kind of problem does Oracle have exactly?" Fortune (June 28, 2013).
27      [10] Jessica Twentyman, "Oracle and SAP are Big Software, but for how long?" *The Register*
    (May 13, 2013).
28      [11] John Freeman et al., "The Death Of The Commercial Database: Oracle's Dilemma," *Seeking
    Alpha* (February 10, 2017).

40.     Eventually, even Defendant Ellison could no longer deny that Oracle would need to develop its own competitive cloud-based technology.  Oracle, however, failed to grasp the urgency of the situation, with Ellison stating in an October 2, 2012 CNBC interview that such technology would be developed over the "next couple of years."  In response, analysts noted at the time that Oracle was "[c]ertainly" not as "cloud-based" as its competitors in the industry and that its approach to cloud-based technology was "not all quite there yet."[12]  Market commentators further stated in May 2013 that "Ellison has been talking big about cloud lately," but that "Oracle, shockingly, appears to be failing" in implementing a cloud strategy.[13]

41.     Absent a competitive cloud-based product, the Company's revenue growth stagnated or suffered from 2013 to 2016. Oracle reported software sales that fell short of analyst expectations in June 2013, witnessed a decline in revenue and new software licenses sales in September 2015 due to Oracle not "moving fast enough to make up for declines in its traditional software sales,"[14] and announced a decline in annual revenue in May 2016.

42.     Confronted with poor results, the Officer Defendants belatedly pivoted to the cloud, announcing that the Company would refocus its efforts entirely on competing in this rapidly developing market.  For instance, in an October 26, 2015 CNBC interview, Hurd affirmed that Oracle now was "determined to compete on every level of the cloud feature for feature." Likewise, Catz explained that Oracle finally was making the "move to cloud," which would represent "a generational shift in technology that [wa]s the biggest and most important opportunity in our Company's history."[15]

43.     The Officer Defendants' pivot to the cloud was one of the most important moments for the Company, with the market keenly focused on its shift to this new technology and ability to open up a growing revenue stream.  For example, *USA Today* reported that "Oracle's future and relevance is pinned on its ability to become a bigger player in cloud," noting that even small

---

[12] Josh Bersin, "Oracle Transformed – It's Now All about the Cloud," *Forbes* (October, 3 2012).

[13] Brad Peters, "The Worst (And Best) Enterprise Cloud Strategies," *Forbes* (May 21, 2013).

[14] Abhirup Roy, "Oracle Unveils Mixed Fiscal 1Q Earnings Results," FoxBusiness (September 16, 2015).

[15] Oracle Corp., Third Quarter 2016 Earnings Call, March 15, 2016.

improvements in cloud sales "were enough … to pop the company's stock."[16] Market commentators noted that the "cloud has become a matter of existential importance to Oracle as its legacy business of selling software licenses and hardware products erodes in the face of a growing enterprise preference for usage-based application and infrastructure subscriptions."[17]

44.     Oracle leadership's slowness to acknowledge the growing importance of cloud, however, had caused the Company to fall far behind in this critical market.  As analysts explained at the time, "[t]he rise of cloud computing … caught the software giant [Oracle] somewhat flat-footed, leaving the firm in scramble mode as it races its peers to the cloud." Indeed, as of September 2016, Amazon's cloud computing revenue dwarfed that of Oracle, with Oracle's cloud infrastructure business bringing in just $171 million in quarterly sales compared to Amazon's $2.89 billion.  In addition, Oracle faced tough competition from smaller cloud specialists, including Salesforce.com, with analysts noting that Oracle was also "at risk from smaller and faster cloud services specialists."[18]  Analysts explained that it would take Oracle a long time to catch up with its cloud competitors, with one Deutsche Bank analyst writing in a September 2016 report that "Oracle talked up its 'next-gen' infrastructure as a cheaper rival to [Amazon's cloud product], but we don't believe it will be competitive anytime soon."

**B.     The Officer Defendants Deny Rumors That Oracle Generates Cloud Revenue Through Improper Sales Tactics**

45.     As a late entrant in the cloud software market, Oracle faced a considerable challenge.  It not only needed to develop a cloud product with competitive capabilities, but it also needed to develop an effective sales and marketing strategy for its nascent cloud product.

46.     From the outset of Oracle's cloud efforts, market watchers cautioned the Company's senior management not to play "catch up" by employing improper sales tactics to generate cloud revenues. In particular, market participants voiced early concerns that Oracle and

---

[16] John Swartz, "Oracle's Mark Hurd builds a cloud arsenal to take on Amazon," *USA Today* (April 26, 2017).

[17] Kurt Marko, "Oracle Cloud World epiphany: Focusing on applications and data, not infrastructure. Yet." *diginomica* (January 24, 2017).

[18] Manikandan Raman, "Oracle Corporation Is At Risk From Competitors Like Salesforce," *Benzinga* (September 19, 2016).

its auditing department should not attempt to extract artificial "cloud" revenues through their audits of its licensees' "on-premises" software licenses.

47.     By way of background, Oracle's software license contracts gave it the right to audit its customers' compliance with the license and impose fees if it found violations. Oracle's License Management Services ("LMS") is a division within Oracle that is tasked with conducting audits of Oracle's on-premises licensees. LMS is, according to the Company's website, the "established authority on Oracle licensing policy." The stated purpose of LMS's audits was to determine whether Oracle's licensees were using Oracle's software in accordance with the terms of the Company's on-premises license and, if not, issue a penalty for such non-compliance. According to Oracle's public statements, LMS purportedly provided "Oracle customers with an open, transparent, and definitive assessment of their compliance position." Oracle's LMS auditors supposedly maintained a "customer-first approach," with their audits limited to "validate the effectiveness of [the customer's] internal controls, and through them, to maintain a compliant position."

48.     Beginning in 2014, certain industry participants expressed concern that Oracle may attempt to misuse LMS "audits" to push Oracle's cloud product on its existing on-premises customer base – which provided a potential and rich revenue opportunity for Oracle's nascent cloud business.  These industry participants included Clear Licensing Counsel, a prominent and independent European organization that advocates for the interests of software consumers.

49.     According to the Securities Class Complaint, the Founder and Chairperson of Clear Licensing Counsel, Martin Thompson, described  how, on May 7, 2014, he participated in a scheduled two-hour meeting with Oracle representatives in Oracle's Thames Valley Park offices in Reading, United Kingdom.  The Securities Class Complaint describes the meeting as follows:

> The meeting was attended by, among others, Debbie Wynne-Owen, Oracle's Senior Director of Global Operations within LMS. During the meeting, Clear Licensing highlighted to Oracle's executives that customers believed that the Company's auditing group, LMS, engaged in "questionable sales tactics," with "LMS activity leading to sales engagement." These findings were based on a survey conducted by Clear Licensing Counsel of 100 organizations located across the globe, including from the United States (29% of respondents), Europe (56% of respondents), Asia (9% of

respondents) and Oceania (6% of respondents). Clear Licensing's findings were also corroborated by accounts provided during a roundtable session held on March 26, 2014 at the Home Office, UK Government, which included representatives of 15-20 major Oracle "on-premise" customers, including from both the public and private sector and some of the largest companies in the world. Following the meeting, in mid-October 2014, Mr. Thompson sent Oracle's Senior Director of Global Operations a written report documenting Clear Licensing Counsel's findings and provided Oracle's executives with an opportunity to respond.

50.     Having received no meaningful response from Oracle, Clear Licensing Counsel then sent a public letter on January 6, 2015 to Defendant Ellison and Oracle's Board of Directors, including Defendants Hurd and Catz.[19]  In that letter, Clear Licensing Counsel and Mr. Thompson specifically cautioned Defendants Ellison, Hurd and Catz that they needed "to take steps to improve the trust of your customers … if you wish to succeed in migrating them to your cloud computing services."

51.     Clear Licensing Counsel's letter warned Oracle's executives that, based on its comprehensive survey and analysis, there was a "deep-rooted mistrust of [Oracle's] core customer base as a result of your auditing and licensing practices."  According to the survey results, Oracle's audits were "often unclear and difficult to respond to" and its licensing terms and changes were "poorly communicated," with 92% of Oracle's on-premises customers expressing that Oracle did not clearly communicate changes to its licensing.   Customers wondered whether potential violations of license agreements were just a pretext to generate cloud revenues.  Clear Licensing Counsel cautioned Defendants that, "if Oracle does not address these concerns then the company's ability to meet its stated $1 billion cloud sales target next year, together with the longer-term outlook for its cloud computing business, will remain in doubt."  The letter further stated that one of the "key issues" Clear Licensing Counsel identified in its November 2014 report was that "Oracle routinely moves the licensing goals posts to favour revenue streams over customer requirements."   The letter concluded by stating that "for the sake of the company's long-term

[19] *See* Open letter: To Larry Ellison and the board of directors at Oracle, *available at*: http://www.clearlicensing.org/2015/01/06/open-letter/ (last visited Apr. 24, 2019).

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT     14

future and the success of its cloud computing services, we urge you to review these recommendations that have been validated by your customers."

52. Clear Licensing Counsel's letter to Defendants Ellison, Hurd, Catz, and Oracle's Board of Directors was publicly released on or about January 6, 2015. Following the letter's release, various media outlets and commentators published follow-up articles and reports about Clear Licensing Counsel's documented concerns. As one commentator explained in a report titled "Oracle Faces Withering Criticism of Its Licensing Practice," Clear Licensing Counsel's letter "received substantial attention in software-licensing circles" during the ensuing months after its publication.[20] Indeed, numerous media outlets published articles and reports about Clear Licensing Counsel's "scathing report" and letter to Defendants Ellison, Catz, Hurd, and Oracle's Board, "predict[ing] that Oracle will struggle to move to the cloud unless it changes its ways."[21]

53. Months later, the financial press published additional reports questioning whether Oracle was misusing its "audit" process to manufacture artificial cloud sales – precisely as Clear Licensing Counsel feared. For example, on June 18, 2015, *Forbes* published an article titled "Is Oracle Using Legal Pressure To Increase Cloud Sales?" In that article, *Forbes* pointed to accounts suggesting that Oracle was "indeed increasing the pressure on existing clients" through its "audits," but that the impact that "these new practices have on boosting Oracle's cloud earnings and possibly alienating its existing customer base is not easy to discern."

54. Five days later, on June 23, 2015, *CRN* published a report titled "Here's Why Some Partners Think Oracle Cloud Sales Numbers Are Misleading."[22] CRN explained that "Oracle says its cloud business is growing at a pace that will soon catapult it to the top of the heap in the enterprise software space, but some of its partners think it's just bombast." CRN referred to three unnamed Oracle customers, who claimed that Oracle salespeople were attempting to sell customers "cloud products they don't need," including by urging the customer into "buying cloud as a way

---

[20] https://scottandscottllp.com/oracle_faces_withering_criticism/
[21] https://www.informationweek.com/software/enterprise-applications/oracle-must-reform-says- software-licensing-group/d/d-id/1318492
[22] CRN is a top technology news and information source for solution providers, IT channel partners, and value-added resellers (VARs).

to reduce their support renewal [for on-premises product], not necessarily because they want to use Oracle cloud products." For these reasons, according to one of CRN's unidentified sources, "Oracle's cloud numbers [reported to investors] are definitely misleading."

55. Oracle denied the accusations contained in CRN's report and the related reports. As discussed in the same CRN article, Oracle publicly assured investors that the allegations that Oracle customers are buying cloud that they did not want and would not use were "***absolutely not true.***"

56. Over the next several months, additional media outlets published reports that continued to question the legitimacy of Oracle's sales practices for its nascent cloud product. For example, on September 11, 2015, *Business Insider* published an article titled "'I Felt Like We Were Being Extorted': Customer Says Oracle Tried To Strong-Arm Him Into a Cloud Sale." In that report, *Business Insider* explained how, according to one unidentified source, Oracle had "used some ugly tactics to sell its cloud and other products the customer didn't want." The report accused Oracle of threatening its customers with an "audit" of their on-premises license and then, to make "the threat go away," telling those customers that they could "buy credits for cloud services" that they did not otherwise want or intend to use.

57. Oracle again minimized these allegations and denied that they had merit. On January 14, 2016, the Senior Vice President of Oracle (UK), Dermot O'Kelly, publicly responded on behalf of Oracle to the "[r]eports last year [that] claimed that Oracle sales reps have used aggressive tactics to convince customers to move to the cloud through methods like tough software audits." In his response, Oracle's Senior Vice President "insisted Oracle wants companies to move at their own pace to the cloud." In denying the accusations, he publicly stated, in remarks published by *Cloud Pro* that "[i]t would be wrong to force a company to do something that's against their will."

58. Six months later, Oracle again assured industry and securities market observers that its cloud revenues were legitimate. On July 21, 2016, Pacific Square Research published a report summarizing "a number of stories in the press, such as [the] one from Business Insider," discussed above at paragraph 63, which asserted that Oracle "used some ugly tactics to sell its cloud and

other products the customer didn't want," including the "nuclear option" of "audits" to "boost cloud." Oracle denied these allegations. The Pacific Square Research report quoted an Oracle spokesperson (*i.e.*, Ken Bond, Senior Vice President, Investor Relations) as stating that these allegations were fictitious "***conspiracy rumor***" that did not even warrant a substantive response, explaining:

> Responding to *every rumor* is never a productive endeavor .   Only color I can add is that if the ***conspiracy rumor*** were true, people would not use the cloud credit and there would be no renewal or revenue growth as a new business would replace cancelled business – not at all what we're expecting.

59.     Unknown to the public at the time, the accusations that the Officer Defendants caused Oracle to deflect and rebuff as "conspiracy rumor" were, in fact, not "conspiracy rumor" at all.  As alleged herein, Oracle widely engaged in the very practices that its executives publicly shunned, and the "revenue growth" that Oracle's executives trumpeted each quarter as proof of Oracle's success was, in significant part, the artificial product of their coercive audits and unsustainable sales practices.

## C.     The Officer Defendants Report Astonishing Cloud Growth Attributed to Oracle's Purportedly Superior Cloud Products and Business Practices

60.     While denying that Oracle's cloud revenue was driven by abusive sales practices, the Officer Defendants caused the Company to report dramatic growth in its cloud business throughout the Relevant Period.  Further rebutting any charge that coercive tactics were driving Oracle's cloud revenue, the Officer Defendants caused Oracle to attribute the Company's ostensible success to legitimate business factors, thus assuring investors that its revenue growth was genuine and sustainable.

61.     For instance, on March 15, 2017, the Officer Defendants caused Oracle to issue its earnings release for the third quarter of 2017, touting that cloud billings had jumped 110% year-over-year (versus 39% year-over-year growth the prior quarter) to $1.2 billion, driving overall financial results higher.  Defendant Catz stated in the release that Oracle was enjoying "hypergrowth … in the cloud," called the Company's growth rate "astonishing," and stated that, "***[o]ur new, large, fast growing, high-margin cloud businesses are driving Oracle's total revenue***

*and earnings up and improving nearly every important non-GAAP business metric you care to inspect*; total revenue is up, margins are up, operating income is up, net income is up, EPS is up."

62.   On Oracle's third quarter earnings call that same day, the Officer Defendants continued to tout the growth of Oracle's cloud business.  Defendant Hurd stated that Oracle was "*the fastest-growing scale cloud business in the world*," while Defendant Catz added that "[o]ur pivot to the cloud is now clearly in full swing."  Defendant Catz emphasized that, for the first time, the growth in Oracle's cloud business had overtaken the declines in its legacy "on-premises" business, stating "*more importantly, the increase in revenue from our cloud business has overtaken new software license declines on an annual basis*," and adding that, "*[t]his is a significant milestone in our transformation, where the combination of our cloud and new software license business added together are growing.*"

63.   Analysts responded enthusiastically to the Officer Defendants' statements about Oracle's represented cloud growth, calling the results "a material inflection point" and a "key milestone" in Oracle's shift to the cloud.  For instance, in a March 15, 2017 report issued following Oracle's earnings release and conference, Macquarie analysts raised their price target for Oracle shares and wrote, "Oracle reported a solid third quarter, *one of its best reports in years, even as the [Company] heads towards the tipping point in its cloud transition* when cloud growth and margin scale are offsetting declines in new license revenues."

64.   On March 16, 2017, Barclays raised their Oracle price target, writing, "[w]ith the company emerging on the other side of cloud transition …, we continue to like the long-term story. If the company is starting to show meaningful client wins for its database/IaaS offering (something management hinted at), we could see *a re-rating of the name.*"[23]

65.   Meanwhile, Defendants continued to rebuff any suggestion that its cloud revenue was driven by coercive sales tactics.  On May 9, 2017, at a Jefferies Technology Group Investor Conference, Ken Bond was asked about the importance of audits as a driver of revenue growth. An analyst asked if Bond could provide "some sort of indication as to what percentage of revenue

---

[23]  "Re-rating" of Oracle refers to an expansion of the stock's earnings multiple, such that investors would be willing to pay more for each dollar of the Company's earnings.

and margin is associated with auditing practices of customers."  In response, Bond stated, "This is one of those things where – gets talked about a lot. And I think this is one of those things where *the story is a lot bigger than the realities*."  Bond assured investors that Oracle used its audits properly, stating that "we try to do [audit] as best we can, in as gracious [a] way as we can."  Bond also assured investors that cloud revenue was not being generated by audits, stating that with regard to questions about revenue associated with auditing, "the key, as we go to cloud, is this conversation is going to go away."

66.     As time progressed, the Officer Defendants continued to emphasize its rapid cloud revenue growth to the investor community.  For example, on June 21, 2017, the Officer Defendants caused Oracle to issue its earnings release for the fourth quarter of 2017, in which it reported that cloud revenues had surged again by 58% to $1.4 billion, pushing up the Company's earnings per share.  Defendant Catz again underscored that cloud growth was a primary driver of Oracle's profitability, stating that, "This cloud hypergrowth is expanding our operating margins."

67.     On the conference call with investors and analysts that day, the Officer Defendants stated that Oracle's cloud business had become the primary driver of Oracle's growth, with Catz stating that "[t]he cloud has become our predominant growth vehicle," and Ellison reiterating that "[o]ur rapid SaaS growth is the driving force behind Oracle's revenue and earnings growth in Q4."[24]

68.     The Officer Defendants also assured investors that the Company's cloud revenue was high- quality and sustainable.  On the June 21, 2017 conference call, an analyst questioned the Officer Defendants about the quality of Oracle's reported cloud revenue, and specifically whether the Company's cloud growth was sustainable or whether it was a "1-year phenom."  Catz responded by denying that Oracle's reported cloud growth was driven by a short-term, "1-year" spike in revenue, but rather was built on a base of "recurring revenue," stating:

---

[24] "SaaS" refers to software-as-service, a business line in which the Company licensed Oracle cloud-hosted "pre-packaged" software and applications on a subscription basis. In fiscal year 2017, Oracle told investors it was successfully pushing its cloud offerings into two additional lucrative cloud businesses: platform-as-service ("Paas"), which provides a framework for developers to build and deploy customized applications; and infrastructure-as-service ("Iaas"), which provides scalable and automated compute resources.

"*So this is absolutely not a 1-year phenomena.*  In fact, what you should see, as this goes on, is we will have less drag from the transition and the base will continue to grow.  And so this should really accelerate. And understand that in our PaaS-IaaS business, we're not even at scale. *So as we really scale that up, profitability is going to increase more quickly and revenues will be built on the base of another recurring revenue – of the recurring revenue business.*"

69.    Investors and analysts relied upon the Officer Defendants' assurances about Oracle's purportedly tremendous cloud growth.  For example, on June 22, 2017, *Business Insider* published an article entitled "*Oracle's blow-out earnings caused over 20 Wall Street analysts to raise price targets.*"  The article reported, "*OracleCloud computing really is starting to breathe new life into Oracle*. … A sunny outlook caused the stock to hit a 52-week high of $51.85 on Thursday before settling down to about $50 in the afternoon."

70.    Also on June 22, 2017, Macquarie analysts again increased their price target, writing, "Oracle reported its *best quarter in years* as we believe the company has weathered the worst of its transition to the cloud .... Critical metrics like cloud ARR, license revenues, total software revenues, billings, and margins all beat [consensus analyst estimates], making the quarter *a solid turning point as management rounds the bend on a multiyear rapid cloud transition*."

71.    The Defendants continued to assure investors that the Company's cloud growth was driven by a variety of legitimate business factors and conditions, such as the quality of Oracle's cloud products and sales force, as well as the value and cost-saving delivered to consumers.  For example, when asked on a September 14, 2017 earnings call about the reasons for Oracle's "momentum in [the] cloud portfolio," Defendant Hurd responded that the Company's cloud growth was due to the fact that "[w]e're better – our products are better.  Our sales force is better. Our ability to implement is better. Our ability to do all of these things has just continued to improve quarter by quarter by quarter, and it manifests itself in the type of results we're talking about this afternoon."

72.    Similarly, at a November 7, 2017 Sanford C. Bernstein Technology Innovation Summit, Ken Bond was asked about "the real biggest driver you think of why [clients] would be moving on-premise to [the cloud]." He stated that "from a cost standpoint as well as an innovation

standpoint, there's a lot to like about cloud for the customer. And ***I think this is one of the biggest drivers of why you're seeing customers really excited about this even if it's still early.***"

73. Buoyed by Oracle's reported success in the cloud, Oracle's stock price surged during the Relevant Period, rising from $42.79 on March 14, 2017 to a high of $52.97 on March 9, 2018 – an increase of nearly 24% – before the truth fully emerged.

## II. WHILE TOUTING CLOUD GROWTH, THE OFFICER DEFENDANTS CAUSE THE COMPANY TO REPURCHASE ORACLE COMMON STOCK DURING THE RELEVANT PERIOD

74. During the Relevant Period, the Officer Defendants, along with the Board, authorized the Company to repurchase shares of Oracle common stock on the open market. Specifically, between March 2016 and December 2017, the Board authorized and announced plans for the Company to repurchase up to $22 billion in Oracle common stock.

75. As detailed in the chart below, during the Relevant Period, the Officer Defendants caused Oracle to repurchase 305.5 million shares of Oracle common stock for a total of approximately $14.5 billion.

| Month/Year of Repurchase | Number of Shares Repurchased (in millions) | Weighted-Average Price per Share | Total Amount Paid |
|---|---|---|---|
| March 2017 | 4.0 | $43.90 | $175,600,000 |
| April 2017 | 3.3 | $44.49 | $146,817,000 |
| May 2017 | 3.8 | $45.07 | $171,266,000 |
| June 2017 | 3.6 | $46.99 | $169,164,000 |
| July 2017 | 3.0 | $50.34 | $151,020,000 |
| August 2017 | 3.6 | $49.30 | $177,480,000 |
| September 2017 | 9.1 | $48.73 | $443,443,000 |
| October 2017 | 16.2 | $49.24 | $797,688,000 |
| November 2017 | 15.4 | $49.20 | $757,680,000 |
| December 2017 | 16.5 | $48.43 | $799,095,000 |
| January 2018 | 44.0 | $50.00 | $2,200,000,000 |
| February 2018 | 20.1 | $49.68 | $998,568,000 |
| March 2018 | 35.5 | $48.68 | $1,728,140,000 |
| April 2018 | 33.8 | $45.72 | $1,545,336,000 |
| May 2018 | 37.2 | $46.46 | $1,728,312,000 |
| June 2018 | 56.4 | $45.23 | $2,550,972,000 |
| **TOTAL** | **305.5** | | **$14,540,581,000** |

76.     Although stock repurchase programs are often benign, market commentators and academics have routinely commented that some companies use buybacks to manufacture rosy earnings reports, without little belief that the company's stock is undervalued.  For instance, according to *Forbes*, "buybacks are the great financial engineering gimmick to enrich executives and make the performance of their companies look better."  Massive share repurchases have the effect of reducing the number of shares outstanding, which in turn hikes the company's earnings per share – a key metric for market analysts and Wall Street.  A study in 2016 in the *Journal of Financial Economics* noted that "managers are willing to trade off investments and employment for stock repurchases that allow them to meet analyst EPS [earnings per share] forecasts."

77.     Here, the Officer Defendants' used the stock repurchase program during the Relevant Period to mask the Company's underperformance.  Since 2016, numerous news outlets have reported that Oracle uses stock buybacks to financially engineer earnings per share metrics.  For instance, prior to the Relevant Period, in March 2016, *Money Morning* reported that Oracle had manufactured better than expected earnings per share results by turning to massive stock buybacks.  The article quoted Money Morning Strategist Shah Gilani as stating, "When managers see declining return on capital from operations, or when they see no worthwhile mergers or acquisitions to grow core business lines, they turn to buybacks.  They can financially engineer higher earnings per share without a boost to gross earnings or net income."  Gilani went on to state that stock buybacks are overused in today's market, even calling it a "con game."

78.     *Kiplinger* also reported in November 2018 that Oracle had the fifth largest share repurchase program commitment in the United States, but also noted that "[t]he massive returns of cash to shareholders have helped undergird ORCL [Oracle] stock despite U.S. sales not always living up to Wall Street's expectations."

79.     More recently, in December 2018, *MarketWatch* published an opinion article that stated, "Oracle Corp. surprised Wall Street with strong earnings Monday, but only with the help of hefty share repurchases."  The article went on to explain how Oracle had conducted billions of dollars in share repurchases in order to beat Wall Street forecasts for earnings per share.  In conclusion, *MarketWatch* summed up Oracle's stock repurchases as follows:

Instead of honestly addressing the areas where it is underperforming, Oracle seems to be responding with financial chicanery and its typical bombast.  Oracle is likely not alone in seeking to support its sinking stock and slowly growing earnings with share repurchases, but investors must be wary of these moves making the numbers look rosier than they actually are.

## III.  THE TRUTH: ORACLE'S EXPLOSIVE CLOUD GROWTH WAS ACTUALLY FUELED BY EXTORTIONATE AND COERCIVE SALES PRACTICES

80.  While repurchasing over $14 billion in Company common stock during the Relevant Period, the Officer Defendants hid from the market the fact that Oracle's "astonishing" cloud growth was illusory and driven by the very practices it denied engaging in: improper and extortionate tactics to coerce customers to buy short-term cloud subscriptions they did not want and would not renew.

81.  Specifically, as the Securities Class Complaint alleges, numerous former Oracle employees, industry insiders, and even a government investigation have confirmed, the Officer Defendants caused Oracle to generate a substantial volume of its cloud sales using a highly improper practice known as "Audit, Bargain, Close" or "ABC."

82.  In the typical ABC deal, Oracle's LMS auditing department would audit an existing on-premises client for violations of the software license and present the client with a hefty bill – say, $10 million. Oracle sales would then intervene, offering to reduce the penalties significantly – by, for instance, $4 million – if the customer purchased $2 million in cloud subscriptions.  These customers, who neither wanted nor needed the cloud products, "purchased" a cloud subscription simply to save money on audit penalties, and, of course, almost never renewed those subscriptions. The Officer Defendants caused Oracle to misleadingly report these sham "sales" as cloud revenue, highlighting them as evidence of explosive business growth, when, in fact, they were nothing of the sort.

83.  The Officer Defendants also caused Oracle to sell cloud subscriptions to customers who did not want them, and in some cases could not even use them, through so-called "attached deals."  In an "attached deal," Oracle employees would offer a customer who was only interested in renewing its "on-premises" services a sharp discount on those services if the customer agreed

to tack on an unwanted one-year cloud subscription.  In many cases, the customer was told that it was receiving a free cloud "trial" subscription on top of a full-price on-premises contract, while Oracle employees internally booked the deal as a full-price cloud sale coupled with a discounted on-premises purchase. Thus, the Officer Defendants caused Oracle to use these attached deals to disguise legacy on-premises revenue as all-important cloud revenue.

84.     As discussed more below, and as alleged in the Securities Class Complaint, these practices were so commonplace within Oracle that Oracle employees internally nicknamed them "financially engineered" and "Dead On Arrival" deals.

### A.     Oracle Fuels Its Cloud Growth By Coercing Customers To Subscribe To Cloud Products Under Threat Of Audit Penalties

85.     According to the Securities Class Complaint, many of Oracle's most senior executives during the Relevant Period confirmed that the "Audit, Bargain, Close" tactic was a key driver of Oracle's cloud revenue and the vehicle through which the overwhelming majority of their teams' cloud sales were made.  The Securities Class Complaint alleges the following:

(a) FE 1,[25] Regional Sales Director for Middle East and Africa, who reported that during the Class Period at least 80% of Middle East and Africa cloud revenue was generated through engineered deals and that it was "crystal clear these [sales] are fake" because "none of these deals are renewed";

(b) FE 3, Senior Technology & Cloud Sales Consultant, who was responsible for supporting Oracle's Southern California cloud sales, stated that Oracle relied on the ABC tactic as a key way to "juice the numbers" for its reported cloud sales;

(c) FE 4, Vice President of Global Sale Engineering, who served as General Manager of Sales Engineering in 2015 selling the first iterations of the cloud product, who characterized this practice as a "part of the core [Oracle] playbook"; and

(d) FE 5, Director of Cloud Customer Success at Oracle from 2016 to October 2018, who confirmed that customers were forced to purchase cloud products under threat of audit and that that these customers would be "irate" when the customer success team called

---

[25] The term "FE" in the Securities Class Complaint is used to identify "Former Employees" of Oracle, with each former employee assigned a number to protect their identity.

to ask how they could get them to deploy and expand their cloud footprint.

86. According to the Securities Class Complaint, these former Oracle executives detailed the mechanics of the ABC scheme. To start, Oracle installed its main on-premises products with extra options and management packs enabled by default, but did not inform its customers that these features had been installed and must be disabled in order to avoid license overages. Once a customer fell into this trap, Oracle's sales and LMS teams worked in a highly coordinated fashion to audit the client for its license violations and push cloud products.

87. The Securities Class Complaint contains numerous statements from former employees of Oracle who corroborated these practices, including:

> FE 1 confirmed that the sales teams and LMS closely coordinated to use audits in order to sell unwanted cloud subscriptions. FE 1 also stated that sales would direct LMS to target clients for audit. In particular, FE 1 stated that the sales team would "identify large clients they thought they could get more money out of and threaten them with audits," instructing LMS to say the Company had suspicions that they were out of compliance. Indeed, FE 1 stated that the sales teams would actually write out the threatening audit letters and give them to LMS to then send to the client. FE 1 stated that frequently, neither sales nor LMS had real evidence that customers targeted for audits were noncompliant, but that the mere threat of an audit would put the customers under so much pressure, because of the enormity of the potential penalties, that customers had no choice but to agree to Oracle's demands that the client purchase cloud products. FE 1 stated that once the cloud sale was complete, the sales team would tell LMS that the customer had trued up, and LMS would close the file without even following-up with the client (making clear that the audit was initiated as a mere pretext to push the cloud sale through). FE 1 stated that "any statements from Oracle that LMS was independent from sales are a lie."

> FE 4 independently corroborated reports by FE 1 about the close coordination between LMS and sales as part of the ABC scheme. FE 4 stated that the sales team would trigger audits, which LMS would run and then send back to the sales team for review. FE 4 explained that LMS would never send a letter to a customer without approval by the sales manager or account executive handling the customer.

> FE 3 further corroborated these reports, stating that LMS worked with sales personnel to ensure that customers signed ABC-based deals: by the start of the Class Period, as Oracle pushed for higher

cloud growth, LMS was given expanded authority to initiate audits, and sales would come in "to finish the deal."

Similarly, FE 6, a Channel Sales Representative from October 2010 to January 2018 who worked with authorized resellers to engineer deals with customers, confirmed that he learned from vendor partners that customers were made to purchase products under threats of audit. FE 6 stated that it was a "regular practice" for sales representatives to contact LMS to start an audit when the customer was not going to buy cloud product, and tell LMS "[t]hey're not going to buy anything from me so let's just audit them." LMS would find a compliance violation, and the representative would start negotiating from there. FE 6 confirmed that these "extortive" tactics were a "common practice."

88.     The Securities Class Complaint also provides an example of an Oracle audit deploying the ABC tactic in connection with the City and County of Denver, which is incorporated herein by reference.  The Securities Class Complaint cites to an email exchange between the City and County of Denver and an Oracle employee illustrating how Oracle utilized the ABC sales tactics to coerce customers into "purchasing" Oracle's cloud products.

89.     According to the Securities Class Complaint, the Denver Audit was no anomaly but rather the primary vehicle through which Oracle employees sold cloud services.  The Securities Class Complaint alleges the following in support:

FE 1 confirmed that during the Class Period at least 80% of Middle East and Africa cloud revenue was generated by "inserting cloud into compliance-based deals." In particular, FE 1 reported that more than 75% of their team's cloud sales in 2017 were made to customers under threat of license audits, who purchased the product simply to avoid the hefty penalties; in 2018 such sales accounted for 86% of his team's revenue.

Statements by FE 2, who had visibility into Oracle's North American cloud sales, confirm that 90-95% of those cloud sales were engineered deals, including ABC deals that were driven by "audits or the threat of audits." Specifically, FE 2 reported that 90-95% of the cloud deals FE 2's team dealt with had no "use cases" attached to them.

90.     According to the Securities Class Complaint, former Oracle employees acknowledged that the use of the ABC sales tactics meant the sales were "fake," and unlikely to be renewed.  In support, the Securities Class Complaint alleges the following:

FE 1 reported that the ABC scheme was used to close huge cloud sales worth tens of millions of dollars, involving high-profile clients like Saudi Telecom Company, a $120 million deal, attaching $22 million in unwanted cloud. FE 1 explained that large compliance-based deals sometimes fulfilled the MEA ("Middle East and Africa") region's sales quotas for the entire year. FE 1 explained that it was "crystal clear these [sales] are fake" because "none of these deals are renewed."

Indeed, FE 1 reported that less than 9% of the MEA region's cloud subscriptions were renewed, and many were never even used. In fact, FE 1 stated that, using the threat of an audit, cloud products were sold to numerous customers who not only did not, but **could not**, use them. In Saudi Telecom Company's case, for instance, government regulations prevented the client from using a cloud data center that was located outside the country. Saudi Telecom still purchased $22 million worth of cloud products, despite the fact that there were no Oracle data centers in-country at the time of that purchase, because it was not interested in using the cloud product, but, rather, was effectively purchasing a discount on audit penalties.

Corroborating these reports of dismal renewal rates associated with ABC deals, FE 5 noted that his Customer Success team recorded when customers purchased cloud product under threat of an audit so that the team members would not waste their time contacting the customer about renewals.

91.   According to the Securities Class Complaint, multiple former Oracle employees reported that Defendants Hurd and Catz personally approved engineered deals, including Audit, Bargain, Close deals.   In support, the Securities Class Complaint alleges the following:

As FE 1 explained, sales teams had to request approval for all of their sales using the Deal Approval System (DAS). When inputting approval requests into DAS, Oracle employees were required to show that the deal was a "cloud insertion" deal, and in particular that LMS was engaged as part of the sales process (*i.e.*, that audits were being used to facilitate the deal).  FE 1 further explained that in ABC deals, the sequencing of DAS reports showed that LMS was engaged with the sales team and the client. FE 1 stated that all deals worth more than $5 million had to be approved by "HQ," which meant either Hurd or Catz. FE 1 stated that he would see Hurd's and Catz's names on approvals of "compliance" deals in the DAS system and in approval notifications that were released once Hurd or Catz signed off on the deal.

Like FE 1, FE 3 confirmed that cloud deals made using the ABC scheme were escalated to Defendant Hurd's office if a discount in excess of 50% was offered on software. FE 3 stated that 80% of FE

his engineered deals went to Hurd's office for approval. FE 3 stated that he personally had "audit cloud deals," clearly marked as such, that were approved by Hurd's office.

FE 1 also reported that he and other EMEA sales teams routinely discussed the volume and size of their audit-driven cloud deals with Loic Le Guisquet, Oracle's President of EMEA, Asia Pacific, and Japan, who managed the Company's operations in these regions, sat on the Oracle Executive Management Committee during the Class Period, and reported directly to Defendant Hurd. FE 1 explained that, on a weekly basis, he prepared slides concerning EMEA sales volume and progress and provided them to Le Guisquet for presentation to Defendant Hurd. Indeed, Le Guisquet routinely instructed FE 1 to ensure that the slides defined certain terms or included certain content so that Defendant Hurd would be able to follow them. FE 1 stated that these slides "would very clearly say that LMS was engaged [on cloud deals presented in the slides], and that they were compliance deals." In addition, FE 1 reported attending "QBR" or quarterly business review meetings, at which sales executives received instructions on how to generate engineered deals. For instance, FE 1 reported that executives were instructed to offer customers a 90% discount on on-premises licenses if they purchased $300,000 worth of cloud subscriptions. Likewise, FE 1 reported that executives were told at these meetings that, if a customer targeted for an engineered deal objects that they did not need, or will not use cloud products, sales personnel should assure the customer that they did not need to use the product, and that the purchase of cloud products was merely a necessary condition to unlocking the on-premises discount.

FE 2 likewise explained that the metrics used in presentations going directly to Oracle's senior management made clear that Oracle's cloud revenue was driven by engineered deals. FE 2 stated that "[a]mong all of Hurd's direct reports there was absolute awareness of the quality of the cloud revenue." FE 2 stated, "I saw presentations that went to Hurd's directs. I saw the info they were receiving about deal quality and it was absolutely something that was discussed." FE 2 reported that these presentations stated that 90-95% of the Company's cloud deals did not have use cases associated with them, demonstrating they were not driven by actual customer need. FE 2 also reported that FE 2 saw slides in draft presentations prepared for Hurd listing "attached" as the top "use case by customer" for cloud purchases (i.e., the reason they purchased cloud).

FE 3 also discussed his concerns about Oracle's engineered deals – i.e., audit-driven and attached deals – being "borderline unethical" with another of Hurd's direct reports, Rich Geraffo, Vice President of Sales. FE 3 reported that Geraffo responded by stating that "cloud

was the future of Oracle's business model, and that auditing was a part of Oracle's business and strategy to drive revenue."

**B.**   **The Officer Defendants Also Caused Oracle To Use "Attached Deals" To Disguise Legacy On-Premise Revenue As All-Important Cloud Revenue And Pad The Company's Cloud Growth**

92.   As alleged in the Securities Class Complaint and above, the Officer Defendants also caused Oracle to generate illusory cloud growth through the use of "attached deals" – deals in which a customer seeking to renew its "on-premises" contract was offered a sharp discount on those services if it agreed to purchase a one-year cloud subscription that it neither wanted nor needed.  Cloud "revenue" generated through these "attached deals" was never sustainable and did not, as the Officer Defendants misled everyone into believing, represent Oracle's growing share of the cloud market.  Instead, these one-year cloud subscriptions that clients neither wanted nor renewed (nor even used) amounted to short-term infusions of cash from an artificial revenue stream that Defendants knew would quickly evaporate.

93.   Similar to the ABC sales tactics, the Securities Class Complaint cites to numerous former Oracle employees who all confirmed that Oracle relied heavily on this tactic throughout the Relevant Period to produce significant purported cloud "revenue."   For example, the following is some of the more important allegations cited in the Securities Class Complaint in support of this proposition:

> FE 4 . . . confirmed that attached deals were "commonplace," though FE 4 said that most cloud sales were driven by "extortion" through the audit process, described above. By using the attached deals, FE 4 explained, "[e]ssentially they were not growing their business or building additional licenses, they were just shifting revenues from one set of books [on-premise] to another [cloud]." Indeed, according to FE 4, Oracle knew that customers were going to just let the cloud contract expire, and sales leadership often expressly communicated to customers that they could "***wash [their] hands***" of cloud products after the contract expired but keep the other reduced support costs for on-premise products.
>
> FE 3 confirmed that "the cloud subscription involved in the [attached] deal was only for one year of service. After that first year, most companies had no interest in renewing the cloud services but were enjoying the decreased maintenance and service costs on their $100,000 worth of [on-premises] software." FE 3 corroborated reports by Oracle's other former employees that sales personnel

explicitly agreed with customers that they would not need to use or renew the cloud software as part of the attached deal. FE 3 reiterated that "[c]ustomers who were given this deal did not renew the cloud subscriptions once they ran out," and stated that FE 3 saw attached deals renewed less than 15% of the time. FE 3 stated that periodic reports detailing cloud utilization reviewed by FE 3 showed many of Oracle's customers who took attached deals were not using their cloud credits and had not even logged into their product. FE 7 stated that his teams would review customer cloud usage reports and see that "ninety percent of our attached deals were not using at all. I would say it was [throughout 2017 and 2018]. I had relationships with the other sales territories," including Austria, Poland, Russia, and Hungary, "and we were not an exception." FE 7 stated, "Almost no one was turning anything on. They weren't using their [cloud] credits."

94.     The Securities Class Complaint also alleges that numerous former Oracle employees confirmed that the use of attached deals meant that few customers would actually renew their subscription for Oracle cloud services.  In support, the Securities Class Complaint alleges as follows:

FE 9 stated that cloud ERP renewals would range from only 15%-25% and that 90% of the accounts that did not renew were DOA. FE 5 similarly explained that Oracle's renewal rate was 15-20% for certain quarters, and that the percent of DOA customers that did not renew was 90%.

95.     The Securities Class Complaint also alleges particularized facts showing that Oracle customers sometimes did not even realize that Oracle had packaged cloud services into attached deals.  For instance, the Securities Class Complaint cites to one former employee who stated as follows:

FE 7 stated that Oracle was "effectively hiding from customers the cloud portion [of the contract] because customers, in the beginning, didn't want to hear about cloud." FE 7 reported that "in many cases," cloud subscriptions would be added to a customer's contract even though Oracle had never discussed that description with them. "Sometimes they would only find out when someone asked them to renew, or if automated email systems sent out information about their cloud credits."

FE 6 corroborated that customers often did not know cloud products were inserted in a deal or how to use those cloud products. FE 6 stated that FE he heard from many sales representatives that Oracle "would bundle things together and push cloud subscriptions right

through" and that customers did not "underst[and] what they were getting in terms of cloud."

96.    The Securities Class Complaint also alleges that based on Oracle former employees, Defendants Hurd and Catz were well aware that a substantial volume of Oracle's cloud revenue was generated through these attached deals, and was therefore illusory, unsustainable, and did not represent actual capture of market share.  The Securities Complaint alleges the following in support:

> For example, as numerous former Oracle employees stated, entries in Oracle's internal deal tracking system clearly noted when cloud sales were the product of engineered deals, and deals at or above the $5 million threshold required and received Hurd's approval.

> Corroborating this point, FE 7 reported that entries on the DAS system would make clear when a deal was attached because the entry would request discounts to an Oracle on-premises contract in order to facilitate a cloud sale, and "notifications of larger deals would be sent to Catz's office for approval and to Hurd's office for inclusion in the [revenue] forecast." Likewise, as discussed above, FE 3 stated that software discounts in excess of 50% had to be approved by Defendant Hurd's office, and that virtually all attached deals involved on-premises discounts of this magnitude. FE 3 stated that 80% of his engineered deals went to Hurd's office for approval.

**C.    Regulator Findings And Industry Experts Confirm Use Of "Audits" To Generate Cloud Revenues From Customers Who Do Not Actually Want Oracle's Cloud Services**

97.    The above accounts cited in the Securities Class Complaint are further corroborated by the findings of industry experts and one of the world's top anti-competition regulators, the National Economic Prosecutor's Office of Chile (the "FNE"),[26] which is Chile's chief authority responsible for defending and promoting competition in all markets of the Chilean economy.

98.    On September 11, 2015, the FNE opened an investigation into alleged anti-competitive conduct by Oracle.  The investigation was comprehensive in scope and included, among other things, (i) conducting a survey of 115 Oracle clients; (ii) gathering statements from

---

[26] The FNE is recognized as a top enforcement agency, with John Leibowitz, the Chairman of the Federal Trade Commission ("FTC"), commenting in 2011 that "Chile has one of the most advanced antitrust systems in Latin America."  Further strengthening its capabilities, the FNE, the Department of Justice, and the FTC entered into a cooperation agreement that provides for antitrust enforcement cooperation and coordination.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT                                          31

1   50 Oracle representatives and employees; (iii) collecting additional statements from Oracle's

2   customers, competitors, former employees and experts; and (iv) reviewing policies and practices

3   of the company and their impact on competition.

4         99.    Following its investigation, the FNE prepared a 30-page report outlining its

5   findings (the "Report") and requiring Oracle to agree to various reforms.  As stated in the FNE's

6   March 28, 2018 Report, which was first made public in April 2018, "in the case of Oracle, it can

7   be said that audits are used with relative frequency."[27]

8         100.   The FNE further found that, after informing customers that they were being audited,

9   members of Oracle's sales department would enter the "auditing" process and propose "sales

10   solutions" that were ***not*** "related to the [audit] findings detected."  Specifically, the FNE found

11   that "'cloud' products or licenses that were neither wanted nor used by customers were

12   incorporated into this [sale] solution."  As the FNE explained in its Report, "in the commercial

13   proposals that follow an audit, [Oracle] includes cloud services that were not always wanted by

14   the clients."

15         101.   The Chilean regulator found numerous customer complaints "in relation to Oracle's

16   audit policy," with "clients repeatedly stat[ing] that contractual terms would appear in the audits

17   that they did not know of."  The Chilean regulator further found that Oracle's "clients described

18   consistently the way Oracle acted in this process [of auditing] as especially tough, with surprising

19   and costly results for the client companies, and in which [Oracle] applied contractual clauses that,

20   the [Oracle] clients noted, they did not have any knowledge until they received the audit reports."

21   The Chilean regulator emphasized how Oracle's audits frequently related to products that

22   customers did not know they purchased, with 64% of Oracle's audits conducted on products that

23   were "installed automatically."

24         102.   The FNE further highlighted that Oracle's use of its audits constituted an "abuse of

25   a dominant position" – a violation of Chilean fair competition laws – and that Oracle's practice of

26

27

---

28   [27] The FNE Report is in Spanish.  The quotations in this section originate from the Securities Class Complaint, which provides English translations of the Spanish text.  U.S. media sources reported on the FNE investigation in July 2018.

1    misusing the audit process to generate unwanted cloud sales "could lead to a sale in the market

2    contravening free competition."

3          103.    While Oracle agreed to implement reforms mandated by the Chilean regulator, it

4    refused to acknowledge any wrongdoing or that it engaged in the underlying practices.

5    Specifically, Oracle stated that it "should be noted that the implementation of such measures does

6    not constitute or represent an acknowledgement by Oracle of the commission of any anti-

7    competitive conduct, nor the recognition of the existence of any risk related to free competition."

8          104.    The findings in the Report are also corroborated by the accounts of industry

9    participants, which Oracle repeatedly discredited before and during the Relevant Period as

10   spreading "conspiracy rumors."  For example, the advisory firm *UpperEdge*, which has advised

11   customers in over 700 audits, has explained that, based on its experience, if an Oracle "customer

12   cannot develop a business case for migrating to Oracle's Cloud solutions, then Oracle will create

13   one, and audits are one of the more common tactics we have seen effectively drive Cloud sales."[28]

14         105.    Similarly, research and advisory company Gartner, which services clients in 100

15   countries around the world, has explained that Oracle "uses high-pressure sales tactics to sell its

16   cloud IaaS offerings, including software audits or threatening to dramatically raise the cost of

17   database licenses if the customer chooses another cloud provider."[29]

18         106.    Finally, the advisory firm Palisade Compliance, which has advised hundreds of

19   Oracle clients, has observed that Oracle, through its audits, attempts "to rig the system so

20   customers are forced to use [their] cloud."[30]

21

22

23

---

24   [28] Jeff Lazarto, "Oracle Gets Creative With Cloud Selling Tactics," *UpperEdge* (April 10, 2018).

25   [29] Founded in 1979, Gartner is a leading research and advisory company serving clients in 100

26   countries around the world. Technology research is Gartner's flagship service and its reports have been cited in Oracle press releases, blog posts, and conference calls on several occasions. Dennis

27   Smith et al., "Magic Quadrant for Cloud Infrastructure as a Service, Worldwide," *Gartner* (May 23, 2018).

28   [30] 37 *https://palisadecompliance.com/new-years-resolutions-oracle-should-make/* (January 2, 2019)

## IV.     THE TRUTH ABOUT ORACLE'S CLOUD REVENUE GROWTH EMERGES

107.    Eventually the Officer Defendants' unsustainable practices fueling Oracle's revenue growth began to collapse.

108.    As cited in the Securities Class Complaint, former Oracle employees explained how Oracle's ability to deploy financially engineered deals slowed dramatically in late 2017, resulting in a slowdown in the Company's cloud revenue growth and decline in its stock price.  According to the Securities Class Complaint, a former employee stated, cloud sales declined in late 2017 because customers were "becoming more knowledgeable and hiring consultants that helped them fight back" when the Company attempted to use audits to drive a cloud deal.  The Securities Class Complaint notes that the former employee said his own teams experienced this, and that his colleagues reported seeing this as well.

109.    The Securities Class Complaint cites another former employee as stating that Oracle's use of engineered deals to drive cloud revenue ultimately led to plateauing cloud revenue growth towards the end of 2017.   As the Securities Class Complaint alleges, the former employee said, "It just wasn't sustainable.   Customers were purchasing a million dollars of cloud subscriptions but weren't planning on making that same purchase next year. They were not renewing. They did it just for the deal and then would not renew the next year."

110.    As a result of these developments, beginning in December 2017, the Officer Defendants were forced to publicly report dramatically slowing cloud revenue growth, revealing to investors in a series of partial corrective disclosures the truth that Oracle's cloud revenue growth rates were illusory and unsustainable.

### A.     On December 14, 2017, Oracle Reports Stagnating Cloud Growth

111.    Leading up to the Company's second quarter 2018 earnings release on December 14, 2017, analysts and commentators continued to trumpet the tremendous cloud growth Oracle had reported throughout the year and repeat the Company's statements touting its cloud pipeline and renewals.  For instance, Trefis analysts reported on December 12, 2017 that:

> Oracle's IaaS, PaaS, and SaaS revenues grew at high double digits through the year, with the trend expected to continue through fiscal 2018 as well. Oracle's cloud segment has been the only revenue stream to witness growth in recent years. Fiscal 2017 was termed as

a turnaround year for Oracle in terms of transitioning its customers to cloud-based offerings, with revenues jumping 50% to $3.6 billion. The trend has continued in FY'18 thus far, with robust revenue growth across cloud services segments.

112.     However, after the market closed on December 14, 2017, the Officer Defendants surprised everyone by causing the Company to report that cloud revenue growth had decelerated, growing by less than 40%.  Oracle's growth compared unfavorably to, among others, the 90% year-over-year growth reported by Microsoft less than two months earlier, and the 76% growth reported by Google Cloud.  Oracle also reported disappointing cloud margins, which was a function of the fact that Oracle's cloud volume was ramping far less quickly than its competitors.  Moreover, the Officer Defendants caused the Company to report significantly lower cloud growth estimates, stating it expected only mid-20% growth the following quarter – a marked decline.

113.     Analysts and the financial press expressed concern about Oracle's slowing cloud growth and the sustainability of its cloud business.  For instance, BMO analysts lowered their price target for Oracle shares from $57 to $55 on December 15, 2017, reporting as a "key point" that "a major concern for investors is the long-term growth of cloud revenue, particularly the SaaS business, given the revenue miss and lower guide."  Dow Jones Newswires also reported that "Disappointment over Oracle results triggers downgrade, price cuts," and "[a]nalysts were sounding some alarm after Oracle Corp. literally clouded up the view on a vital metric for growth, disappointing investors and analysts over both its results and forecast."

114.     Investors and analysts also connected the disclosure to Oracle's sales practices, including the *Business Insider*, which noted in a December 15, 2017 article that "there are some signs that some of Oracle's customers are fed up with some of its hard-nosed sales tactics." Additionally, JMP analysts noted in a December 15, 2017 report that "many customers are irate with Oracle due to auditing practices on the technology side of the business and have already placed their bets on AWS, Microsoft Azure, or Google Cloud Platform."

115.     In response to the Officer Defendants' disclosures, Oracle stock declined by approximately 4%, from $50.19 per share on December 14, 2017, to close at $48.30 per share on December 15.

**B.      On March 19, 2018, Oracle Reports That Its Cloud Growth Slowed Even More Significantly**

116.    On March 19, 2018, the Officer Defendants caused Oracle to issue its third quarter 2018 financial results, disclosing that the Company's cloud growth had slowed even more significantly to only 32%.  Again, Oracle's reported cloud revenue growth stood in stark contrast to its competitors.  In comparison, for the same quarter, Microsoft announced cloud growth of 98% and Google experienced 85% cloud revenue growth.  Oracle's cloud margins were again disappointing, coming in at 58.1%, which is far from the 80% the Officer Defendants had assured investors Oracle would achieve.   In addition, Oracle admitted that it expected additional deceleration of the Company's cloud business, with Catz telling investors on the Company's earnings call that cloud revenues are "expected to grow 19% to 23% in USD, 17% to 21% in constant currency," well below the market's expectations.

117.    Analysts and commentators expressed deepening concern about Oracle's cloud business.  For instance, in a March 20, 2018 article entitled "Oracle's cloud biz heading in the wrong direction right now," TechCrunch reported that "Oracle's cloud numbers could be reason for concern . . . . [T]he general trend from Oracle seems contrary to the eye-popping growth numbers we have seen from other companies."   In a March 20, 2018 report entitled, "Cloud Decelerates Again," Deutsche Bank analysts observed that apparently "strong SaaS bookings are not translating to rev[enue]s growth," in part because of what appeared to be "slow Cloud Machine deployments" by clients who purchased cloud – *i.e.*, despite reporting growing cloud sales, the Company did not appear to be achieving sustained revenue due to cloud customers not actually using the product.  The market linked Oracle's faltering revenues to the use of the practices described herein, including in a March 20, 2018 JMP analyst report, which highlighted Oracle's "cloud weakness," including that there were "fundamental challenge[s]" in the Company's cloud business, such as "Oracle's auditing mentality compared to the 'partner friendly' nature of cloud platforms such as Amazon."

118.    In response to the Officer Defendants' March 19, 2018 disclosures, Oracle stock price declined nearly 10%, from $51.95 per share on March 19 to $47.05 per share on March 20, on high volume.

119.    In the months following this partial corrective disclosure, investors' questions about the Officer Defendants' execution of Oracle's coercive sales practices intensified.  In a May 21, 2018 article entitled "Oracle's Strong Arm Cloud Tactics – the 2018 Model," Forbes reported that Oracle was using its "'Audit Bargain Close' playbook" to "pressure customers into cloud adoption" and added that:

> That hardly seems like a great business retention strategy, but given Oracle's power over its customer base that comes from its licensing and compliance practices, it is a powerful tool. It does lead to more sales in the cloud category, which is just [what] Oracle wants. But it leads to questions that should be disturbing to Oracle customers and possibly to Oracle employees and investors: Has Oracle shifted its core competency from creating technology products to running an enterprise sales staff that is expert in squeezing customers? Is Oracle's cloud technology less important to its revenues than its cloud promotion practices? Will Oracle ever reveal how much of its cloud sales are actually shelfware?

120.    The Officer Defendants caused Oracle, however, to continue to deny that these concerns had merit.  For example, on May 22, 2018, *The Information* published a report titled "Oracle's Aggressive Sales Are Backfiring With Customers."  In the report, the authors quoted an anonymous Oracle employee, who accused Oracle of coercing customers to "strike [cloud service] deals to avoid expensive audits of how they were using Oracle software."  The article also reported that Oracle had attempted to use the tactic to coerce toy-maker Mattel, Guardian Life Insurance, and Southern California Edison into doing large cloud deals, but they refused, choosing instead to pay steeper penalties.  The article further reported that, according to the employee, Mattel told Oracle that it "was 'not strategic' as a cloud partner" and chose to continue its relationship with Microsoft Azure.

121.    The Officer Defendants caused Oracle to deny *The Information*'s report, claiming it was based on "inaccurate accounts" fabricated by "anonymous sources or competitors" and stated that "Oracle, like virtually every other software company, conducts software audits in limited circumstances to ensure that our products are used as licensed. We pride ourselves in

providing our existing 400,000 customers a variety of options to move to the cloud when they are ready. Oracle is grateful to its large and growing customer base and has no reason to resort to scare tactics to solicit business. ***We are disappointed that* The Information *is presenting inaccurate accounts regarding a handful of customers, based on anonymous sources or competitors who seek to enhance their own consulting services.***"

### C.   On June 14, 2018, JPMorgan Releases a Large-Scale CIO Survey Showing That Oracle Is "Trailing In Cloud Computing Plans"

122.   On June 14, 2018, JP Morgan issued a report that – contrary to the Officer Defendants' statements to *The Information* and elsewhere – further indicated to the marketplace that Oracle's cloud business was suffering as a result of its coercive tactics.   Specifically, JPMorgan issued a report announcing it was downgrading Oracle shares to Neutral based on the results of "large-scale CIO survey," in which the analysts ask "CIOs to rank the top 8 or 9 IT mega-vendors in terms of who will be most critical and indispensable to their IT environment in the future."

123.   JPMorgan reported that while, in the past Oracle "has been stable and received ~11% of the votes," the Company's standing in this latest poll dropped by ***more than 40%*** to a mere 6.5%.   The analysts stated that these results made them "uncomfortable because the results of our CIO surveys over the years have been highly predictive" of sales trends.   The JPMorgan analysts concluded:

> [W]e ask the following: if the largest-scale CIO survey shows ORCL now has negative spending intentions; and ORCL is lagging in Digital Transformation projects; and ORCL is trailing in Cloud Computing plans; and its criticality as a mega-vendor has fallen to new lows; and ORCL databases are being unplugged in favor of Microsoft and Amazon databases; and ORCL applications are being unplugged in favor of Salesforce and Workday applications; and customers are weary of ORCL's unpopular commercial tactics – then where is this business and this stock heading in the next couple of years?

124.   JP Morgan further discussed the "Specific Reasons for Declining Oracle Spend," stating that reasons that the CIOs moved away from Oracle included that "they do not like Oracle's 'business practices and the difficulty of working with them in the past.'"   JP Morgan further stated

1  that the CIOs are "moving off of Oracle Business Intelligence Cloud Service because they have

2  not found value in it."

3      125.    On this news, the price of Oracle stock fell approximately 5%, from $48.27 per

4  share on June 13, 2018 to $45.90 per share on June 14, 2018, on high trading volume.

5      **D.    On June 19, 2018, the Officer Defendants Cause Oracle to Report Additional**
        **Cloud Slowdowns And Stun Investors By Announcing the Company Will No**

6      **Longer Report Cloud Business Financial Results**

7      126.    On June 19, 2018, Oracle held its fourth quarter 2018 earnings call with investors.

8  On that call, the Officer Defendants shocked the market by announcing that it would no longer

9  separately report financial results for its cloud business, and would, instead, consolidate those

10 financial results into a combined "Cloud Services and License Support" line item so that investors

11 could no longer see them.  In addition, under pressure from analysts on the call, Catz disclosed

12 total cloud revenue growth for the quarter had come in at a lackluster 21%, demonstrating that

13 Oracle's cloud business had slowed to crawl, and making clear the impetus behind the Company's

14 desire to hide its cloud results.  The Officer Defendants also declined to provide separate guidance

15 for cloud revenues going forward.  PiperJaffray reported on June 20, 2018 that Oracle had

16 informed it that the "*reporting change was driven by Larry Ellison*."

17     127.    As the market immediately recognized, the Officer Defendants' decision to shield

18 the Company's cloud results from public view meant that the Company had something to hide,

19 and that the welfare of that business was in jeopardy.  In a June 20, 2018 report, William Blair

20 analysts concluded that "it is an attempt to *pull the proverbial wool over investors' eyes—*

21 *particularly related to cloud sales*," and was "the main factor driving the stock down in the

22 aftermarket, given the importance of cloud services growth (into which investors now have less

23 visibility) to the bull thesis." RBC analysts reported on June 19 that Oracle's move was a "*[r]adical*

24 *change in disclosure*," while Oppenheimer analysts reported on June 20 that the change was "a

25 *red flag*" that "masks visibility and raises concerns about the performance and trajectory of the

26 cloud business."  JPMorgan analysts similarly reported on June 20 that "*Oracle's sudden decision*

27

28

1    *to discontinue the disclosure of detailed cloud revenue obfuscates one of the most important*

2    *metrics to gauge the cloud transition story.*" (emphasis in original).

3         128.    Analysts also reported that Oracle's stated rationale for the move – namely, that it

4    was hard to distinguish cloud revenue from more traditional on-premises revenue – was not

5    credible.  For instance, *TechCrunch* reported on June 20, 2018 that John Dinsdale, an analyst with

6    Synergy Research, a firm that analyzes the cloud market, stated,

7              when a company chooses to reduce the amount of financial detail it
              shares on its key strategic initiatives, that is not a good sign.  I think
8              one of the justifications put forward is that is becoming difficult to
              differentiate between cloud and non-cloud revenues.   If that is
9              indeed what Oracle is claiming, ***I have a hard time buying into that***
10             ***argument. Its competitors are all moving in the opposite direction.***

11   Confirming the point, *TechCrunch* reported that "the bigger players have been more open about

12   this.  For instance, in its most recent earnings report, Microsoft reported its Azure cloud revenue

13   grew 93 percent.  Amazon reported its cloud revenue from AWS was up 49 percent to $5.4 billion

14   in revenue, getting very specific about the revenue number."

15        129.    Other analysts agreed that the Officer Defendants' explanation was not credible –

16   and further reported that Oracle's radical disclosure change undermined Defendants' prior

17   statements.  For example, Deutsche Bank reported on June 20, 2018 that:

18             The decision to stop disclosing any key cloud metric is at odds with
              Oracle's own multi-year effort to pitch itself as a leading cloud
19             vendor and materially limits investor visibility into Oracle's growth
              engine . . . . We're not convinced by Oracle's explanation that the
20             on-premise and cloud boundaries are blurring. … This move implies
              that Oracle's cloud growth is largely coming from existing
21             database/apps migrations, not new logos or workloads . . . .

22        130.    Similarly, on June 20, 2018, JMP analysts reported that, "We think it is worth

23   remembering that, as little as three quarters ago on the F1Q18 earnings call, Oracle was focusing

24   investors on cloud growth."

25        131.    Notably, JMP further reported that the dramatic deceleration in Oracle's cloud

26   growth was driven by the Company's treatment of its customers:

27             We think Oracle would benefit from shifting its focus away from
              winning and toward customer success Last night, we spoke with an
28

industry contact that underscored Oracle's lack of focus on customer success as he provided his perspective on ORCL's decision to deemphasize the cloud metrics. He stated: "No one is re-upping. There was a big incentive to sell cloud – it was attached to contracting docs. Buy off but then it's up to you to use it. There was no customer success to say, 'Hey, you bought this, now let's get value from it."

132.    Similarly, *The Upper Edge* reported on June 27, 2018 that the fall-out from the coercive sales tactics was causing plummeting cloud numbers.  In an article entitled "What Oracle Doesn't Want You to Know," *The Upper Edge* reported that "[m]any analysts are speculating that the timing of this change [in financial reporting], and the fact that Oracle is being evaluated based on its cloud growth, suggests that it may have something to hide."  The article stated that Oracle had "Poor Cloud Application Performance" and that "[w]e have worked with customers that have deployed Oracle's SaaS applications for a number of years and we have yet to hear a success story that did not require much more work than anticipated just to get the system running in production and stable, let alone delivering the expected business value."  *The Upper Edge* noted that Oracle's "Cloud Deals [were] Manufactured by Duress:"

> Oracle claims there is a potential compliance issue that will cost the customer millions of dollars. This can be done either after an audit has been completed, even though the compliance claim may be in dispute, or prior to initiating an audit based on some sort of claim that Oracle believes there is a compliance issue. Oracle creates a big fuss and may even threaten to terminate licenses or launch into a full- scale audit unless the fees are paid immediately. Then the Oracle sales rep steps in and says they can significantly reduce the compliance fees owed or eliminate the audit if the customer makes a purchase that includes some sort of cloud service.

133.    Further, the article stated that when a customer needs to purchase additional licenses for on-premise products, the "sales rep steps in and says they can significantly improve the pricing if the deal includes a cloud services purchase.  We have seen a number of customers sign up for cloud services with no intention of ever using them simply because the overall cost was lower when compared to buying just the additional on-prem licenses they required."  *The Upper Edge* article went on to state that:

> The issue with these two scenarios is that these deals do not represent customer demand for Oracle's cloud solutions. … These

scenarios are what Oracle means when they refer to cloud sales to existing on-prem customers as new workstreams. It is code for an existing customer buying a cloud solution they did not require and that is not replacing a current Oracle on-premise licenses product set. Oracle's hope is that the customer will use the solution since they have the right to do so and will hopefully find value and renew and expand the service in the future. This is a key distinction between the true customer-driven demand vs. a coerced trial period that may lead to demand.

134.    As a result of these revelations that the Company's cloud business growth had ground to a near-halt, the price of Oracle stock fell approximately 7.5%, from $46.27 per share on June 19, 2018 to $42.82 per share on June 20, 2018, on high trading volume.

## V.    THE OFFICER DEFENDANTS ACTED WITH SCIENTER

135.    Numerous facts, in addition to those discussed above, support a strong inference that the Officer Defendants knew, or were deliberately reckless in not knowing, that Oracle's cloud growth and revenues were fueled by the improper and extortionate sales and audit practices detailed below.

### A.    The Officer Defendants Knew And Had Access To Information Undermining Their Statements to Investors

136.    The Officer Defendants knew and had access to information demonstrating that Oracle generated cloud revenue growth through audits and attached deals.  As detailed above, the Securities Class Complaint alleges that numerous former Oracle employees explained that Defendants Hurd and Catz approved Oracle's engineered cloud deals through the DAS system and that the DAS system  made clear whether a cloud deal was closed using the ABC scheme, as well as whether it was an attached deal. DAS entries specified whether a deal was audit-driven, whether LMS was engaged as part of the sales process, and whether steep discounts were requested as part of an attached deal.  Moreover, the Securities Class Complaint maintains that multiple former Oracle employees independently confirmed that Defendants Hurd or Catz had to sign off on large deals and deals that included a steep discount, as virtually all attached deals did.  The Securities Class Complaint alleges the following in support:

FE 1 further stated that he would see Hurd's and Catz's names on approvals of "compliance" deals in the DAS system and in approval notifications that were released once Hurd or Catz signed off on the

deal. Likewise, FE 3 stated that 80% of FE 3's engineered deals went to Hurd's office for approval and that he personally had "audit cloud deals," clearly marked as such, that were approved by Hurd.

\*       \*       \*

FE 1 also described presentations he prepared specifically for Hurd's consumption that "would very clearly say that LMS was engaged" on cloud deals and that "they were compliance deals." FE 2 similarly reported that presentations going to Hurd's direct reports showed that 90-95% of the Company's North American cloud sales had no use cases associated with them, demonstrating that they were not driven by actual customer need.  FE 2 stated that "[a]mong all of Hurd's direct reports, there was absolute awareness that there were issues with the quality of the cloud revenue."  FE 2 stated, "I saw presentations that went to Hurd's directs.  I saw the info they were receiving about deal quality and it was absolutely something that was discussed."

**B.      Prior To Making Their Misstatements And Omissions, the Officer Defendants Were Informed Of Allegations That Oracle Generated Artificial Cloud Revenues Through Coercive Audits And Sales Tactics**

137.    Both prior to and during the Relevant Period, multiple sources informed the Officer Defendants of illicit audit and sales activities designed to inflate the Company's cloud revenues. For example, on May 7, 2014, Clear Licensing representatives met with high-level Oracle executives, including Oracle's Senior Director Global Operations within LMS, and informed them of LMS's "questionable sales tactics," with "LMS activity leading to sales engagement." Thereafter, on November 3, 2014, Clear Licensing sent Oracle's Senior Director Global Operations a written report providing the results of Clear Licensing's survey of a hundred Oracle customers, together with summaries of customer accounts bolstering Clear Licensing's findings of LMS's abusive audit and sales practices.  Then, on January 6, 2015, after having received no meaningful response from the Company, Clear Licensing sent a letter to Defendant Ellison and Oracle's Board, including Defendants Hurd and Catz, informing them of the customer survey results, expressing concern that Oracle's audits were being used to improperly generate cloud revenues, and warning them of Oracle's inability to meet its stated $1 billion cloud sales target next year if these practices continued to go unaddressed.

138.    The Officer Defendants also knew, had access to, and denied media reports published prior to and during the Relevant Period, detailing Oracle's coercive audit and sales practices.  For example, immediately following the public release of Clear Licensing's January 6, 2015 letter, multiple media outlets and commentators published follow-up articles and reports about Clear Licensing Counsel's "scathing report" and prediction "that Oracle will struggle to move to the cloud unless it changes its ways."  Months later, the financial press published additional reports recounting allegations from various sources, including unnamed Oracle customers, that the Company was misusing its "audit" process to generate artificial cloud revenues, including pressuring customers to buy "cloud products they don't need."

139.    The Officer Defendants were further informed of allegations of Oracle's coercive audit and sales tactics prior to the Relevant Period through the Chilean regulator FNE's comprehensive investigation, which ultimately found that Oracle pushed cloud-based products to resolve audits even when the customer did not want cloud.  Specifically, in September 2015, the FNE informed Oracle that it had opened an investigation into Oracle's licensing and audit practices.  During its investigation FNE specifically asked Oracle for information concerning its auditing practices and attached deals, including: (i) documents or internal presentations related to sales as a result of an audit; (ii) policies related to the promotion of Oracle products to customers negotiating with LMS; and (iii) information concerning the amount of sales generated through audits or "true up" processes.  That the Officer Defendants made their misstatements and omissions in the midst of a regulatory investigation and in the face of specific accusations of wrongdoing further supports the scienter inference.

### C.    The Officer Defendants Specifically Denied The Allegations That They Were Using Audits To Close Cloud Sales

140.    Both prior to and during the Relevant Period, the Officer Defendants were also directly asked about allegations regarding the Company's abusive sales and auditing practices to boost cloud revenue, and in response, they denied that there was any misconduct and falsely attributed the Company's cloud business growth to legitimate business factors.

141.   For instance, the Officer Defendants were informed by, among others, Clear Licensing, media reports and the FNE of allegations of Oracle's improper licensing and audit practices.  However, with each of these sources, the Officer Defendants caused Oracle to deny the accusations.  Indeed, the Officer Defendants caused Oracle to tell investors as early as June of 2015, that media reports regarding the Company's improper auditing practices were "absolutely not true" and "conspiracy rumor," assuring that "[i]t would be wrong to force a [customer] to do something that's against their will."

142.   The Officer Defendants' pattern of making such false denials continued throughout the Relevant Period, including in response to analysts' specific inquiries.  For example, on May 9, 2017, an analyst questioned Ken Bond about the importance of audits as a driver of revenue growth and whether he could provide "some sort of indication as to what percentage of revenue and margin is associated with auditing practices of customers."  In response, Bond denied that the Company's audit practices were driving its revenue growth, stating that "[t]his is one of those things where – gets talked about a lot. And I think this is one of those things where the story is a lot bigger than the realities."  Bond further assured investors that Oracle did not use extortive audits, stating that "we try to do it as best we can, in as gracious [a] way as we can" and that "as we go to cloud, we don't have to worry about that anymore."

143.   Similarly, during the Relevant Period, the Officer Defendants repeatedly denied media reports of Oracle's abusive auditing practices, consistently characterizing them as "inaccurate accounts."  For example, following a May 22, 2018 report by *The Information* that Oracle used the threat of audits to drive cloud sales, the Officer Defendants caused the Company to publicly respond that it had "no reason to resort to scare tactics to solicit business" and was "disappointed that *The Information* is presenting inaccurate accounts regarding a handful of customers, based on anonymous sources or competitors who seek to enhance their own consulting services."

144.   Likewise, the Officer Defendants made further false denials by repeatedly attributing the Company's "astonishing" cloud business growth to legitimate business factors and assuring investors that Oracle's "hypergrowth" in the cloud revenue was sustainable.  For example,

on the September 14, 2017 earnings call, Defendant Hurd claimed that the Company's cloud growth was due to the fact that "[w]e're better – our products are better. Our sales force is better. Our ability to implement is better." Similarly, at the November 7, 2017 industry conference, Ken Bond explained why customers were purportedly moving from on-premise to cloud, stating that "from a cost standpoint as well as an innovation standpoint, there's a lot to like about cloud for the customer. And I think this is one of the biggest drivers of why you're seeing customers really excited about this even if it's still early." Finally, throughout the Relevant Period, the Officer Defendants also falsely denied that Oracle's cloud growth was the product of short-term sales tactics, including when Catz stated on the June 21, 2017 earnings call that cloud revenue growth was "absolutely not a 1-year phenomena."

145. The Officer Defendants' repeated denials of wrongdoing in response to repeated analyst questions and media reports, coupled with their false assurances to investors of the Company's legitimate sales practices, further support a strong inference of scienter.

**D.  The Officer Defendants' Use Of Engineered Deals To Drive Cloud Sales Was Widespread Throughout The Company, Occurring Across Continents And In Multiple Different Business Units**

146. As discussed above, the Securities Class Complaint alleges that numerous senior former sales executives in Oracle's North American operations, Middle East and Africa operations, and European operations all gave highly corroborative accounts detailing the widespread use of the ABC scheme and attached deals to drive significant cloud revenue for Oracle. These accounts, alleged in the Securities Class Complaint, describe the same deal mechanics implemented widely across the Company by the entirety of Oracle's sales personnel, with detailed information about the substantial volume of ABC and attached deals all flowing towards Hurd and Catz (including through the DAS system) for years at a time.

147. Moreover, the Officer Defendants' deployment of the ABC deals required a high degree of coordination between sales and LMS departments all over the world. The high degree of overlap, replication, and coordination in the implementation of the ABC and attached deal scheme, as well as the ubiquitous use of these tactics by an army of Oracle employees over

1   different departments in different parts of the world for years on end, further strengthens the

2   inference that Defendants knew or, at minimum, were deliberately reckless in not knowing of the

3   misstated and omitted facts.

4        **E.**      **Oracle Repeatedly Changed The Way It Reported Cloud Revenue During The Relevant Period, Underscoring Its Efforts To Obscure Declining Growth**

6       148.    The Officer Defendants' attempt to conceal Oracle's deteriorating cloud revenues

7   further supports the scienter inference. As discussed above, in June 2018, the Officer Defendants

8   dramatically changed Oracle's financial reporting of cloud revenues. Specifically, the Officer

9   Defendants caused Oracle to stop separately reporting financial results for its cloud business,

10   instead consolidating those results into its legacy "on-premises" business. In so doing, they

11   attempted to – and did – mask the Company's deteriorating cloud performance, which was no

12   longer powered by a huge volume of deals completed through coercive sales tactics and audits.

13       149.    The Officer Defendants sudden and drastic decision to change Oracle's financial

14   reporting is particularly suspicious when considered in the context of prior decisions to report

15   separately their cloud and non-cloud revenues. In September 2015, the Company heralded its

16   decision to separately report its cloud and non-cloud revenues, as it would "better reflect how we

17   look at the Company now that cloud has become a significant contributor to revenue." Then, in

18   June 2017, the Officer Defendants caused the Company to announce that it would start disclosing

19   additional details regarding its "cloud revenues," including breaking out cloud SaaS revenue

20   separately from cloud PaaS/IaaS revenue. The Officer Defendants caused Oracle to tout this

21   additional "cloud" disclosure at the time as a "significant improvement in our financial reporting

22   to align with how we are running the business now" because the "cloud has become our

23   predominant growth vehicle." That the Officer Defendants would suddenly eliminate Oracle's

24   critical "cloud" revenues disclosures – just twelve months after introducing additional disclosures

25   to "significant[ly] improv[e]" in its financial reporting – further strengthens the scienter inference.

26       150.    Indeed, Oracle's top competitors – including Amazon, Microsoft, and IBM –

27   separately reported (and continue to separately report) their "cloud" and "non-cloud" revenues,

28   ensuring that investors are given "a clear view of [their] cloud growth." Such disclosure is valuable

because "[s]oftware is moving to the cloud, and without explicit, easy to understand, non-changing data, it is going to be difficult for investors to correctly appraise the more valuable recurring Cloud business."[31]

151.    Analysts' contemporaneous reaction to the Officer Defendants' about-face change in its financial reporting further demonstrates its suspicious nature.  William Blair concluded the change was "an attempt to pull the proverbial wool over investors' eyes—particularly related to cloud sales."  Oppenheimer identified the reporting change as "a red flag" that "masks visibility and raises concerns about the performance and trajectory of the cloud business."  JPMorgan similarly characterized the change as an attempt to "obfuscate[] one of the most important metrics to gauge the cloud transition story."  And *The Upper Edge* characterized the change as "suggest[ing] that [Oracle] may have something to hide."  Analysts also correctly found the Officer Defendants' stated rationale for the move – *i.e.*, that it is difficult to distinguish cloud revenue from traditional on-premises revenue dubious, stating that they had "a hard time buying into that argument" and that they were "not convinced by Oracle's explanation," particularly given Oracle's "multi-year effort to pitch itself as a leading cloud vendor" and that Oracle's cloud competitors were all reporting these figures.

### F.    Statements Touting Oracle's Cloud Growth Concerned The Single Most Important Issue Facing The Company During The Relevant Period

152.    The Officer Defendants' decision to have Oracle "move to cloud" was, as Defendant Catz publicly told investors, "the biggest and most important opportunity in our Company's history."  Defendant Catz echoed these sentiments at Oracle OpenWorld in the beginning of the Relevant Period, stating that "[m]oving to the cloud [wa]s the single largest opportunity and we have to face it."[32]  Defendant Hurd likewise stated that "[t]his movement to cloud, this is an inevitable destination as opposed to an interesting turn,"[33] and that "[t]he move to

---

[31] Jordan Novet, "Oracle Falls 7% After Company Reduced Visibility Into Its Cloud Business," *CNBC* (June 20, 2018).

[32] Sohini Bagchi, "Digital India Driving Growth For Oracle: CEO Safra Catz," *CXOtoday.com* (May 9, 2017).

[33] Stephanie Condon, "Oracle CEO Mark Hurd: AI Shouldn't be a standalone application," *ZDNet* (October 2, 2017).

1  the cloud is not just a technical thing; this is a business model, generational change about how we
2  think about IT."[34]   Defendant Hurd further stated that the cloud market presented a "tremendous
3  opportunity for us to grow and blow way past $10 billion" in revenue.[35]   Likewise, Defendant
4  Ellison told investors during the Company's November 2017 annual shareholders meeting that
5  "[w]e expect the bulk of our business going forward, and the bulk of our growth will be driven by
6  our public cloud business."

7      153.   The Officer Defendants' need to generate revenues through the Company's new
8  cloud offerings was particularly acute because demand for its on premises products was declining.
9  Wall Street recognized the importance of Oracle's transition to the cloud.  As the *USA Today*
10 explained, "Oracle's future and relevance [wa]s pinned on its ability to become a bigger player in
11 cloud."[36]  In December 2017, *Forbes* further described how "Oracle's cloud segment has been the
12 only revenue stream to witness growth in recent years," adding that the "trend is likely to continue
13 in the coming years."[37]  Media reports additionally stated that the "cloud has become a matter of
14 existential importance to Oracle as its legacy business of selling software licenses and hardware
15 products erodes in the face of a growing enterprise preference for usage-based application and
16 infrastructure subscriptions."[38]  Analysts further explained that "[w]ithout aggressive action to
17 significantly increase non-database [i.e., cloud] revenue, we do not believe Oracle can offset the
18 oncoming decline in commercial database revenue fast enough to maintain its present valuation,"
19 adding that "Oracle needs an even more radical and rapid organizational and cultural shift toward
20 'cloud-first.'"[39]  Finally, further demonstrating its importance to the Company and its investors,

21

22

---

23  [34] "Mark Hurd Chief Executive Officer" Oracle NetSuite company profile.
    [35] Anita Balakrishnan, "Oracle CEO pushes back on challenge from Salesforce: 'Are you
24  kidding me?'" CNBC (May 4, 2017).
    [36] 43 John Swartz, "Oracle's Mark Hurd builds a cloud arsenal to take on Amazon," *USA Today*
25  (April 26, 2017).
    [37] Trefis Team, "Oracle Earnings Preview: Cloud-Based Segments To Continue To Drive
26  Growth," *Forbes* (December 12, 2017).
    [38] Kurt Marko, "Oracle Cloud World epiphany: Focusing on applications and data, not
27  infrastructure. Yet." *diginomica* (January 24, 2017).
    [39] John Freeman et al., "The Death Of The Commercial Database: Oracle's Dilemma," *Seeking
28  Alpha* (February 10, 2017).

Oracle's cloud revenues were discussed by Defendants and investors on every earnings call during the Relevant Period, occupying the vast majority of the executives' discussion and analyst inquiry.

154.    Given the "existential" import of cloud to Oracle and its future, Defendants knew or were deliberately reckless in not knowing – that its cloud revenues were driven by illusory "sales" completed through coercive audits and attached deals.

### G.    The Officer Defendants Stated That They Were Deeply Focused On Oracle's Cloud Revenues

155.    The Officer Defendants stated that they were acutely focused on the Company's cloud revenues.  Beginning in late 2012, Defendant Ellison stated that "over the next couple of years senior management down to individual programmers and sales people are focused on one thing: selling applications in the cloud, selling our platform in the cloud and selling our infrastructure in the cloud," echoing that the Company was "laser-light focused" on cloud.[40]  A year later, Defendant Hurd reinforced to investors that "[w]e are very focused on the cloud."[41]  Once again, in 2016, Defendant Catz told investors that, "as you know, our focus is now on cloud" and that "[w]e had leading products to begin with, but we started and rewrote them all, focused exclusively – really focused on the cloud."  The Company's executives continued to assure investors that they were singularly focused on "cloud revenues," with Defendant Hurd telling investors that his "focus" was on the "transformation to the cloud."[42]  That Defendants were, by their own admissions, "very focused" and "laser-focused" on the Company's cloud business and revenues further strengthens the scienter inference.

### H.    The Officer Defendants Had a Unique Financial Incentive

156.    Starting on June 1, 2017, the Officer Defendants had a unique motivation to (i) engage in stock buybacks as a form of financial engineering, and (ii) overinflate the performance of Oracle's cloud business and engage in coercive business practices, because their compensation

---

[40] Steffanie Marchese, "CNBC EXCLUSIVE: CNBC TRANSCRIPT: ORACLE CEO LARRY ELLISON SITS DOWN ONE-ON-ONE WITH MARIA BARTIROMO TODAY ON CNBC," *CNBC* (October 2, 2012).

[41] Rachel King, "Oracle's Hurd defends cloud strategy in light of exec shuffle," *ZDNet* (September 29, 2014).

[42] Steven Bertoni, "PODCAST: Oracle CEO Mark Hurd On How A Tech Giant Can Stay Nimble and Bet Big On Future Trends," *Forbes* (February 27, 2018).

packages were directly tied to operating metrics focused solely on stock price, market capitalization, and operating performance goals relating to Oracle's cloud business.

157.   According to the Company's Proxy Statement, filed with the SEC on September 29, 2017, for the fiscal 2018 year beginning June 1, 2017 and ending May 31, 2018, "the Compensation Committee adopted a unique performance-based equity compensation program for [the Officer Defendants]."   In doing so, the Proxy Statement disclosed that Oracle's "cloud business had become an important part of [the Company's] long-term success as [its] customers have increasingly elected to use [its] suite of cloud offerings."  The Proxy Statement went on to state that "[c]onsequently, the Compensation Committee sought to *directly link* the long-term incentive compensation of [the Company's] most senior executives with ambitious goals related to [its] *cloud offerings* and *stockholder return*."

158.   The Compensation Committee granted the Officer Defendants equity awards consisting entirely of performance-based stock options payable in seven equal tranches that are eligible to be earned based on the achievement of the following goals over a five-year performance period:

**1 tranche** may be earned if Oracle's average stock price equals or exceeds $80 for 30 calendar days

**6 tranches** may be earned based on achievement of both (1) market capitalization goals and (2) operational goals (one goal of each type must be satisfied in order for a tranche to be earned)

**Six Market Capitalization Goals**
- Increase Oracle's market capitalization from a baseline of $207 billion by:
  - $16.7 billion
  - $33.3 billion
  - $50 billion
  - $66.7 billion
  - $83.3 billion
  - $100 billion
- Shares issued in connection with a material acquisition would be excluded from the calculation of market capitalization

**Six Operational Goals**
- Become the largest enterprise SaaS company as measured by an independent third-party report
- Attain $20 billion in non-GAAP total cloud revenues in a fiscal year
- Attain $10 billion in non-GAAP total SaaS revenues in a fiscal year
- Attain $10 billion in non-GAAP total PaaS and IaaS revenues in a fiscal year
- Attain non-GAAP SaaS gross margin of 80%
- Maintain non-GAAP PaaS/IaaS gross margin of at least 30% for three of the five fiscal years in the performance period

159.   The performance goals noted above created a unique motivation for the Officer Defendants to increase the Company's stock price and grow Oracle's cloud revenues at all costs. As disclosed, the Officer Defendants' compensation structure did not include qualifiers or other

limits. Rather, whether the Officer Defendants received any compensation depended primarily on the Company's stock price and market capitalization (incentivizing stock repurchases) and the cloud business (incentivizing growth through unscrupulous business tactics).

I.  **Defendant Kurian Sold Hundreds Of Millions Of Dollars' Worth Of Oracle Stock During The Relevant Period**

160.  Defendant Kurian was, by his own account, responsible for leading Oracle's product transformation from on-site products to cloud services. At the same time that Defendants were touting the Company's cloud business, Kurian – who was deeply attuned to the true sources of Oracle's cloud revenues – was selling millions of his personal shares. Indeed, Kurian exercised his options and sold nearly 4 million shares, reaping over ***$191 million*** in gross proceeds from insider sales.

161.  Defendant Kurian's sale transactions, which were made over the open market and not pursuant to any 10b5-1 plan, are set forth below:

| Transaction Dates | Shares Sold | Price Per Share | Total Value ($) |
|---|---|---|---|
| 07/18/17 | 750,000 | $50.46 | $37,843,275 |
| 01/18/18 | 1,500,000 | $50.29 | $75,433,950 |
| 01/18/18 | 200,000 | $50.29 | $10,057,860 |
| 04/23/18 | 137,843 | $46.13 | $6,358,698 |
| 04/26/18 | 300,000 | $46.06 | $13,818,000 |
| 04/27/18 | 25,600 | $46.06 | $1,179,136 |
| 04/30/18 | 57,155 | $46.00 | $2,629,130 |
| 05/02/18 | 91,888 | $45.85 | $4,213,065 |
| 05/02/18 | 253,877 | $45.85 | $11,640,260 |
| 05/03/18 | 333,637 | $45.15 | $15,063,711 |
| 05/04/18 | 300,000 | $45.15 | $13,545,000 |
| | **3,950,000** | | **$191,782,084** |

162.  Kurian's sales, both individually and collectively, were unusual and suspicious in size and timing. For instance, in the first transaction that occurred on July 18, 2017, Kurian sold 750,000 shares at over $50 per share, reaping over $37.8 million in gross proceeds. The sale – which represented nearly 7% of Kurian's entire holdings – was made shortly after the Company announced positive fourth quarter fiscal year 2017 results on June 21, 2017, including that cloud revenues had increased by 58% to $1.4 billion, that sent the Oracle's shares to a historic high for the Company.

163.    Similarly, with regard to the second transaction on January 18, 2018, Kurian sold 1.7 million shares (or approximately 15% of his total ownership stake) at a share price of over $50 for gross proceeds of approximately $85.5 million.   The sale was made toward the end of the third quarter of fiscal year 2018, the period for which Defendants would later disclose – *after* Kurian unloaded his personal shares – that Oracle's cloud revenue growth had stagnated and that the Company forecasted significantly slower sales growth for its cloud business than its competitors. When Oracle ultimately revealed this negative news to investors on March 19, 2018, the Company's shares plummeted by over 9.4% to $47.05. Thus, Defendant Kurian's January 18, 2018 sale allowed him to avoid this loss and instead cash out on the artificially inflated stock price resulting from Defendants' misrepresentations and omissions.

164.    Likewise, Kurian's flurry of sales made over the course of 10 trading days in late April and early May 2018, amounted to 1.5 million shares, or 15.6% of Kurian's holdings, for gross proceeds of over $68 million. Defendant Kurian made these sales at the end of the fourth quarter of fiscal year 2018, the period for which the public would later learn – *after* Kurian dumped his personal shares on the market – that Oracle's cloud growth had been artificially inflated as a result of the improper sales tactics described herein. Significantly, Kurian's sales were executed at a weighted average price of $45.63, a stark difference from the close price at the end of the Relevant Period on June 20, 2018 of $42.82, thereby yielding Kurian an additional several million dollars as a result of the Defendants' fraud.

165.    Finally, Defendant Kurian's sales were inconsistent with his prior trading history. Defendant Kurian sold a higher percentage of his available shares during the Relevant Period than in the previous period of the same length. Indeed, Defendant Kurian sold *42.5%* of his available shares during the Relevant Period – which was nearly three-times the percentage of shares that he sold in the prior period of equal length. Specifically, during the prior period of the same length (December 8, 2015 to March 14, 2017), Kurian sold only 1,104,300 shares, or *15.5%* of his available shares, for gross proceeds of approximately $45.7 million.

166.    Defendant Kurian's unusually timed and outsized personal stock sales provide further support for the scienter inference.

J.      **The Officer Defendants Had An Additional Motive to Artificially Inflate the Performance of Oracle's Cloud Business: the NetSuite Transaction**

167.    The Officer Defendants had a unique motive to inflate the Company's cloud business following Oracle's 2016 acquisition of NetSuite, a cloud company that Ellison had a 43% ownership stake in prior to the acquisition (the "NetSuite Transaction").

168.    In 2016, Oracle announced plans to acquire NetSuite for $109 in cash per share. Given Defendant Ellison's ownership of NetSuite stock, he personally received $3.5 billion in cash for his NetSuite shares.

169.    Immediately following announcement of the NetSuite Transaction, many news outlets and market commentators called into question the fairness of the NetSuite Transaction.  For instance, *The San Francisco Chronicle* published an article detailing the conflicts of interest present in the NetSuite Transaction, stating simply, "To say that this deal reeks of conflict of interest would be an understatement."   Importantly, *The San Francisco Chronicle* noted that the NetSuite Transaction was likely completed by Oracle because "NetSuite was going to start competing with Oracle for cloud software customers."  In short, the NetSuite Transaction was part of Oracle's expansion into cloud.  While investors were concerned about Ellison's conflicts, Oracle stock had continued to increase in the interim, making it less likely that investors would cry foul.  Importantly, *The San Francisco Chronicle* concluded: "Rising stock prices wash away many sins.  ***But how would a NetSuite acquisition*** — one that so greatly enriches Oracle's chairman — ***look to shareholders if Oracle were performing poorly***?"

170.    Then, in the wake of the NetSuite Transaction, a stockholder filed a derivative action in the Court of Chancery of Delaware alleging that the Officer Defendants, among others, promoted their loyalty to Ellison over their duties to Oracle when they orchestrated a transaction in which Oracle overpaid to acquire NetSuite.  According to the Amended Complaint filed in the Court of Chancery of Delaware, Oracle agreed to purchase NetSuite for a price substantially greater than the fair value of NetSuite.  On March 19, 2018, Vice Chancellor Glasscock denied the defendants' motion to dismiss in that action, finding that the plaintiff pled sufficient facts to state

a claim for breach of the duty of loyalty against, among others, the Officer Defendants for their role in carrying out the conflicted transaction for the benefit of Defendant Ellison.

171.   Based on the foregoing, the Officer Defendants had a unique motivation to inflate the Company's cloud business following the NetSuite Transaction.   Specifically, the Officer Defendants were motivated to avoid further backlash for agreeing to a conflicted transaction to benefit Ellison by creating the impression that Oracle's cloud business was succeeding and the NetSuite Transaction was a success.   By engaging in underhanded sales practices, the Officer Defendants created the impression that Oracle's cloud business was flourishing, including NetSuite, and therefore the conflicted purchase of NetSuite was a success.

### K.   The Officer Defendants Were Directly And Extensively Involved In Developing And Maintaining Oracle's Cloud Business

172.   Each of the Officer Defendants was directly and extensively involved in developing and maintaining Oracle's cloud business; the implementation and execution of Oracles' licensing, audit and sales policies and practices; and the day-to-day operations of the Company.

(a)   **Defendant Catz** played a key role in designing and implementing Oracle's strategy to transition its customers from on-premises software products to the Company's cloud offerings.   Catz spoke frequently to the financial press about Oracle's election to "move to the cloud," characterizing the strategy as "a generational shift in technology that [wa]s the biggest and most important opportunity in our Company's history."   In press releases and earnings calls, Catz frequently spoke about and held herself out as knowledgeable to both investors and analysts about the Company's reported financial results and forecasts, including Oracle's "hypergrowth . . . in the cloud," customer adoption of these products and sales pipeline, the factors driving the Company's cloud revenue, growth and forecasts, and whether such revenue and profitability were sustainable. Later, Catz spoke about and held herself out as knowledgeable about the principal reasons for reduced guidance in cloud revenue growth.   Catz, who has served as a Company executive for the past 20 years and a member of the Company's Board since 2001, was also heavily involved in the day-to-day operations of the Company. Indeed, Defendant Ellison described Catz as "[v]ery details-oriented," "the No. 2 person for some time," and "our first-ever, de facto chief operating

officer." In 2005, Defendant Ellison stated "[i]f I dropped dead tomorrow, Safra Catz would be the CEO of Oracle." Catz's active involvement in Oracle's day-to-day operations is further corroborated by former Oracle employee accounts cited in the Securities Class Complaint. For instance, the Securities Class Complaint alleges that former Oracle employees' accounts demonstrate that Catz had personal knowledge as to how Oracle's cloud revenue was being generated by its sales team, including the specific volume of Oracle's revenue generated through engineered deals such as Audit, Bargain, Close deals. In addition, the Securities Class Complaint alleges that Catz was actively involved in reviewing and approving specific sales transactions, including engineered deals based on former employees reporting that Catz reviewed and approved sales in excess of $5 million, as demonstrated by entries in Oracle's DAS database and internal documents, and that those sales included engineered deals. Further, the Securities Class Complaint alleges that former employees stated that the DAS entries for deals approved by Catz clearly indicated whether approved deals were audit-driven or attached. In addition, Catz signed and certified the purported accuracy of each of the Company's quarterly and annual filings during the Relevant Period.

(b)     **Defendant Hurd** also played a key role in designing and implementing Oracle's strategy to transition its customers from on premises software products to the Company's cloud offerings. Hurd repeatedly touted his "focus" on Oracle's transformation to the cloud and the Company's cloud products. According to the Company's website, Hurd "manages corporate direction and strategy at Oracle, facilitating company activity in consulting, sales, marketing, alliances and channels, and support." Hurd's bio page further represents that he "helped shift the long-term strategy of the company toward the cloud" and "[a]dapting to this new business model." Hurd also spoke frequently to the financial press about Oracle's transition to the cloud, affirming that the Company was "determined to compete on every level of the cloud feature for feature." Hurd further claimed to have familiarity with the quality of Oracle's cloud products, their importance to the Company's business prospects and implementation of sales strategies with respect to such products, including ERP. For example, on the September 14, 2017 earnings call, Defendant Hurd attributed the Company's cloud growth to the fact that "[w]e're better – our

products are better. Our sales force is better. Our ability to implement is better." Hurd similarly spoke about and held himself out as knowledgeable to both investors and analysts about the Company's reported financial results and forecasts, including Oracle's growth rates for its cloud business and drivers for such growth. Hurd too was actively involved in Oracle's day-to-day operations. Hurd stated that he "stay[s] close to the action," earning him the description as an executive that "digs into details and is a hands-on manager that examines every alternative." Hurd's hands-on management style is further supported by former Oracle employee accounts. Relying on former Oracle employee accounts, the Securities Class Complaint alleges that Hurd had personal knowledge as to how Oracle's cloud revenue was being generated by its sales team, including the volume of Oracle's revenue generated through engineered deals such as Audit, Bargain, Close deals. In addition, according to former Oracle employee accounts cited in the Securities Class Complaint, Hurd was actively involved in reviewing and approving specific sales transactions, including engineered deals. Further, in Hurd's role as a director, he corresponded with industry participants regarding Oracle's licensing, audit and sales practices, and the letter from Clear Licensing's Counsel was addressed to him as a Board member. In addition, Hurd signed and certified the purported accuracy of each of the Company's quarterly and annual filings during the Relevant Period.

(c)     **Defendant Ellison** co-founded Oracle, was its longtime CEO and Board Chairman, and continues to remain actively involved in the Company's day-to-day operations as its Chief Technology Officer and one of its directors. In public filings, Oracle states that Ellison "continues to lead and oversee our product engineering, technology development and strategy" and his "familiarity with and knowledge of [Oracle's] technologies and product offerings are unmatched." Ellison's active involvement in designing and implementing Oracle's strategy to transition its customers from on premise software products to the Company's cloud offerings is confirmed by Defendant Catz who credited Ellison as "le[ading] the transformation to the cloud," and has stated that Ellison is still "in charge" at Oracle even after becoming the Company's CTO in 2014, noting, "don't let titles fool you." Ellison also regularly spoke to the financial press about Oracle's pivot to the cloud. Ellison further claimed to have familiarity with the quality of and

1   customer experience with Oracle's cloud products.  Ellison likewise regularly spoke about and

2   held himself out as knowledgeable to both investors and analysts about the Company's reported

3   financial results and forecasts, including Oracle's growth rates for its cloud business and drivers

4   for such growth, as well as customer renewal rates.  Ellison also directed the manner in which

5   Oracle's financials would be reported, including making the decision to no longer separately report

6   cloud revenues in June 2018.  In addition, in Ellison's role as a director, Ellison corresponded with

7   industry participants regarding Oracle's licensing, audit and sales practices, and the letter from

8   Clear Licensing's Counsel was addressed to him.  In addition, Ellison signed the Company's 2017

9   Annual Report as a member of the Company's Board of Directors.

10       173.    The Officer Defendants' deep involvement in the Company's operations and cloud

11   business in addition to the many other factors discussed above further strengthens the inference of

12   scienter.

**VI.    WHILE BUYING BACK ORACLE'S STOCK, THE OFFICER DEFENDANTS MADE AND DISSEMINATED MATERIALLY FALSE AND MISLEADING STATEMENTS**

**A.    Materially False and Misleading Statements and Omissions During Oracle's Fiscal Third Quarter 2017**

174.    The Relevant Period begins on March 15, 2017.  On that day, the Officer

Defendants caused Oracle to issue a press release announcing its financial results for the third

quarter of fiscal year 2017, and file that press release with the SEC on Form 8-K.  The press release

disseminated by the Officer Defendants stressed the Company's growing cloud revenue, stating

that, "Total Cloud Revenues, including infrastructure as a service (IaaS), were $1.2 billion, up

62% in U.S. dollars [year-over-year] and up 63% in constant currency."

175.    The March 15, 2017 press release also quoted Catz, who emphasized Oracle's

"hypergrowth" in cloud – including 85% for two key cloud businesses, SaaS and PaaS – and the

positive impact of this volume growth on "nearly every important non-GAAP business metric,"

including both cloud and total margins:

> ***The hyper-growth we continue to experience in the cloud has rapidly drive both our SaaS and PaaS businesses to scale*** . . . . [O]ur SaaS and PaaS businesses grew at the ***astonishing rate of 85% in Q3. … Our new, large, fast growing, high- margin cloud***

> ***businesses are driving Oracle's total revenue and earnings up and improving nearly every important non-GAAP business metric you care to inspect;*** total revenue is up, margins are up, operating income is up, net income is up, EPS is up. Take a look. Q3 was a very strong quarter.

176. These statements were materially false and misleading when made.  It was misleading for the Officer Defendants to report that Oracle's cloud revenues were $1.2 billion, and to state that Oracle's cloud business had experienced "hypergrowth," including 62% growth in total cloud revenue year -over-year and "astonishing" 85% year-over-year growth in SaaS and PaaS while failing to disclose that: (1) a material portion of the cloud revenue was produced through "financially engineered deals" created by Oracle's use of the coercive "Audit, Bargain, Close" and "attached" deal tactics; (2) the revenue produced through these deals was artificial because it did not result from true purchases of Oracle's cloud products, but rather resulted from clients purchasing a discount on audit penalties or on-premises products; and (3) consequently, a material portion of the reported cloud revenue and revenue growth did not consist of true cloud sales, and was not sustainable.

177. Also on March 15, 2017, Oracle held its fiscal third quarter 2017 earnings conference call.  On that call, Catz trumpeted Oracle's achievement of a key milestone in cloud, namely that cloud growth was now outpacing declines in the legacy on-premises business:

> Our pivot to the cloud is now clearly in full swing. ***We continue to see outside growth rates in our cloud business, especially when compared with our key competitors who are all seeing slowing growth***; but more importantly, ***the increase in revenue from our cloud business has overtaken new software license declines on an annual basis . . . .***

178. On that same call, Hurd also highlighted Oracle's cloud growth, stating, "Cloud revenue was up 72% and were now at an annualized $5 billion run rate SaaS/PaaS revenue was up 86%." Hurd further stated that Oracle was "***the fastest-growing scale cloud business in the world…***"

179. Finally, on Oracle's March 15, 2017 earnings call, Ellison also told investors that Oracle's cloud business was "growing rapidly." Ellison stated, "***SaaS and PaaS are large, rapidly***

1   *growing businesses for us. Together SaaS and PaaS grew 85% this past quarter*, but soon

2   infrastructure as a service will be growing even faster, and before long infrastructure as a service

3   will become Oracle's largest cloud business. In summary, ***all of Oracle's cloud businesses are***

4   ***growing rapidly*** …."

5        180.   These statements were materially false and misleading when made. It was

6   misleading for the Officer Defendants to state that Oracle was seeing "outside growth rates in its

7   cloud business," was "the fastest-growing scale cloud business in the world," and was "growing

8   rapidly," and to report revenue growth rates noted above, while failing to disclose that (1) a

9   material portion of the cloud revenue was produced through "financially engineered deals" created

10   by Oracle's use of the coercive "Audit, Bargain, Close" and "attached" deal tactics; (2) the revenue

11   produced through these deals was artificial because it did not result from true purchases of Oracle's

12   cloud products, but rather resulted from clients purchasing a discount on audit penalties or on-

13   premises products; and (3) consequently, a material portion of the reported cloud revenue and

14   revenue growth did not consist of true cloud sales, and was not sustainable.

15        181.   Analysts and investors reacted positively to the Officer Defendants' misleading

16   statements or dissemination of statements about Oracle's cloud growth.  For instance, a Cannacord

17   analyst report dated March 15, 2017, stated that "Oracle, as it always does, spoke bullishly about

18   its push into IaaS to counter Amazon and for now investors are believers."  A Macquarie analyst

19   report dated March 15, 2017 stated that "Oracle reported a solid third quarter, one of its best reports

20   in years, even as the co. heads towards the tipping point in its cloud transition when cloud growth

21   and margin scale are offsetting declines in new license revenues." Similarly, a Barclays analyst

22   report dated March 16, 2017 stated "An Inflection Point? Oracle has had a tough transition to the

23   cloud. However, management is now guiding for double-digit EPS growth in FY18 (partly helped

24   by cost benefits from the recent hardware restructuring) and talks about increasing momentum

25   around its IaaS business."  A BTIG analyst report dated March 16, 2017 stated of Oracle's

26   delivered strong F3Q17 results, that "we are continuing to see signs that we are at a material

27   inflection point" in the Company's transition to cloud, and we "expect to see meaningful earnings

28

growth in FY18 for the first time in three fiscal years" as a result of Oracle's "strong cloud revenue growth."

182.    As a result of the Officer Defendants' statements and dissemination of statements, Oracle's stock price significantly increased from $41.70 on March 15, 2017 to $44.29 on March 16, 2017. Deutsche Bank reported on March 16, 2017 that "[t]he *key catalyst* for the after-market rally in the stock is the Cloud growth."

183.    On March 17, 2017, the Officer Defendants caused Oracle to file its financial results for the third quarter of fiscal 2017 with the SEC on Form 10-Q.  Oracle's March 17, 2017 Form 10-Q was signed by Defendants Catz and Hurd.  The Form 10-Q reported that total cloud revenues for the three months ended February 28, 2017 were $1.189 billion, and for the nine months ended February 28, 2017 were $3.211 billion.

184.    These statements were materially false and misleading when made. It was misleading for the Officer Defendants to report total cloud revenues for the three months ended February 28, 2017 were $1.189 billion and for the nine months ended February 28, 2017 were $3.211 billion, while failing to disclose that: (1) a material portion of the cloud revenue was produced through "financially engineered deals" created by Oracle's use of the coercive "Audit, Bargain, Close" and "attached" deal tactics; (2) the revenue produced through these deals was artificial because it did not result from true purchases of Oracle's cloud products, but rather resulted from clients purchasing a discount on audit penalties or on-premises products; and (3) consequently, a material portion of the reported cloud revenue and revenue growth did not consist of true cloud sales, and was not sustainable.

185.    On May 4, 2017, Oracle held a press conference announcing the addition of new partners to its Oracle Network Cloud Service, during which Defendant Kurian told investors that Oracle "continue[s] to see tremendous growth across our cloud business."  Defendant Kurian was quoted in a related press release from the same day as stating that "[w]e continue to see tremendous growth across our cloud business."

186.    These statements were materially false and misleading when made.  It was misleading for Defendant Kurian to state that Oracle "continue[s] to see tremendous growth across

1   our cloud business" while failing to disclose that: (1) a material portion of the cloud revenue was

2   produced through "financially engineered deals" created by Oracle's use of the coercive "Audit,

3   Bargain, Close" and "attached" deal tactics; (2) the revenue produced through these deals was

4   artificial because it did not result from true purchases of Oracle's cloud products, but rather

5   resulted from clients purchasing a discount on audit penalties or on-premises products; and (3)

6   consequently, a material portion of the reported cloud revenue and revenue growth did not consist

7   of true cloud sales, and was not sustainable.

8       187.   Additionally, on May 9, 2017, Ken Bond presented at the Jefferies Technology

9   Group Investor Conference.  Bond told investors that Oracle's cloud growth was driven by

10  customers "willingly making a choice" to abandon a multi-vendor IT strategy and consolidate their

11  IT needs in Oracle, stating that "[a]s we move to cloud, the first thing that we see is we start to

12  address more of the customer spend.  The customers are willingly making a choice, where they're

13  forgoing their traditional multi-vendor strategy, spending money on software, then another vendor

14  for hardware, another for labor and so on to going to a single vendor. And that product provider,

15  in the case it's Oracle, it does mean a fairly significant uplift in revenue for Oracle."  Bond also

16  told investors that "[t]he good news" was that "growth in cloud is actually getting bigger."

17      188.   These statements were materially false and misleading when made.  It was

18  misleading for Bond to state that Oracle's cloud growth was being driven by "customers []

19  willingly making a choice" to abandon a "multi vendor strategy" to consolidate with Oracle, and

20  that these customer decisions were creating a "significant uplift in revenue for Oracle," without

21  disclosing that: (1) a material portion of Oracle's cloud revenue was driven by "financially

22  engineered deals" that were based on Oracle's use of the coercive "Audit, Bargain, Close" and

23  "attached" deal tactics; (2) the revenue produced through these deals was artificial because it did

24  not result from true purchases of Oracle's cloud products, but rather resulted from clients

25  purchasing a discount on audit penalties or on-premises products; and (3) consequently, a material

26  portion of the reported cloud revenue and revenue growth did not consist of true cloud sales, and

27  was not sustainable.

28

189.    Ken Bond was also asked by an analyst to "give us some sort of indication as to what percentage of revenue and margin is associated with auditing practices of customers." In response, Bond denied that Oracle used audits to drive cloud sales, stating that: "This is one of those things where – gets talked about a lot. ***And I think this is one of those things where the story is a lot bigger than the realities.***" Defendant Bond further assured investors that the Company was not using extortive or coercive techniques with regard to its audits, stating that "***And we try to do it as best we can, in as gracious [a] way as we can***." Defendant Bond further assured investors that could revenues were not being driven by the audits and, in fact, the transition to cloud would decrease any incidence of audits, stating that "[o]n the other hand, the key, as we go to cloud, ***is this conversation is going to go away***" and that "***as we go to cloud, we don't have to worry about that anymore***.  Because when you're in the cloud, you basically have a number of users that you've signed up for."

190.    These statements were materially false and misleading when made.  It was misleading for Bond to deny that Oracle used audits to drive cloud sales, and that Oracle's audits were not coercive, without disclosing that a material portion of Oracle's cloud revenue was, in fact, driven by "financially engineered deals" that were based on Oracle's use of the coercive "Audit, Bargain, Close" tactic.

191.    On May 10, 2017, Kurian presented at Oracle OpenWorld in India and again highlighted Oracle cloud's growth, stating that "Because of the demand that we're seeing in the cloud, we've had very, very strong growth in customers."

192.    This statement was materially false and misleading when made.  It was misleading for Kurian to state that Oracle had a "very, very strong growth in customers" due to legitimate demand for Oracle's product while failing to disclose that: (1) a material portion of Oracle's growth in cloud customers was through "financially engineered deals" that were based on Oracle's use of the coercive "Audit, Bargain, Close" and "attached" deal tactics; and (2) the customers obtained through these deals were artificial because they were not truly purchasing Oracle's cloud products, but were rather purchasing a discount on audit penalties or on-premises products.

**B.**     **Materially False And Misleading Statements And Omissions During Oracle's Fiscal Fourth Quarter 2017**

193.    On June 21, 2017, the Officer Defendants caused Oracle to issue a press release announcing its fiscal fourth quarter and full year 2017 results, and file that press with the SEC on Form 8-K.  The press release emphasized that Oracle's year-over-year cloud fourth quarter cloud revenues had increased dramatically, stating that, "Total cloud revenues ***were up 58%*** [year-over-year] to $1.4 billion, and non-GAAP total cloud revenues ***were up 64%*** [year-over-year] to $1.4 billion." The press release further highlighted that the Company's year-over-year cloud full-year cloud revenues had also increased dramatically, stating that, "Total cloud revenues ***were up 60%*** [year-over-year]to $4.6 billion. Non-GAAP cloud revenues ***were up 66%*** [year-over-year] to $4.7 billion."

194.    These statements were materially false and misleading when made. It was misleading for the Officer Defendants to disseminate a report that total quarterly cloud revenues were up 58% to $1.4 billion, and total annual cloud revenues were up 60% to $4.6 billion, without disclosing that: (1) a material portion of Oracle's cloud revenue was driven by "financially engineered deals" that were based on Oracle's use of the coercive "Audit, Bargain, Close" and "attached" deal tactics; (2) the revenue produced through these deals was artificial because it did not result from true purchases of Oracle's cloud products, but rather resulted from clients purchasing a discount on audit penalties or on- premises products; and (3) consequently, a material portion of the reported cloud revenue and revenue growth did not consist of true cloud sales, and was not sustainable.

195.    The June 21, 2017 press release also quoted Catz, who stressed the "rapid adoption" of Oracle's cloud products and the "hyper-growth" of its business: "Our fourth quarter results were very strong as revenue growth and earnings per share both substantially exceeded the high end of guidance. . . . ***We continue to experience rapid adoption of the Oracle Cloud led by the 75% growth in our SaaS business in Q4***. This ***cloud hyper-growth is expanding our operating margins***, and we expect earnings per share growth to accelerate in fiscal 2018."

196.    In that same press release, Hurd trumpeted the Company's cloud revenues, and, in particular, that Oracle had delivered on its ambitious promise to deliver $2 billion in annual recurring revenue for the 2017 fiscal year – with most of it supposedly booked during the Relevant Period.   This achievement marked another critical milestone in Oracle's cloud transition that persuaded investors the Company's pivot to cloud was complete. "We sold $855 million of new annually recurring cloud revenue (ARR) in Q4, ***putting us over our $2 billion ARR bookings goal for fiscal year 2017. We also delivered over $1 billion in quarterly SaaS revenue for the first time***. Next year is going to be even better. We expect to sell a lot more than $2 billion in new cloud ARR in fiscal year 2018."

197.    These statements were materially false and misleading when made. It was misleading for Defendants Catz and Hurd to state that Oracle was experiencing "rapid adoption" of its cloud products, "hyper-growth" of its cloud business, and to emphasize the purportedly ballooning cloud sales figures set forth above, while failing to disclose that: (1) a material portion of Oracle's cloud revenue was driven by "financially engineered deals" that were based on Oracle's use of the coercive "Audit, Bargain, Close" and "attached" deal tactics; (2) the revenue produced through these deals was artificial because it did not result from true purchases of Oracle's cloud products, but rather resulted from clients purchasing a discount on audit penalties or on-premises products; and (3) consequently, a material portion of the reported cloud revenue and revenue growth did not consist of true cloud sales, and was not sustainable.

198.    Also on June 21, 2017, Oracle held its fiscal fourth quarter and full year 2017 earnings call with investors.   On that call, Catz told investors, "As you can see, we had a tremendous quarter in just about every way, as cloud revenue, new software license and earnings were all much better than expected. ***The adoption by our customers of our products and services is at an all-time high . . . . The cloud has become our predominant growth vehicle.***" Catz further stated, "our tremendous growth resulted in SaaS revenue crossing the $1 billion a quarter threshold in Q4, having grown 76% in constant currency Cloud PaaS and IaaS revenue for the quarter were $403 million, up 45% from last year." Catz further reported that "Total cloud revenues in the

1  quarter were $1.4 billion, up 66% from last year," and that "cloud billings grew 42% in U.S. dollars

2  this quarter."

3      199.   Similarly, Hurd highlighted Oracle's growing cloud bookings, stating, "cloud

4  bookings, $855 million. ***It's the best quarter we have ever had. It's up 43% over what was a very***

5  ***strong Q4 last year***. We had a goal of $2 billion in ARR, and we finished with nearly $2.1 billion.

6  Next year, we will sell more  As Safra said, cloud revenue growth at 66%, we're now at a $6

7  billion annualized run rate ***[w]ith revenue now at an annualized run rate of $6 billion and a***

8  ***growth rate of 66%, we're clearly the fastest-growing cloud company at scale.***" Hurd stated that

9  the success of Oracle's cloud business was exceeding expectations: "[w]e tracked ahead of

10  virtually every metric that I track, whether it was cloud bookings, cloud revenue, EPS."

11      200.   On that same June 21, 2017 earnings call, Ellison told investors that Oracle was

12  outpacing its competitors in cloud growth and highlighted that growth as the driving force of

13  Oracle's success: "Last fiscal year, ***we sold more than $2 billion in cloud annually recurring***

14  ***revenue. … Our rapid SaaS growth*** is the driving force behind Oracle's revenue and earnings

15  growth in Q4."

16      201.   These statements were materially false and misleading when made. It was

17  misleading for the Officer Defendants to state that Oracle was "clearly the fastest-growing cloud

18  company at scale," that customer "adoption" of cloud products was "at an all-time high," and that

19  "the cloud business has become our predominant growth vehicle," and to report the significant

20  revenue growth and recurring revenue results described above while failing to disclose that: (1) a

21  material portion of Oracle's cloud revenue was driven by "financially engineered deals" that were

22  based on Oracle's use of the coercive "Audit, Bargain, Close" and "attached" deal tactics; (2) the

23  revenue produced through these deals was artificial because it did not result from true purchases

24  of Oracle's cloud products, but rather resulted from clients purchasing a discount on audit penalties

25  or on- premises products; and (3) consequently, a material portion of the reported cloud revenue

26  and revenue growth did not consist of true cloud sales, and was not sustainable.

27      202.   On the call, an analyst asked the Officer Defendants about the quality of Oracle's

28  reported cloud revenue, and specifically whether the Company's cloud growth was sustainable or

1  whether it was a "1-year phenomenon," asking: "You just reiterated the fiscal '18 double-digit

2  earnings growth. And I guess, I think what's becoming more relevant is, do we think about this as

3  a 1-year phenom bouncing off of the fiscal transition? Or how can we really be thinking about

4  earnings growth beyond fiscal '18 into '19 and '20?" Catz responded by falsely denying that

5  Oracle's reported cloud growth was driven by a short-term, "1-year" spike in revenue, but rather

6  was built on a base of "recurring revenue":

> ***So this is absolutely not a 1-year phenomena.***  In fact, what you
> should see, as this goes on, is we will have less drag from the
> transition and the base will continue to grow. And so this should
> really accelerate. And understand that in our PaaS-IaaS business,
> we're not even at scale. ***So as we really scale that up, profitability
> is going to increase more quickly and revenues will be built on the
> base of another recurring revenue -- of the recurring revenue
> business.***

12  203.  These statements were materially false and misleading when made.  It was

13  misleading for Defendants Catz to emphasize the quality and sustainability of Oracle's cloud

14  revenue, and state that the Company's cloud growth was "absolutely not a 1-year phenomena,"

15  without disclosing that: (1) a material portion of Oracle's cloud revenue was driven by "financially

16  engineered deals" that were based on Oracle's use of the coercive "Audit, Bargain, Close" and

17  "attached" deal tactics; (2) the revenue produced through these deals was artificial because it did

18  not result from true purchases of Oracle's cloud products, but rather resulted from clients

19  purchasing a discount on audit penalties or on-premises products; and (3) consequently, a material

20  portion of the reported cloud revenue and revenue growth did not consist of true cloud sales, and

21  was not sustainable.

22  204.  Analysts and investors reacted positively to Oracle's announcement.  *Tech Trader*

23  *Daily* reported on June 22, 2017 that analysts were "ga-ga during the conference call following the

24  report, responding to the results with phrases such as 'really phenomenal,' 'impressive,' 'very

25  strong,' and 'really fabulous."  In a June 26, 2017 article, *Barron's* stated that Oracle "last week

26  wowed Wall Street with a financial report that put to rest fears of the company being rendered

27  obsolete by cloud computing."  On June 22, 2017, BTIG analysts reported that "Oracle delivered

28  excellent F4Q17 results with on-premise license to cloud transition now charging ahead at full

steam" and "it's now clear that we're at a material inflection point and a trendline has formed." On June 22, 2017 *Business Insider* article noted that "OracleCloud computing really is starting to breathe new life into Oracle. The company had a blow-out Q4 2017 earnings Wednesday thanks to 58% year-over-year growth for the quarter in cloud. A sunny outlook caused the stock to hit a 52-week high of $51.85 on Thursday[.]"

205.    As a result of these disclosures, Oracle's stock price increased from $45.07 on June 21, 2017 to $48.93 on June 22, 2017. This included an increase of more than 10% in after- hours trading, which *Dow Jones Institutional News* called "the stock's biggest one-day gain in two-and-a-half years, following a strong earnings report for its fiscal fourth quarter credited mostly to its growing cloud business.  That left the shares at 17 times adjusted forward earnings – the highlight multiple Oracle has fetched since 2008."

206.    On June 27, 2017, the Officer Defendants caused Oracle to file its financial results for the fiscal year ended May 31, 2017 with the SEC on Form 10-K, which was signed by Defendants Ellison, Catz, and Hurd.  The Form 10-K reported that total cloud revenues for the year ended May 31, 2017 was $4.57 billion

207.    This statement was materially false and misleading when made. It was misleading for the Officer Defendants to report total cloud revenues for the year ended May 31, 2017 as $4.57 billion while failing to disclose that: (1) a material portion of the cloud revenue was produced through "financially engineered deals" created by Oracle's use of the coercive "Audit, Bargain, Close" and "attached" deal tactics; (2) the revenue produced through these deals was artificial because it did not result from true purchases of Oracle's cloud products, but rather resulted from clients purchasing a discount on audit penalties or on-premises products; and (3) consequently, a material portion of the reported cloud revenue and revenue growth did not consist of true cloud sales, and was not sustainable.

C.    **Materially False And Misleading Statements And Omissions During Oracle's Fiscal First Quarter 2018**

208.    On September 14, 2017, the Officer Defendants caused Oracle to issue a press release announcing its fiscal first quarter 2018 results, and file  that press with the SEC on Form

8-K.  The press release reported substantial increases in Company's year-over-year cloud growth, emphasizing that "Total Cloud Revenues were up 51% [year-over-year] to $1.5 billion."  The Company also highlighted to investors that SaaS revenues were up 62% year-over-year to $1.1 billion and PaaS and IaaS revenues were up 28% year-over-year to $400 million.  In addition, Catz highlighted to investors that Oracle was continuing to experience "sustained hyper-growth" in its cloud business:  "***The sustained hyper-growth in our multi-billion dollar cloud business continues to drive Oracle's overall revenue and earnings higher and higher...***"

209.    These statements were materially false and misleading when made.  It was misleading for the Officer Defendants to report that "Total Cloud Revenues were up 51% to $1.5 billion," and state that Oracle's cloud business was experiencing "sustained hyper-growth" that was driving Oracle's revenue and earnings higher, while failing to disclose that: (1) a material portion of Oracle's cloud revenue was driven by "financially engineered deals" that were based on Oracle's use of the coercive "Audit, Bargain, Close" and "attached" deal tactics; (2) the revenue produced through these deals was artificial because it did not result from true purchases of Oracle's cloud products, but rather resulted from clients purchasing a discount on audit penalties or on-premises products; and (3) consequently, a material portion of the reported cloud revenue and revenue growth did not consist of true cloud sales, and was not sustainable.

210.    Also on September 14, 2017, Oracle held its fiscal first quarter 2018 earnings call with investors.  On that call, Catz stressed the "very, very strong" customer adoption of Oracle's cloud products and stated that this drove the Company's outstanding revenue and earnings results: "[a]s you can see, we had another good quarter. ***Customer adoption of our cloud products and services continue to be very, very strong***, and our on-premise business remains very resilient. The result was that total revenue were at the high end of my guidance, and earnings per share beat my guidance by $0.01."

211.    Hurd also trumpeted Oracle's cloud growth during Oracle's September 14, 2017 earnings call with investors. Hurd stated, "Cloud revenue up 51% now at a $6 billion annual run rate." Defendant Hurd stated that SaaS revenue was "up 61%, as Safra said, accelerating from 55% growth last year" and that with regard to PaaS, Oracle's "revenue was up 28%." Defendant Hurd

then highlighted Oracle's cloud bookings by stating, "[o]ur cloud bookings were executing well on a very big and growing pipeline. . . Revenue growth now at an annualized rate of $6 billion or growth rate of 51%, and we are the fastest growing cloud company at scale."

212.    These statements were materially false and misleading when made. It was misleading for Catz to state that "[c]ustomer adoption of our cloud products and services continue to be very, very strong" and for Hurd to state that Oracle was "the fastest growing cloud company at scale," and to report the revenue figures and growth rates set forth above, while failing to disclose that: (1) a material portion of Oracle's cloud revenue was driven by "financially engineered deals" that were based on Oracle's use of the coercive "Audit, Bargain, Close" and "attached" deal tactics; (2) the revenue produced through these deals was artificial because it did not result from true purchases of Oracle's cloud products, but rather resulted from clients purchasing a discount on audit penalties or on-premises products; and (3) consequently, a material portion of the reported cloud revenue and revenue growth did not consist of true cloud sales, and was not sustainable.

213.    On that same call, a Macquarie analyst noted Oracle's "momentum in [the] cloud." Hurd responded, attributing Oracle's success to its superior products, implementation, and salesforce: "just sort of every aspect of selling in the cloud, I think the company holistically is getting better at. We're better – our **products** are better.  Our **sales force** is better.  Our ***ability to implement*** is better.  Our ability to do all of these things has just continued to improve quarter by quarter by quarter, and it manifests itself in the type of results we're talking about this afternoon."

214.    These statements were materially false and misleading when made.  It was misleading for Hurd to state that Oracle's cloud growth was driven by its superior products, implementation, and salesforce while failing to disclose that: (1) a material portion of Oracle's cloud revenue was driven by "financially engineered deals" that were based on Oracle's use of the coercive "Audit, Bargain, Close" and "attached" deal tactics; (2) the revenue produced through these deals was artificial because it did not result from true purchases of Oracle's cloud products, but rather resulted from clients purchasing a discount on audit penalties or on-premises products;

1   and (3) consequently, a material portion of the reported cloud revenue and revenue growth did not

2   consist of true cloud sales, and was not sustainable.

3       215.    Following Defendants' statements, on September 14, 2017, MUFG analysts

4   reported that "the company had a solid quarter as it continues its transition to the cloud. We note

5   the company's sustained a 50+% year-over-year (YoY) cloud revenue growth rates have persisted

6   even as cloud revenues passed $1B in FY 2Q17." A September 15, 2017 Cowen report noted that

7   "ORCL beat across the board, with total Cloud growth of 51%[.]" A September 15, 2017 Credit

8   Suisse report stated that "[w]e maintain our Outperform rating and $62 target price following better

9   than expected F1Q results, with organic cc revenue growth accelerating to ~3.5% y/y, its best rate

10  in 2 years."

11      216.    On September 18, 2017, the Officer Defendants caused Oracle to file its fiscal first

12  quarter 2018 financial results with the SEC on Form 10-Q, which was signed by Catz and Hurd.

13  In that Form 10-Q, Oracle reported that total cloud revenues were $1.467 billion for the three

14  months ended August 31, 2017.

15      217.    These statements were materially false and misleading when made. It was

16  misleading for the Officer Defendants to report that total cloud revenues were $1.467 billion for

17  the three months ended August 31, 2017 while failing to disclose that: (1) a material portion of

18  Oracle's cloud revenue was driven by "financially engineered deals" that were based on Oracle's

19  use of the coercive "Audit, Bargain, Close" and "attached" deal tactics; (2) the revenue produced

20  through these deals was artificial because it did not result from true purchases of Oracle's cloud

21  products, but rather resulted from clients purchasing a discount on audit penalties or on-premises

22  products; and (3) consequently, a material portion of the reported cloud revenue and revenue

23  growth did not consist of true cloud sales, and was not sustainable.

24      218.    On September 26, 2017, the Officer Defendants caused Oracle to file its fiscal year

25  2017 annual proxy statement (the "2017 Proxy Statement"), which asked stockholders to vote on

26  significant changes to the performance-based awards granted to the Officer Defendants and

27  Defendant Kurian. In short, the 2017 Proxy Statement changed the performance-based metrics to

28

focus solely on stock price, market capitalization, and operating metrics pertaining to the growth of the Company's cloud revenues.  The 2017 Proxy Statement stated in pertinent part:

> Six of the seven Performance Option tranches may be earned only if Oracle satisfies a combination of (1) an operational performance goal tied to significant growth of Oracle's cloud business and (2) a substantial increase in Oracle's market capitalization. The seventh Performance Option tranche may be earned only upon growth in Oracle's stock price. Thus, even if Oracle's cloud business grows, the Performance Options cannot be earned unless Oracle delivers significant value to stockholders in the form of stock price and market capitalization growth.

219.   The 2017 Proxy Statement also stated that "our customers are increasingly *electing* to run their IT environments using our Oracle Cloud offerings" and that the Company to "aggressively pursue[] the opportunities presented by this shift in *customer preferences* from on-premises to cloud offerings."  The 2017 Proxy Statement further noted that "[o]ver the last five years, we have delivered a 46% compound annual growth rate in revenue from our SaaS offerings, and a 25% compound annual growth rate in revenue from our PaaS and IaaS offerings."

220.   These statements were materially false and misleading when made.  It was false and misleading for the Officer Defendants to state or otherwise disseminate a statement saying that Oracle's customers were "increasingly electing" to adopt Oracle's cloud services, when customers were being coerced into doing so through heavy-handed sales tactics with no intention of using or renewing the services.  It was likewise false and misleading for the Officer Defendants to state or otherwise disseminate a statement saying that Oracle customers' shift to cloud services were based on the customers' own "preferences," rather than the coercive and abusive sales practices carried out under the supervision and at the direction of the Officer Defendants.  Moreover, it was materially misleading for the Officer Defendants to cause Oracle to report the significant revenue growth in cloud services while failing to disclose that: (1) a material portion of Oracle's cloud revenue was driven by "financially engineered deals" that were based on Oracle's use of the coercive "Audit, Bargain, Close" and "attached" deal tactics; (2) the revenue produced through these deals was artificial because it did not result from true purchases of Oracle's cloud products, but rather resulted from clients purchasing a discount on audit penalties or on- premises products;

1  and (3) consequently, a material portion of the reported cloud revenue and revenue growth did not

2  consist of true cloud sales, and was not sustainable.

3       221.   At a November 7, 2017 Sanford C. Bernstein Technology Innovation Summit, Ken

4  Bond made additional false and misleading statements regarding the drivers of Oracle's cloud

5  revenue growth.  Specifically, Bond was asked about the "revenue impact of a client moving from

6  an on-prem revenue license to cloud" and the "driver, the real biggest driver you think of why they

7  would be moving on-premise to SaaS."  Bond responded that Oracle's customers were moving

8  from on-premises to cloud for two reasons.  First, because "***by moving on-premise loads to cloud,***

9  ***you're going to see a reduction of total cost of ownership***," *i.e.*, the cloud product was less

10  expensive.  "That's the first primary advantage."  Second, "***You'll also see customers who want***

11  ***to move toward cloud for what I'll call an innovation advantage***," *i.e.*, the cloud product made

12  technology updates easier to install.   Bond summed up: "***So from a cost standpoint as well as an***

13  ***innovation standpoint, there's a lot to like about cloud for the customer.  And I think this is one***

14  ***of the biggest drivers of why you're seeing customers really excited about this even if it's still***

15  ***early.***"

16       222.   These statements were materially false and misleading when made.  It was

17  misleading for Bond to state that the drivers of Oracle's customers moving from on-premises to

18  the cloud was a "reduction of total cost of ownership" and "an innovation advantage," while failing

19  to disclose that: (1) a material driver of Oracle's cloud sales to on-premises customers was Oracle's

20  use of the coercive "Audit, Bargain, Close" and "attached" deal tactics to create "financially

21  engineered deals;" and (2) in these deals, the on-premises customers were not truly purchasing

22  Oracle's cloud products, but rather were purchasing a discount on audit penalties or on-premises

23  products.

24  **D.     Materially False And Misleading Statements And Omissions During Oracle's**
           **Fiscal Second Quarter 2018**
25

26       223.   On November 15, 2017, Oracle held its Annual Meeting of Stockholders.  The

27  Officer Defendants continued to discuss Oracle's explosive cloud growth at that meeting.  Ellison

28  stated, "Where we deliver ***the applications in the public cloud is growing very, very, very rapidly***

and really subsuming, taking over our application business . . . . ***Our SaaS applications business has been growing in excess of 50%, been growing very, very, very rapidly.***"

224.    These statements were materially false and misleading when made. It was misleading for Defendant Ellison to state that Oracle's SaaS business "has been growing in excess of 50%" and "very, very rapidly," while failing to disclose that: (1) a material portion of Oracle's cloud revenue was driven by "financially engineered deals" that were based on Oracle's use of the coercive "Audit, Bargain, Close" and "attached" deal tactics; (2) the revenue produced through these deals was artificial because it did not result from true purchases of Oracle's cloud products, but rather resulted from clients purchasing a discount on audit penalties or on-premises products; and (3) consequently, a material portion of the reported cloud revenue and revenue growth did not consist of true cloud sales, and was not sustainable.

225.    As discussed above, on December 14, 2017, the corrective disclosure period began. On that day, Oracle held its fiscal second quarter 2018 earnings call with investors. The Officer Defendants caused Oracle to report slowing cloud growth in the second quarter of 2018 that missed market expectations, and provided guidance for the further slowing of cloud growth that also fell below market expectations.  These occurrences were a function of the fact that the Officer Defendants were finding it increasingly difficult to use the ABC tactic or attached deals to push its cloud products on customers who did not want them, and customers were not renewing the ABC or attached deals they had previously been pushed into.  This partially revealed to the market that the Company's cloud revenue was unsustainable. As a result of the Officer Defendants' announcements, Oracle's stock priced dropped approximately 4%, from $50.19 per share on December 14, 2017, to close at $48.30 per share on December 15, 2017.

226.    Nevertheless, the Officer Defendants made a number of calming statements that continued to conceal the full truth and partially mollified their concern about Oracle's cloud business.

227.    On the December 14, 2017 earnings call, Catz told investors that total cloud revenues in the quarter were $1.5 billion, up 39% from the previous year, and stated that "[c]loud SaaS revenue for the quarter were $1.1 billion, up 47% from last year.  Fusion cloud revenue was

56% for the quarter. Cloud PaaS and IaaS revenue for the quarter was $398 million, up 20% from last year."  Catz also told investors that "[a]s for cloud margins, our SaaS business continues to scale and grow, and the gross margin has expanded to 66%, up from 59% last Q2."

228.    Catz further told investors that "[c]ustomer adoption of our cloud products and services continues to be very strong, and what we have called our on-premise business remains robust. Bottom line, our transition to the cloud is going well."

229.    These statements were materially false and misleading when made.  It was misleading for Defendant Catz to report that "customer adoption of our cloud products" "continues to be very strong" and that the "transition to the cloud is going well," and to report the revenue metrics set forth above, while failing to disclose that: (1) a material portion of Oracle's cloud revenue was driven by "financially engineered deals" that were based on Oracle's use of the coercive "Audit, Bargain, Close" and "attached" deal tactics; (2) the revenue produced through these deals was artificial because it did not result from true purchases of Oracle's cloud products, but rather resulted from clients purchasing a discount on audit penalties or on-premises products; and (3) consequently, a material portion of the reported cloud revenue and revenue growth did not consist of true cloud sales, and was not sustainable.

230.    On Oracle's December 14, 2017 earnings call, a MoffettNathanson analyst asked the Officer Defendants to explain why cloud revenue growth was slowing and, specifically, whether customers were not deploying Oracle cloud products: "I think what some of us are trying to reconcile is, is the cloud guidance is a little bit slower than it has been.  So it looks like something might be decelerating a little bit.  And I just wanted to understand, is there a gap as people maybe buy licenses on-prem, and then maybe it's a quarter or 2 before they deploy in the cloud?"  Catz responded by falsely denying that customers were not declining to deploy cloud products, but were, rather, strategically timing that deployment and "moving to [Oracle's] cloud when it makes sense for them."

231.    Addressing the same analyst question about the cause of Oracle's revenue slowdown, Ellison also falsely stated that the slowdown was merely due to the fact that "a lot of customers are waiting for" Oracle's next generation cloud product, "the Autonomous Database,"

1  a cloud database that uses machine learning to reduce the need for periodic maintenance, "just to

2  become available."

3    232.    These statements were materially false and misleading when made.   It was

4  misleading for Defendants Ellison and Catz to state that any slowdown in revenue or delay in

5  deployment was due to "customers "waiting for the Autonomous Database just to become

6  available," or to customer's strategic deployment decisions, when in truth, the deceleration of

7  cloud revenue was caused by the fact that Oracle was finding it increasingly difficult to use the

8  ABC tactic or attached deals to push its cloud products on customers who did not want them, and

9  customers were not renewing the ABC or attached deals they had previously been pushed into.

10    233.    In response to analyst questions about "competitors and surveys saying customers

11  are moving off Oracle," Ellison denied that customers were "moving off Oracle," instead

12  challenging the analyst to "go ahead. You tell me who's moving off of Oracle."   Hurd also

13  responded to the same question by stating that "I'd like to just go back to the math and just go back

14  to the numbers, right? I mean, we've got sort of every other database being used, just in share

15  terms, is ours. And when you see us throwing up yet again another growth rate above market, it's

16  just any of these sort of stories, anecdotes -- by the way, I've heard them for 7 years, right, that --

17  yes and predates me. So everyone's, 'Oh, everyone's moving off the Oracle Database. . . . I'd just

18  love somebody show up with something more than a story. Just show up with a number . . .

19  certainly, nobody gaining share over us . . . when you just look at overall numbers, we're gaining

20  share in Database.'"

21    234.    These statements were materially false and misleading when made.   It was

22  misleading for Defendants Ellison and Hurd to state that Oracle customers were not "moving off

23  [] Oracle" and to emphasize Oracle's "growth rate above market," while failing to disclose that a

24  material portion of Oracle's cloud customers were declining to renew the "financially engineered

25  deals" that were based on Oracle's use of the coercive "Audit, Bargain, Close" and "attached" deal

26  tactics.

27

28

**E.    Materially False And Misleading Statements And Omissions During Oracle's Fiscal Third Quarter 2018**

235.    On March 19, 2018, Oracle held its fiscal third quarter 2018 earnings call with investors.  As discussed above, Oracle reported even more significant slowdowns in its cloud revenue and margin growth than it had in December 2017, again missing market expectations, and provided guidance for further slowing cloud growth below market expectations.  These occurrences were a function of the fact that the Company was finding it increasingly difficult to use the ABC tactic or attached deals to push its cloud products on customers who did not want them, and customers were not renewing the ABC or attached deals they had previously been pushed into.  This partially revealed to the market that the Company's cloud revenue was unsustainable.  As a result of Defendants' announcements, Oracle's stock price declined nearly 10%, from $51.95 per share on March 19, 2018 to $47.05 per share on March 20, 2018.

236.    Nevertheless, as before, the Officer Defendants made a number of calming statements that continued to conceal the full truth and partially mollified their concern about Oracle's cloud business.  For instance, Defendant Ellison assured investors that Oracle's cloud renewal rates remained highly positive and would drive additional revenue expansion.  Ellison stated, "the combination of faster sales and higher renewal rates should dramatically increase our growth rate in our SaaS business."

237.    Ellison also attributed the decline in Oracle's cloud revenue growth to Oracle's "bring your own license" or BYOL program. "BYOL" allowed clients to purchase software licenses that could be flexibly used in whatever medium the customer chose, either cloud or on-premises. Thus, if customers had existing Oracle software licenses for other Oracle legacy services, customers could reuse them when subscribing to Oracle PaaS.

238.    Ellison stated, "Let me try to be clear about this, as I can be. With BYOL, when someone brings their database to the cloud, some of that database -- some of that revenue goes into license and someone -- some of that revenue goes into cloud. Without BYOL, if we didn't have BYOL and someone -- an Oracle customer went to the cloud, 100% of the revenue would go to

the cloud. So there's no question, BYOL has lowered our cloud revenue and increased our license revenue."

239.    These statements were materially false and misleading when made. It was misleading for Ellison to attribute the decline in Oracle cloud revenue growth to its BYOL program, when, in truth, the deceleration was caused by the fact that Oracle was finding it increasingly difficult to use the ABC tactic or attached deals to push its cloud products on customers who did not want them, and customers were not renewing the ABC or attached deals they had previously been pushed into.

240.    Additionally, on May 22, 2018, in response to a report by *The Information* that Oracle customers were resisting efforts to use audits to drive cloud deals, the Officer Defendants caused Oracle to put out a response that:

> Oracle, like virtually every other software company, conducts software audits in limited circumstances to ensure that our products are used as licensed. We pride ourselves in providing our existing 400,000 customers a variety of options to move to the cloud when they are ready. Oracle is grateful to its large and growing customer base and has no reason to resort to scare tactics to solicit business. We are disappointed that ***The Information is presenting inaccurate accounts regarding a handful of customers, based on anonymous sources or competitors who seek to enhance their own consulting services.***

241.    These statements were materially false and misleading when made. It was misleading for the Officer Defendants to deny that the Company used audits to drive cloud sales, and state that Oracle had "no reason to resort to scare tactics to solicit business," without disclosing that a material portion of Oracle's cloud revenue was, in fact, driven by "financially engineered deals" that were based on Oracle's use of the coercive "Audit, Bargain, Close" tactic.

## VII.    IN REPURCHASING STOCK, ORACLE RELIED ON THE OFFICER DEFENDANTS' FALSE OR MISLEADING STATEMENTS

242.    In purchasing common stock in connection with the stock repurchase program, Oracle relied on the Officer Defendants' false or misleading statements, either directly or through the "fraud on the market" doctrine articulated in *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), and

1   *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398 (2014), or through the doctrine

2   articulated in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972).

3       243.    Throughout the Relevant Period, Oracle justifiably expected the Officer Defendants

4   to disclose material information as required by law and SEC regulations in the Company's periodic

5   filings with the SEC and in statements made to the investing public.   Oracle would not have

6   purchased its securities at artificially inflated prices had the Officer Defendants disclosed all

7   material information known to them or that was so obvious it should have been known to them, as

8   detailed herein.   Thus, reliance by Oracle should be presumed with respect to the Officer

9   Defendants' omissions of material information as established by the *Affiliated Ute* presumption of

10   reliance.

11       244.    Additionally, the "fraud on the market" presumption applies to the Officer

12   Defendants' misstatements of material facts or failures to disclose material facts.

13       245.    At all relevant times, the market for Oracle stock was efficient market for the

14   following reasons, among others:

15           (a)    Oracle stock met the requirements for listing, and was listed and actively

16   traded on NYSE, a highly efficient and automated market;

17           (b)    As a regulated issuer, Oracle filed periodic public reports with the SEC and

18   NYSE;

19           (c)    Oracle's common-stock trading value was substantial on a daily basis,

20   exceeding on average over 14 million shares per day throughout the Relevant Period;

21           (d)    Oracle regularly and publicly communicated with public investors via

22   established market communication mechanisms, including through regular disseminations of press

23   releases on the national circuits of major newswire services and through other wide-ranging public

24   disclosures, such as communications with the financial press and other similar reporting services;

25           (e)    Oracle was followed by several securities analysts employed by major

26   brokerage firm(s) who wrote reports which were distributed to the sales force and certain

27   customers of their respective brokerage firm(s).   Each of these reports was publicly available and

28   entered the public marketplace; and

(f)   The market price of Oracle's stock reacted rapidly to new information entering the market.

246.   As a result of the foregoing, the market for Oracle stock promptly digested current information regarding the Company from all publicly available sources and reflected such information in the price of Oracle's common stock.  The foregoing facts indicate the existence of an efficient market for trading of Oracle's stock and support application of the fraud-on-the-market doctrine.

247.   Oracle relied on the integrity of the market price for the repurchase of its common stock and is entitled to a presumption of reliance with respect to the Officer Defendants' misstatements and omissions alleged herein.

248.   Had Oracle known of the material adverse information not disclosed by the Officer Defendants, or been aware of the truth behind the Officer Defendants' material misstatements, the Company would not have purchased Oracle stock at artificially inflated prices.

## VIII.   NEITHER THE STATUTORY "SAFE HARBOR" NOR THE "BESPEAKS CAUTION" DOCTRINE APPLIES TO THE OFFICER DEFENDANTS' MISREPRESENTATIONS

249.   Neither the safe-harbor provision of the Private Securities Litigation Reform Act of 1995 ("PSLRA") nor the judicially created "bespeaks caution" doctrine applicable to forward-looking statements under certain circumstances applies to any of the false or misleading statements pleaded herein. None of the subject statements constituted a forward-looking statement; rather, they were historical statements or statements of purportedly current facts and conditions at the time the statements were made, including statements about Oracle's cloud revenues, historical cloud growth and its present financial condition, among other things.

250.   Alternatively, to the extent any of the false or misleading statements pleaded herein could be construed as forward-looking statements, they were not accompanied by any meaningful cautionary language identifying important fact that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Further, to the extent the PSLRA's safe harbor would otherwise apply to any forward-looking statements pleaded herein, the Officer Defendants are liable for those false or misleading forward-looking statements pleaded herein

because, at the time each such statement was made, the speaker(s) knew the statement was false or misleading, or the statement was authorized and/or approved by an executive officer of Oracle or an Officer Defendant who knew that the statement was materially false or misleading when made.  None of the historic or present tense statements made by the Officer Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by the Officer Defendants expressly related to, or stated to be dependent on, those historic or present tense statements when made.

## IX.   THE GROUP PLEADING DOCTRINE APPLIES TO THE OFFICER DEFENDANTS' MISSTATEMENTS AND OMISSIONS

251.   While the allegations herein identify the Officer Defendant signatories or speakers with respect to the false or misleading statements identified above, the group pleading doctrine also applies to render the Officer Defendants responsible for statements as to which they are not explicitly identified as the speaker or signatory.  The Officer Defendants participated in the drafting, preparation, or approval of the various shareholder and investor reports and other communications concerning Oracle identified herein, and were aware of or recklessly disregarded the misstatements contained in those reports and other communications as well as the omissions from them, and were aware of their materially false and misleading nature. Each Officer Defendant, by virtue of his or her position(s) at Oracle, had access to adverse undisclosed information about the Company's business prospects and financial condition and performance as alleged herein, and knew or recklessly disregarded that those adverse facts rendered the subject statements materially false or misleading when made.

252.   The Officer Defendants, because of their positions of control and authority as officers of Oracle, were able to and did control the content of the various SEC filings, press releases, and other public statements pertaining to the Company during the Relevant Period. Each Officer Defendant was provided with copies of the documents alleged herein to be false or misleading prior to or shortly after their issuance, or had the ability or opportunity to prevent their

issuance or to cause them to be corrected.  Accordingly, each Officer Defendant is responsible for the accuracy of the public reports, releases, and other statements detailed herein and is therefore primarily liable for the misrepresentations in them or misleading omissions from them.

## X.     THE MISSTATEMENTS AND OMISSIONS CAUSED DAMAGE TO ORACLE

253.    Throughout the Relevant Period, the price of Oracle's common stock was artificially inflated as a result of the Officer Defendants' materially false and misleading statements regarding Oracle's cloud sales, revenue, and growth.  The Officer Defendants engaged in a scheme to deceive the market and a course of conduct that operated as a fraud and deceit on Oracle, which repurchased shares at artificially inflated prices.   When the Officer Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of Oracle's stock fell as the prior artificial inflation dissipated.  As a result of its purchases of Oracle common stock during the Relevant Period, the Company suffered damages under the federal securities laws.

254.    On December 14, 2017, after the market closed, the Officer Defendants caused Oracle to issue its second quarter 2018 financial results and disclosed that Oracle revenue growth had decelerated, growing by less than 40%.  The Officer Defendants also caused the Company to report significantly lower cloud growth estimates, stating it expected only mid-20% growth the following quarter – a significant decline.

255.    Following these disclosures, the price of Oracle stock fell by approximately 4%, from $50.19 per share on December 14, 2017, to close at $48.30 per share on December 15, on high trading volume.  This is so despite the Officer Defendants causing the Company to repurchase 16.5 million shares of common stock during the month of December 2017.

256.    The market connected these disclosures to Oracle's sales practices.  For example, a *Business Insider* article dated December 15, 2017 noted that "there are some signs that some of Oracle's customers are fed up with some of its hard-nosed sales tactics."   Additionally, JMP analysts noted in a December 15, 2017 report that "many customers are irate with Oracle due to auditing practices on the technology side of the business and have already placed their bets on AWS, Microsoft Azure, or Google Cloud Platform."

257.    The Officer Defendants, however, stopped the stock from falling further by falsely stating that "customer adoption of our cloud products" "continues to be very strong" and that the "transition to the cloud is going well."  The Officer Defendants also falsely portrayed to investors that the Company's cloud margins had disappointed because, "a lot of customers are waiting for the Autonomous Database just to become available."  The Officer Defendants' damage control worked.  For example, a December 15, 2017 Jefferies report, entitled "Patience Grasshopper," explained that "[w]e understand investor frustration with the unwinding complexity of this model as it evolves, but we continue to believe that the business momentum in the field continues to build and this will translate into meaningful cash flow growth over time."

258.    Then, on March 19, 2018, after the market closed, the Officer Defendants issued Oracle's third quarter 2018 financial results, again disclosing that the Company's cloud growth had deteriorated even more significantly to only 32%.  The Officer Defendants admitted that they expected further deceleration of the Company's cloud business, with Catz telling investors on the Company's earnings call that cloud revenues are "expected to grow 19% to 23% in USD, 17% to 21% in constant currency," far below market expectations.

259.    In response to the Officer Defendants' March 19, 2018 disclosures, Oracle stock declined nearly 10%, falling from $51.95 per share on March 19 to $47.05 per share on March 20, again on high volume.  This is so despite the Officer Defendants causing the Company to repurchase 35.5 million shares of common stock during the month of March 2018.

260.    The market again connected these disclosures to the Officer Defendants' undisclosed financially engineered deals and extortive tactics.  For example, a JMP analyst report, dated March 20, 2018, highlighted Oracle's "cloud weakness," including "fundamental challenge[s]" to the Company's cloud business, such as "Oracle's auditing mentality compared to the 'partner friendly' nature of cloud platforms such as Amazon."  And, in the months following this partial corrective disclosure, investors' questions about Oracle's coercive sales practices intensified. For example, in a May 21, 2018 article entitled "Oracle's Strong Arm Cloud Tactics – the 2018 Model," *Forbes* reported that Oracle was using its "'Audit Bargain Close' playbook" "to

1   pressure customers into cloud adoption" and in a May 22, 2018 article, *The Information* reported

2   that large Oracle customers were resisting the Company's efforts to use audits to drive cloud deals.

3       261.   The Officer Defendants, however, prevented the stock from falling further by

4   issuing a number of comforting statements to investors.  For example, the Officer Defendants

5   attributed the falling cloud revenue growth to Oracle's BYOL program, with Ellison stating that

6   "there's no question, BYOL has lowered our cloud revenue and increased our license revenue."

7   Again, the Officer Defendants' assurances worked.  For example, on March 19, 2018, MUFG

8   analysts issued a report entitled "BYO License Artificially Dampens Cloud Growth: Thesis Still

9   Intact."

10       262.   On June 14, 2018, JPMorgan issued a report announcing it was downgrading Oracle

11   shares to Neutral based on the results of "large-scale CIO survey," in which the analysts ask "CIOs

12   to rank the top 8 or 9 IT mega-vendors in terms of who will be most critical and indispensable to

13   their IT environment in the future."  JPMorgan reported that while in the past Oracle "has been

14   stable and received ~11% of the votes," the Company's standing in this latest poll dropped by

15   more than 40% to 6.5%.  JPMorgan connected this drop in CIO ranking to the Officer Defendants'

16   coercive practices, stating that reasons that CIOs moved away from Oracle included that they "do

17   not like Oracle's business practices and difficulty of working with them in the past."  Investors

18   were focused on this article.  For example, Data Centre stated in a June 15, 2018 article that the JP

19   Morgan report "may come as no surprise to customers who have long been frustrated with Oracle's

20   strong-arm tactics to get them to shift to the fluffy stuff, as the legacy database vendor becomes

21   increasingly desperate to catch up to other cloud vendors."

22       263.   On this news, the price of Oracle stock fell approximately 5%, from $48.27 per

23   share on June 13, 2018 to $45.90 per share on June 14, 2018, on high trading volume.  This is so

24   despite the Officer Defendants causing the Company to repurchase 56.4 million shares of stock in

25   the month of June 2018.

26       264.   Finally, on June 19, 2018, Oracle held its fourth quarter 2018 earnings call with

27   investors after the market closed.  On that call, the Officer Defendants' shocked the market by

28   announcing that the Company would no longer separately report financial results for its cloud

1   business, and would, instead, consolidate those financial results into a combined "Cloud Services

2   and License Support" line item so that investors could no longer see them. In addition, Catz

3   disclosed that total cloud revenue growth for the quarter had come in at just 21%.

4        265.   On this news, the price of Oracle stock fell approximately 7.5%, from $46.27 per

5   share on June 19, 2018 to $42.82 per share on June 20, 2018, on high trading volume of 59,129,000

6   shares.  This is so despite the Officer Defendants causing the Company to repurchase 56.4 million

7   shares of common stock during the month of June 2018.

8        266.   The market immediately connected the June 19, 2018 disclosure and the decrease

9   in transparency with "red flags" at Oracle.   For example, JMP reported that the dramatic

10   deceleration in Oracle's cloud growth was driven by the Company's treatment of its customers

11   and that an industry contact told them that "*No one is re-upping. There was a big incentive to sell*

12   *cloud – it was attached to contracting docs. Buy off but then it's up to you to use it. There was*

13   *no customer success to say, 'Hey, you bought this, now let's get value from it.*"  Similarly, *The*

14   *Upper Edge* reported on June 27, 2018 that "[m]any analysts are speculating that the timing of this

15   change [in financial reporting], and the fact that Oracle is being evaluated based on its cloud

16   growth, suggests that it may have something to hide" and noted that Oracle's "Cloud Deals [were]

17   Manufactured by Duress."

18        267.   All told, the stock declined 19% percent from the Relevant Period high of $52.97

19   to $42.82 on June 20, 2018.  This is so despite the Officer Defendants causing the Company to

20   repurchase a total of 243.5 million shares of common stock between December 2017 and June

21   2018 for an average purchase price of approximately $47.54.

22        268.   The Officer Defendants' wrongful conduct, as alleged herein, directly and

23   proximately caused the damages suffered by the Company.  Had the Officer Defendants disclosed

24   complete, accurate, and truthful information concerning these matters, the Company would not

25   have purchased Oracle's securities at the artificially inflated prices that it paid.  It was also

26   foreseeable to the Officer Defendants that misrepresenting and concealing these material facts

27   would artificially inflate the price of Oracle common stock and that the ultimate disclosure of this

28

1  information, or the materialization of the risks concealed by the Officer Defendants' material

2  misstatements and omissions, would cause the price of Oracle securities to decline.

3  <u>**DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS**</u>

4  269.    Plaintiff brings this action derivatively in the right and for the benefit of Oracle to

5  redress injuries suffered, and to be suffered, by Oracle and its stockholders as a direct result of the

6  Officer Defendants' violations of federal securities laws and breaches of fiduciary duty.

7  270.    Oracle is named as a nominal defendant solely in a derivative capacity.

8  271.    This is not a collusive action to confer jurisdiction on this Court that it would not

9  otherwise have.

10  272.    At the time this action was commenced, Oracle's Board consisted of the following

11  fourteen (14) members: Defendants Ellison, Catz, and Hurd, as well as Non-Party Directors

12  Henley, Berg, Boskin, Chizen, Conrades, Garcia-Molina, James, Moorman, Panetta, Parrett, and

13  Seligman.

14  273.    Plaintiff has not made any demand on Oracle to institute this action because such a

15  demand would be a futile, wasteful, and useless act.

16  274.    Under Delaware law, demand is futile if a majority of the directors are *either*

17  interested in or not independent of a person interested in the claims asserted.  Further, where a

18  board is made up of an even number of directors, a majority of directors is considered to be ***half***

19  the Board.

20  275.    Based on these principles, demand is futile here if seven (7) of the fourteen (14)

21  directors are *either* interested in or not independent of a person interested in the claims asserted

22  herein.  As discussed below, demand is futile because (i) the Officer Defendants face a substantial

23  likelihood of liability for violating the federal securities laws and breaching their duty of due care,

24  and (ii) at least four other directors are not independent of the Officer Defendants.

25  **A.    Demand Is Futile Against the Officer Defendants**

26  276.    The Officer Defendants served as officers of Oracle (and directors) during the

27  Relevant Period.  As officers, the Officer Defendants face a substantial likelihood of liability if

28  there is reason to doubt that they breached their duty of care – *i.e.*, acted with gross negligence.

277.   As alleged above, the Officer Defendants knowingly or recklessly made or disseminated materially false and misleading statements regarding the Company's cloud sales and revenues.   As such, the Officer Defendants face a substantial likelihood of liability for violating the federal securities laws and breaching their fiduciary duty of due care by causing the Company to violate the securities laws.

278.   Although the claims asserted herein establish a substantial likelihood of liability on their own, the Officer Defendants likewise face a substantially likelihood of liability because they are named parties in a federal securities complaint filed in this District.   Because the factual allegations in this action substantially overlap the factual allegations in the Securities Class Complaint, to the extent the Officer Defendants face liability in the federal class action, they are in capable of assessing demand against themselves in this action.

279.   For these reasons, demand is futile against the Officer Defendants.

**B.      Demand Is Futile Against A Majority of the Board Who Are Not Officer Defendants Due To A Lack of Independence**

280.   Because Defendants Ellison, Catz, and Hurd face a substantial likelihood of liability, demand is futile if four (4) of the remaining ten (10) directors lack independence from Defendants Ellison, Catz, or Hurd.  As discussed in this section, Defendant Ellison has complete control over the Board with deep ties to many of the Non-Party Directors, which renders them incapable of assessing a demand.

**1.      Ellison Controls Oracle and Its Board**

281.   Ellison is the founder, visionary, controlling stockholder, and CTO of Oracle. Ellison exerts tremendous control over the Board due to his ownership interests and position, and his domination of the Board.   As of September 17, 2018, Defendant Ellison controlled 30.6% of the voting power of Oracle common stock.  As a result of Ellison's control and influence as the founder of Oracle, no director could ever be appointed or reelected to the Board over Ellison's objections.  As part of his effort to control the Board, Ellison richly rewards those who demonstrate their loyalty to him, and purges those who question his decisions or otherwise threaten his leadership.

282.    Ellison has spent his entire career ensuring that only his loyalists are allowed to occupy Board and executive positions at Oracle.   Karen Southwick, the author of an Ellison biography entitled *Everyone Else Must Fail*, has written that, "Ellison has created Oracle in his own image" and that "[n]o other large company is as dominated by a single individual." Southwick's research included interviews with many former high-ranking Oracle executives, as well as Oracle customers, competitors and partners.  Marc Benioff, a former Oracle executive in marketing and product management who went on to found Salesforce.com, was quoted in Everyone Else Must Fail as stating, "Larry's like a spiritual guru, and Oracle is like a cult."

283.    As part of his continued effort to maintain complete control over the Company, Ellison has developed a reputation for richly rewarding executives who display personal loyalty, while summarily purging any who pose a perceived threat to his leadership.  As one former Oracle director told Forbes magazine, "This is a team, and Larry is the only captain. If someone wants to pop up and announce they're the star — poof! You're out."[43]  In a similar vein, former technology journalist Alex Vieux has explained:

> Larry has an acute sense of when he doesn't need people anymore. He's like a juicer. He squeezes people dry and then discards them. I've seen it with [former Oracle Executive Vice President] Gary Bloom, [former Oracle President and Chief Operating Officer] Ray Lane, [former Vice President of Oracle USA sales and service] Gary Kennedy, [former Oracle marketing executive] Terry Garnett. At the same time, he gives them good money and exposure they would never get without him. They get a springboard to do whatever they want with their lives. He fulfills his part of the bargain, but he does it in a very devilish way.[44]

284.    Former Board member Joe Costello was quoted in Southwick's biography as stating that Ellison treats the Oracle Board as a "necessary inconvenience."  Costello was driven off of the Oracle Board by Ellison after Costello's own company, Cadence Design Systems, selected an Oracle competitor for a particular contract.  Ellison was so incensed by this perceived betrayal that he threatened to ruin Costello and Costello's reputation, to the point where Costello

---

[43]  Victoria Murphy Barrett, Irreplacable? *Forbes*, Aug. 14, 2006, *available at:* https://www.forbes.com/free_forbes/2006/0814/082.html (last visited Apr. 29, 2019).
[44] Southwick, *supra*, at 448.

1   resigned.  Lane stated that, "[Costello] was a very valuable board member, and his resignation

2   should have sent a signal to everyone: the board serves at Larry's will."

3        285.   Ellison has repeatedly fired or otherwise forced out high-ranking Oracle executives,

4   including members of the Board, over personality conflicts or perceived threats to his leadership.

5   According to *Forbes*, "Silicon Valley is littered with refugees from Oracle Corp., former acolytes

6   who fled for better jobs or were fired after fighting with strongman Larry Ellison."[45] For example,

7   Oracle President, Chief Operating Officer and Director Ray Lane was forced to resign in June

8   2000 — three weeks before approximately $70 million in options were about to vest (and thus that

9   Lane forfeited) — after conflicting with Ellison over the leadership of Oracle. As recounted in an

10  Ellison biography by Matthew Symonds called Softwar: An Intimate Portrayal of Larry Ellison

11  and Oracle (2003),[46] when Ellison reclaimed the title of President, he told Lane that, "The whole

12  company needs to understand that there is one centralized point of authority, and it will be the

13  CEO."

14       286.   Similarly, Oracle Executive Vice President Gary Bloom, once thought of as a

15  possible successor to Ellison, left Oracle because Ellison began to oppose him and expressed

16  favoritism to Ellison's longtime loyalist Safra Catz.  As recounted in the Symonds Ellison

17  biography, Bloom stated, "It got to a point where I was responsible for the vast majority of the

18  company, yet I had no contact with the guy who actually ran the company."

19       287.   Terence Garnett is another Oracle executive who was pushed out of Oracle after

20  conflicting with Ellison.  After his June 1994 firing, Garnett alleged that Ellison had instructed

21  him to steer business opportunities and Oracle corporate resources to Ncube Corp., a company

22  owned by Ellison, and directed Oracle engineers to develop software that would run better on

23  Ncube computers than on competing machines. Because Garnett refused to follow those

24  instructions, Ellison had him summarily removed from the Company.[47]

25

26      [45] Victoria Murphy Barret, *Terry Versus Larry*, Forbes, Aug. 14, 2006.

27      [46] Symonds' biography was written with Ellison's collaboration and includes extensive commentary from Ellison.

28      [47] *See* David Bank, *Oracle CEO Improperly Steered Business to NCube, Lawsuit Says*, San Joe Mercury News, Oct. 27, 1994.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

288.    Other members of the current Board have also publicly acknowledged Ellison's dominance over Oracle's corporate governance.   For example, at an Oracle stockholder meeting in October 2008, Berg stated, "I guess as a founder, owner, operator, you can equate [Ellison] to the owner of a team who can sit up in a skybox and own the franchise."[48]   This statement demonstrates that the Board is subservient to Ellison, cannot legitimately exercise independent business judgment regarding matters where Ellison is an interested party, and do not appreciate that Oracle's stockholders are the ones who truly "own the franchise."

289.    Further, while Ellison is no longer CEO and has assumed the position of CTO and "full time" Executive Chairman, his dominance over Oracle has remained unchanged.   Analysts and others in the industry acknowledged Ellison's continued dominance following the announcement of his stepping down:

- "He's not going anywhere," said Tim Bajarin, tech analyst and president of Creative Strategies.

- The shift "doesn't really change things," said Scott McNealy, former Sun Microsystems CEO (which Oracle eventually acquired) and current chairman of social media marketing start-up Wayin. "He's going to continue to do the things he's going to continue to do."

- Mike Wilson, author of "The Difference Between God and Larry Ellison: God Doesn't Think He's Larry Ellison" stated, "Oracle is Larry Ellison, and Larry Ellison is Oracle."

- Marc Benioff, CEO of Salesforce.com, who worked at Oracle and got funding for his company from Ellison stated, "There always has been & always will be, one CEO at Oracle. 'All sw & hw engineering functions will continue to report to @larryellison.'"

290.    Further, as discussed below, each director or officer has received significant compensation while serving as a fiduciary of Oracle.   Given Defendant Ellison's prominent role in retaining the employ of these individuals, as well as their material ties to Ellison, Defendants Catz and Hurd, and the Non-Party Directors below, are incapable of assessing demand as to the claims alleged herein.

---

[48] Thomas Wailgum, *What Oracle's Larry Ellison Has In Common With The Simpsons' Mr. Burns*, CIO.com, Oct. 16, 2008.

1

2

2. **A Majority of Directors Have Material Ties to Ellison Rendering Them
Incapable of Assessing Demand Against the Officer Defendants**

3

(a) **Defendant Catz**

4

291.   Defendant Catz is beholden to Ellison and incapable of objectively evaluating

5

matter concerning Ellison.  Catz is not independent because she is a highly compensated senior

6

officer in a company controlled by Ellison.  Catz has held numerous executive positions at Oracle

7

since joining the Company in 1999.  Catz has been Oracle's CEO since September 2014.  She

8

served as the Company's President from January 2004 to September 2014 and as CFO most

9

recently from April 2011 until September 2014.  Previously, she served as CFO from November

10

2005 until September 2005 and as interim CFO from April 2005 to July 2005.  Since 2007, Catz

11

has received roughly ***$514 million*** in compensation from Oracle.  Due to her position as CEO, and

12

her massive pay packages, the Company admits that Catz is not independent.

13

292.   Catz is also a close aide to Ellison who has been described in the media by

14

*CNNMoney* and *Fortune* as Ellison's "secretive but effective right hand," "Ellison's ultra-effective

15

consigliere," and "Elison's Ms. Inside."  According to *Mercury News*, "[a]t one point, Ellison and

16

Catz dated, according to two biographies of Ellison and interviews with former Oracle employees.

17

They remained friends over the next decade."  Matthew Symonds wrote in his Ellison biography

18

that Catz has "a degree of loyalty to her boss that transcended any personal agenda of her own."

19

Ellison himself has stated that he and Catz "share a high-bandwidth communications link," that

20

they "finish each other's sentences" and that he relies on her as his "chief confidante and

21

counselor."  As explained in the Symonds biography, Catz has said that, "I came in [to Oracle]

22

with absolutely no agenda other than to help Larry.  That actually makes my job incredibly easy.

23

If Larry wants something done, now it happens because I'm going to check that it has."

24

293.   Catz's power and status within Oracle derive from her close personal relationship

25

and overwhelming loyalty to Ellison.  In August 2006, Henley was quoted in *Forbes* as saying

26

that, "[Catz's] power isn't that she has a lot of people working for her; she doesn't. Her power is

27

that she's on the same wavelength as Larry."  Catz herself appears to agree with this assessment.

28

She is quoted in the Symonds biography as stating, "I'm not interested in building power and I

don't have any individual power here.  People will send me things for my approval, and my response will always be okay, if it's within the scope of a decision I already know Larry has approved. I say that as a reminder that I don't have any power of my own." Symonds, *supra*, at 295.  Although this statement was made while Catz was Co-President under then-CEO Ellison, Ellison still holds the reins at Oracle in his CTO role.

294.    According to *Fortune*, Catz is also fiercely protective of Ellison—and her relationship with him, and before Oracle went public with the news that Hurd was joining the Company, Safra spent six hours with Hurd and told him "he wouldn't live long enough to regret getting between Larry and herself or attempting to unseat Larry."

### (b)    Defendant Hurd

295.    Defendant Hurd is beholden to Ellison and incapable of objectively evaluating any matter concerning Ellison.  Hurd is not independent because he is a highly compensated senior officer in a company controlled by Ellison.  Hurd has served as Oracle's CEO since September 2014.  Since 2011, Hurd has received roughly ***$455 million*** in compensation from Oracle.  Due to his position as CEO, and his massive pay packages, the Company admits that Hurd is not independent.

296.    Hurd and Ellison are also close personal friends.  According to *The Lubbock Avalanche Journal* and *The New York Times*, Hurd and Ellison have bonded over their love of tennis.  According to those same reports, both Ellison and Hurd are avid tennis players and Hurd often plays tennis at Ellison's house.

297.    Moreover, Defendant Ellison has admitted that he is a close personal friend to Hurd.  Specifically, when Hurd was forced to resign as CEO of Hewlett Packard in 2010 due to expense-account violations and in the wake of sexual harassment allegations, Ellison not only scooped up Hurd and named him as Co-President alongside Catz, but publicly defended him.  In a letter to *The New York Times*, Ellison said, "The HP board just made the worst personnel decision since the idiots on the Apple board fired Steve Jobs [Ellison's long-time next-door neighbor and best friend] many years ago."  The letter concluded as follows: "Since full disclosure seems to be the order of

1   the day, I should disclose that Mark Hurd (is) *a close personal friend* and that I am deeply offended

2   by what just happened to him.  If the HP board is offended by my comments . . . so be it."

### 3.   Director Henley

298.   Director Henley is not independent of Defendant Ellison, and by extension Catz and Hurd, due to his long-standing ties to Oracle as a former executive and Chairman.  For ten years, from 2004 to 2014, Henley served as Executive Chairman at Oracle.  When Ellison stepped down from CEO to assume the CTO position in 2014, Ellison assumed the Chairman position and Henley was demoted to Vice Chairman of Oracle.  While Oracle no longer publishes Henley's compensation or outstanding unvested stock options, as recently as fiscal year 2011, Henley received approximately *$4.15* million in compensation and *$11.333* million in stock option awards. The Company admits in its public filings that Henley is not independent.

### 4.   Director James

299.   Director James is not independent of Defendant Ellison, and by extension Defendants Catz and Hurd, due to her receipt of substantial compensation from Oracle.  James has received and will continue to receive substantial compensation as a director of Oracle.  Since 2016, Director James has received over *$1.6 million* in cash and stock awards – a material amount to any individual, especially when that person expects to receive about a half of a million dollars per year in subsequent years.  As a member of one of the highest compensated board of directors in the United States, Director James expects to receive roughly half of a million dollars or more per year as a director.

300.   James is an Operating Executive at the Carlyle Group.   In that capacity, she serves on the boards of Veritas Holdings Ltd. and ION Investment Group Limited, two Carlyle portfolio companies.  Veritas specializes in information management, and Oracle is an important Veritas partner.  Indeed, in a 2017 interview, Veritas's CTO discussed "the 'very long future that the two companies have together working on the problem of information management.'"  ION, a software conglomerate, has a business segment that is "a Gold level member of the Oracle Partner Network."  Catz publicly described James as a close friend at Oracle's 2014 OpenWorld conference.

1    301.    Until 2016, James served as Intel's President.  Since then, she has publicly stated

2  that she is trying to become the CEO of another large technology company.  In a talk at Stanford,

3  James described her approach to dealing with boards of directors: "When you're CEO, it's all

4  about the board. If you have a dysfunctional board and a board that isn't supportive or that has [its]

5  own internal dynamic and politics, life's too short for that."  In that same talk, James also said that

6  "people do what they think the CEO wants, even if they know it's wrong. And that's a very

7  dangerous phenomenon."  Moreover, in October 2017, the Oracle Board determined that James

8  was no longer independent under the New York Stock Exchange's listing standards.  The reason:

9  James had been appointed CEO of Ampere Computing LLC, a joint venture between Oracle,

10  Carlyle, and MACOM Technology Solutions Holdings, Inc., in which Oracle made a $46 million

11  investment towards in October 2017.

### 5.    Director Seligman

13    302.    Director Seligman is not independent of Defendant Ellison, and by extension

14  Defendants Catz and Hurd, due to her substantial compensation from Oracle and close personal

15  ties to Defendant Ellison.  Seligman has received and will continue to receive substantial

16  compensation as a director of Oracle.  Since 2006, Director Seligman has received over ***$5.3***

17  ***million*** in cash and stock awards – a material amount to any individual, especially when that person

18  expects to receive about a half of a million dollars per year in subsequent years.  As a member of

19  one of the highest compensated board of directors in the United States, Director Seligman expects

20  to receive roughly half of a million dollars or more per year as a director.

21    303.    Seligman also has ties to Ellison, which render her unable to independently evaluate

22  matters concerning Ellison.  Seligman and her husband, Ernest von Simson ("von Simson"), co-

23  founded the Research Board, a private sector think tank and forum, serving top Chief Information

24  Officers of over 100 of the largest firms in North America and Europe, and Ostriker von Simson,

25  a consultancy that works with large global enterprises to advise them on choosing and deploying

26  technologies and software, which gave them an insider look at the IT industry.  Ellison is one of

27  the credited guest speakers to have spoken before both the Research Board and the CIO Strategy

28  Exchange (which is chaired by Ostriker von Simson).  Through their co-founded entities, Seligman

and von Simson came to know and admire the leadership "giants" of the IT sector, including Ellison. In von Simson's book, "The Limits of Strategy: Lessons in Leadership from the Computer Industry," von Simson deems Ellison one of the "Star Walkers," along with Michael Dell, Steve Jobs, Scott McNealy and Bill Gates, all of whom are central to the book's narrative.

304.    Additionally, in 2010, Seligman's husband published a book that provides the following description of his first interaction with Ellison after Research Board was sold: "At the end [of an Ellison presentation], he spotted me and flashed a huge grin.  Walking me, arm around my shoulder, to the side of the stage and away from his Gartner hosts, he said, 'I hope you really made them pay for the RB.'  I was touched."  Ellison ended up writing a blurb for the book.  That book mentions that Seligman and her husband have known Ellison since the late 1980s and have had "numerous interactions over the subsequent years, including lunch at Ellison's Silicon Valley estate."

305.    Further, Seligman owns two condos on the 140-square-mile island of Lanai in Hawaii, which Ellison acquired in 2012 for $300 million.  As a result of Ellison's purchase of Lanai, Ellison owns nearly everything on the island, including many of the commercial buildings, homes, and apartments, the Four Seasons hotels and golf courses, the water company and utilities, half the roads, one of the two grocery stores, the community center and pool, the movie theater and some 88,000 acres of land (2% of the island is owned by the government or by longtime Lanai families).  According to *The New York Times*, Ellison formed Pulama Lanai to run the operations of the island and which employs a majority of the adults on the island. Pulama Lanai has been reported to be a vast and mostly uncommunicative force.  At the time of Ellison's Lanai purchase Seligman's husband, Ernest von Simson, was the long-time President of their condo association (Ernest von Simson remains Secretary and Treasurer of the condo association).  Seligman's condos are located 1.1 miles (driving distance) from the Four Seasons Resort Lanai and overlook one of the golf courses.  With ownership of these residences comes the eligibility to become a member of the Island Club which provides access to all Four Seasons' facilities and golf courses for half price membership.

306.     Seligman and her husband are also one of four couples making up the "Champion" donors category (the highest donor circle for individual donors) to the TriLanai, which offers races on the Hawaiian Island of Lanai and is sponsored in part by Ellison-owned Pulama Lanai (that runs the operations of the island).  Tri-Lanai also lists Ellison-owned hotels, the Four Seasons Resort Lanai and Hotel Lanai, as recommended accommodations.  The other two members of the condo association Board where Seligman lives are also sponsors of the TriLanai.

### 6.     Director Conrades

307.     Director Conrades is not independent of Defendant Ellison, and by extension Defendants Catz and Hurd, due to his long-standing position as a director of Oracle and his prior involvement in approving conflicted transactions between Oracle and Ellison.  Director Conrades has received substantial and will continue to receive compensation as a director of Oracle.  Since 2008, Director Conrades has received over *$4.8 million* in cash and stock awards – a material amount to any individual, especially when that person expects to receive about a half of a million dollars per year in subsequent years.  As a member of one of the highest compensated board of directors in the United States, Director Conrades expects to receive roughly half of a million dollars or more per year as a director.

308.     Conrades has held multiple high-level positions at Akamai Technologies Inc., and Oracle and Akamai have "made substantial purchases from each other."  While Conrades was Executive Chairman of Akamai Technologies, Inc. ("Akamai"), Akamai received over a million dollars from transactions between Akamai and Oracle.

309.     Conrades is also a major investor in and director of MyTaskIt, a software startup. MyTaskIt's Chief Technology Officer is Michael Russo, a Senior Director of Development at Oracle.  Russo needs Oracle management's approval to continue working at MyTaskIt.

310.     Further, Conrades is Partner Emeritus at Polaris Venture Partners and Managing Partner at Longfellow Venture Partners; both are venture capital firms focused on areas in which Oracle is an active acquirer.  Polaris and Longfellow have portfolio companies that rely on Oracle technology or are managed by former Oracle executives.

### 7. Director Berg

311. Director Berg is not independent of Defendant Ellison, and by extension Defendants Catz and Hurd, due to his long-standing position as a director of Oracle and his prior material connection to Ellison and his family throughout his professional career.

312. Director Berg has received and will continue to receive substantial compensation as a director of Oracle. Since 2009, Director Berg has received over *$6.3 million* in cash and stock awards – a material amount to any individual, especially when that person expects to receive about a half of a million dollars per year in subsequent years. As a member of one of the highest compensated board of directors in the United States, Director Berg expects to receive roughly half of a million dollars or more per year as a director.

313. Berg has also been an agent in the entertainment industry for more than 35 years. Berg has served as chairman of Northside Services, LLC, a media and entertainment advisory firm, since May 2015. He was chairman of Resolution, a talent and literary agency he founded, from 2013 until 2015. Between 1985 and 2012, Berg was the chairman and CEO of International Creative Management, Inc. ("ICM"), a talent agency for the entertainment industry.

314. According to the *Los Angeles Times*, ICM represented David Ellison, Larry Ellison's son, in his initial interest in an acting career.[49] When David Ellison was approached about financing "Flyboys," "[David] Ellison approached his father [Larry Ellison] and, with the help of Jeffrey Berg at International Creative Management, eventually fashioned a deal," which accounted for 'less than 30%' of the $60 million in production costs." ICM also acted as the U.S. sales agent for "Flyboys," and Berg himself organized the party for "Flyboys," held on Larry's Ellison's yacht at the time, the Rising Sun.

315. Despite a lengthy career as an agent, Berg was essentially ousted from ICM in 2012 after a bitter power struggle with ICM founding partner Chris Silbermann, started his own entertainment agency Resolution in 2013, which shuttered within 18 months, and now runs a small

---

[49] Mary McNamara, A wing and a player, Los Angeles Times (Aug. 24, 2005), *available at* https://www.latimes.com/archives/la-xpm-2005-aug-24-et-ellison24-story.html (last visited Apr. 29, 2019).

agency Northside Services, LLC.  According to company information database buzzfile.com, Northside Services, LLC is currently estimated to have 4 employees and annual revenues of $211,032, making his Oracle compensation material based on publicly available compensation information for other business ventures.[50]

### 8. Director Boskin

316.   Director Boskin is not independent of Defendant Ellison, and by extension Defendants Catz and Hurd, due to his lucrative compensation as a director and Ellison's ties to his employer, Stanford University.

317.   Director Boskin has received and will continue to receive substantial compensation as a director of Oracle.  Since 2009, Director Boskin has received over ***$9.4 million*** in cash and stock awards – a material amount to any individual, especially when that person expects to receive about a half of a million dollars per year in subsequent years.  As a member of one of the highest compensated board of directors in the United States, Director Boskin expects to receive roughly half of a million dollars or more per year as a director.

318.   Boskin is the Tully M. Friedman Professor of Economics and Hoover Institution Senior Fellow at Stanford University, where he has been on the faculty since 1971.  Stanford University has close ties to Ellison and Oracle:

- Ellison's The Lawrence Ellison Foundation has made nearly $3 million in donations to Stanford in the past 3 years.

- Oracle has made donations to Stanford each year for at least the past 10 consecutive years, and in fiscal year 2016 alone has donated between $19 and $30 million to Stanford.

- According to Oracle's Annual Proxy Statement, for at least the past 10 years, Stanford has received various donations from Board members, and Board Members (in addition to Boskin and Garcia-Molina) have served and continue to serve on advisory or oversight boards or are otherwise employed part-time by Stanford University.

- Oracle is Stanford University's Strategic Partner.

---

[50]   *See*   Profile   of   Northside   Services,   LLC   (available   at: http://www.buzzfile.com/business/Northside-Services,-LLC-424-274-4200).

- Oracle is a founding member of the Stanford Medicine Corporate Partners program, which supports the development of the new Stanford Hospital, pursuant to which Oracle has granted Stanford $25 million over 10 years.

319.    Ellison and Oracle maintain close ties to Stanford University that prevent Boskin from independently evaluating matters concerning Ellison.  For example, as recounted by the Delaware Court of Chancery in connection with prior derivative litigation regarding Oracle, the Ellison Medical Foundation (now re-named The Lawrence Ellison Foundation) has made approximately $10 million in grants to Stanford.  The directors with ties to Stanford University may believe that their continued employment there or service on boards and committees result in part from such donations to Stanford and thus, those directors may not be able to act independently from (or adversely to) Oracle (and Ellison).

320.    Additionally, Boskin, is a Senior Fellow and Steering Committee member of the Stanford Institute for Economic Policy Research ("SIEPR"), to which Oracle has consistently made yearly donations of between $5,000 and $20,000.

321.    In addition to his professional ties through Stanford and the SIEPR, Boskin is also a personal friend of Ellison.  Boskin made a $500,000 donation to the UC Davis Health System, the hospital that repaired Ellison's shattered elbow after a 1992 high-speed bicycle crash and where Ellison established the Lawrence J. Ellison Ambulatory Care Center.  When Boskin was injured in a 1999 car accident, a media report described Ellison as a "constant visitor," bringing sushi to Boskin's hospital room.[51]

### 9.    Director Chizen

322.    Director Chizen is not independent of Defendant Ellison, and by extension Defendants Catz and Hurd, due to his lucrative compensation as a director and his ties to Stanford University.

323.    Director Chizen has received and will continue to receive substantial compensation as a director of Oracle.  Since 2009, Director Chizen has received over ***$7.1 million*** in cash and stock awards – a material amount to any individual, especially when that person expects to receive

---

[51] Pat Steger, *Wrong Address Didn't Faze Larry*, SFGate.com, Mar. 12, 1999.

about a half of a million dollars per year in subsequent years.  As a member of one of the highest compensated board of directors in the United States, Director Chizen expects to receive roughly half of a million dollars or more per year as a director.

324.    Chizen has ties to Stanford, which render him further non-independent. Chizen was featured as a speaker in a Stanford course offered on Cloud computing (as a collaboration between The Stanford Center for Professional and the Stanford Computer Science Department), which was taught by former Oracle On Demand president Timothy Chou (whose bio lists him as having been a leader in bringing enterprises to the cloud since 1999, when he returned to Oracle to work for Ellison). The Chizen Family Foundation, of which Chizen is President and a Director, has donated to Stanford Hospital in at least 2013 and 2014.

### 10.    Director Garcia-Molina

325.    Director Garcia-Molina is not independent of Defendant Ellison, and by extension Defendants Catz and Hurd, due to his lucrative compensation as a director and Ellison's ties to his employer, Stanford University.

326.    Director Garcia-Molina has received and will continue to receive substantial compensation as a director of Oracle.  Since 2005, Director Garcia-Molina has received over ***$5.3 million*** in cash and stock awards – a material amount to any individual, especially when that person expects to receive about a half of a million dollars per year in subsequent years.  As a member of one of the highest compensated board of directors in the United States, Director Garcia-Molina expects to receive roughly half of a million dollars or more per year as a director.

327.    Garcia-Molina has been the Leonard Bosack and Sandra Lerner Professor in the departments of Computer Science and Electrical Engineering at Stanford University since 1995 and served as chairman of the department of Computer Science from 2001 to 2004.  He has been a professor at Stanford University since 1992.  From 1994 until 1997 he was the director of the Computer Systems Laboratory at Stanford University.

328.    Garcia-Molina is employed at Stanford University ("Stanford"), which has close ties to Ellison and Oracle as cited above.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### 11.    Director Panetta

329.    Director Panetta is not independent of Defendant Ellison, and by extension Defendants Catz and Hurd, due to his lucrative compensation as a director and his close ties to Ellison and his family.

330.    Director Panetta has received and will continue to receive substantial compensation as a director of Oracle.  As a member of one of the highest compensated board of directors in the United States, Director Panetta expects to receive roughly half of a million dollars or more per year as a director.  Since 2015, Director Panetta has received over **$2 million** in cash and other stock awards – a material amount to any individual, especially when that person expects to receive about a half of a million dollars per year in subsequent years.

331.    Panetta also has ties to Ellison and Ellison's daughter, Margaret Elizabeth Ellison ("Megan Ellison"), which prevents Panetta from acting independently of Ellison.  Panetta played an important role in the development of the Megan Ellison-funded film, "Zero Dark Thirty," which chronicles the hunt for and ultimate Navy SEAL raid leading to the death of Osama bin Laden. Prior to Osama bin Laden's death, Megan Ellison had signed on to provide all the financing on a movie directed by Kathryn Bigelow ("Bigelow") and produced by Mark Boal ("Boal") about an unsuccessful mission to kill Osama bin Laden. Before filming began and the script was still in development, it was announced that Osama bin Laden had been killed. According to declassified internal CIA documents obtained by *Vice News* pursuant to a Freedom of Information Act request, only days after the news broke, Boal was in contact with Panetta (who was the Director of the CIA from 2009 to 2011), and Panetta personally offered to help Boal (who was writing the screenplay) with unprecedented access to CIA information and remained in close contact throughout the filmmaking process.

332.    Additionally, according to a draft of a Pentagon inspector general's report: "Leon Panetta was fully cooperating with the movie project and that several CIA staff used White House-approved talking points to talk to Mr. Boal about the intelligence that led to UBL's [Usama bin Laden's] location."  Draft Report of the Inspector General United States Department of Defense at 4 (available at: http://pogoarchives.org/m/go/ig/dod-ig-fouo-draft-report.pdf).  The draft report

also stated that "Panetta wants the Department to cooperate fully with the makers of the UBL film." *Id.* at 7.  Megan Ellison not only provided the financing for "Zero Dark Thirty," but was also heavily involved in its pre- and post-production: she consulted regularly with Bigelow and Boal during development; she was instrumental in the dogged pursuit of casting the film's lead actress, Jessica Chastain (who ultimately won an Oscar for her role); she was on set on location during filming; and she became close with the film's actors.  Megan Ellison (through her company Annapurna Productions) covered the entire approximately $45 million budget for "Zero Dark Thirty."  While several U.S. senators, including Senator Dianne Feinstein (D-CA) and then-Senators John McCain (R-AZ), Mark Udall (D-CO), and Carl Levin (D-MI), openly criticized the movie (Senator Feinstein was so "incensed" she walked out of an advance screening after only 15-20 minutes), Panetta came to its defense.  During an interview, Panetta, who was portrayed by James Gandolfini in the movie, stated, "It's a movie.  And it's a good movie."  Panetta continued "I think people ought to make their own judgments.  There are parts of it that give you a good sense of how the intelligence operations do work.  But I also think people in the end have to understand that it isn't a documentary, it's a movie."

333.   Given these standing ties to Ellison alleged herein, Panetta was unable to independently consider the claims asserted herein or otherwise consider matters pertaining to Ellison or his handpicked executives.

### CLAIMS FOR RELIEF

### COUNT I
**Derivative Claim For Violations Of Section 10(b) Of The Exchange Act
And SEC Rule 10b-5 Promulgated Thereunder
(Against All Defendants)**

334.   Plaintiff incorporates by reference and realleges each of the foregoing allegations as though fully set forth in this paragraph.

335.   This Count is asserted on behalf of the Company against the Officer Defendants for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

336.    During the Relevant Period, in connection with Oracle's repurchases of Oracle shares, the Officer Defendants made, disseminated, or approved false or misleading statements about Oracle specified herein, which they knew or deliberately disregarded were false or misleading and were intended to deceive, manipulate, or defraud.  Those false or misleading statements and the Officer Defendants' course of conduct were designed to artificially inflate the price of the Company's common stock.

337.    At the same time that the price of the Company's common stock was inflated due to the false and misleading statements made by the Officer Defendants, the Officer Defendants caused the Company to repurchase millions of shares of its own stock at prices that were artificially inflated due to the Officer Defendants' false or misleading statements.  The Officer Defendants engaged in a scheme to defraud Oracle by causing the Company to purchase at least $14 billion in shares of Oracle stock at inflated prices.

338.    The Officer Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Oracle in connection with the Company's purchases of Oracle common stock during the Relevant Period.

339.    The Officer Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the U.S. mails, engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon the Company; made or disseminated various false and/or misleading statements of material facts and omitted to state material facts necessary in order to make the statements made or disseminated, in light of the circumstances under which they were made or disseminated, not misleading; made or disseminated the above statements intentionally or with a deliberately reckless disregard for the truth; and employed devices and artifices to defraud in connection with the Company's purchase of Oracle common stock, which were intended to, and did (a) deceive Oracle regarding, among other things, the reasons for Oracle's cloud revenues and growth; (b) artificially inflate and

maintain the market price of Oracle stock; and (c) cause Oracle to purchase the Company's stock at artificially inflated prices and suffer losses when the true facts became known.  Throughout the Relevant Period, Defendants were in possession of material, adverse non-public information regarding the Company's cloud revenues and growth.

340.    The Officer Defendants were among the senior management and the directors of the Company, and were therefore directly responsible for, and are liable for, all materially false or misleading statements made during the Relevant Period, as alleged above.

341.    As described above, the Officer Defendants acted with scienter throughout the Relevant Period, in that they acted either with intent to deceive, manipulate, or defraud, or with severe recklessness. The misstatements and omissions of material facts set forth herein were either known to the Officer Defendants or were so that the Officer Defendants should have been aware of them.

342.    As a result of the Officer Defendants' misconduct, Oracle has suffered damages in that it paid artificially inflated prices for Oracle common stock as part of the repurchase program and suffered losses when the true facts became known.  Oracle would not have purchased Oracle common stock at the prices it paid, or at all, but for the artificial inflation in the Company's stock price caused by the Officer Defendants' false or misleading statements.

343.    As a direct and proximate result of the Officer Defendants' wrongful conduct, the Company suffered damages in connection with its repurchases of Oracle common stock during the Relevant Period.  By reason of such conduct, the Officer Defendants are liable to the Company pursuant to Section 10(b) of the Exchange Act and SEC Rule 10b-5.

344.    Plaintiff brought this claim within two years of its discovery of the facts constituting the violation and within five years of the violation.

## COUNT II
### Derivative Claim For Violations of Section 20(a) of the Exchange Act
### (Against Defendant Ellison)

345.    Plaintiff incorporates by reference and realleges each of the foregoing allegations as though fully set forth in this paragraph.

346.   This Count is asserted on behalf of the Company against Defendant Ellison for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

347.   During his tenure as an officer and/or Chairman of the Board, as well as the Company's visionary founder with absolute control over the Board and the Company, Defendant Ellison was a controlling person of all Officer Defendants within the meaning of Section 20(a) of the Exchange Act.   By reason of his absolute control, Defendant Ellison had the power and authority to direct the management and activities of the other Officer Defendants, to hire and fire the other Officer Defendants at whim, and to cause the other Officer Defendants to engage in the wrongful conduct complained of herein.   Defendant Ellison was able to and did control, directly or indirectly, the content of the public statements made by all other Officer Defendants during the Relevant Period, including the materially misleading financial statements, thereby causing the dissemination of the false and misleading statements and omissions of material facts as alleged herein.

348.   In his capacity as founder, visionary, controlling stockholder, senior executive, and Chairman of the Board of Oracle, Defendant Ellison had direct involvement in and oversight over the day-to-day operations of the Officer Defendants and the Company's employees, who would not act unless Defendant Ellison agreed with their course of conduct.   Specifically, Defendant Ellison is, and was at all relevant times, Oracle's Chief Technology Officer, Chairman of the Board, founder, visionary leader, and controlling stockholder.   As the absolute control person of Oracle, Defendant Ellison has personally hired and overseen the work of the Officer Defendants in carrying out his vision for the Company as well as threatened to take or has taken retaliatory actions against any employee who strays from his leadership.   According to Catz, Defendant Ellison "led the transformation to the cloud," and is still "in charge" at Oracle even after becoming the Company's CTO in 2014, noting, "don't let titles fool you."

349.   As a result of the foregoing, Defendant Ellison, individually, was a controlling person of the other Officer Defendants within the meaning of Section 20(a) of the Exchange Act.

350.   As set forth above, all Officer Defendants violated Section 10(b) of the Exchange Act by their acts and omissions as alleged herein.   To the extent Defendant Ellison is not the maker

or disseminator of a specific false or misleading statement made by the other Officer Defendants, or lacked ultimate authority over such statement made by the other Officer Defendants, Defendant Ellison is liable pursuant to Section 20(a) of the Exchange Act, jointly and severally, with, and to the same extent as, the other Officer Defendants are liable under Section 10(b) of the Exchange Act and Rule 10b-5 thereunder to the Company in connection with its purchases of Oracle common stock pursuant to the Company's stock repurchase program.  As detailed above, during the Relevant Period, Defendant Ellison was culpable for the material misstatements made by the other Officer Defendants.

351.    As a direct and proximate result of Defendant Ellison's conduct, the Company suffered damages in connection with its purchase of Oracle common stock pursuant to the stock repurchase program.

## COUNT III
**Derivative Claim For Breach of Fiduciary Duty**
**(Against All Defendants)**

352.    Plaintiff incorporates by reference and realleges each of the foregoing allegations as though fully set forth in this paragraph.

353.    Each of the Officer Defendants owed and owes fiduciary duties to Oracle and its stockholders.  By reason of these fiduciary relationships, the Officer Defendants specifically owed and owe Oracle the highest obligation of good faith, fair dealing, loyalty, and due care in the administration and management of the affairs of the Company, including the Company's financial reporting, internal controls, and stock repurchase program.

354.    Each of the Officer Defendants consciously and deliberately breached their fiduciary duties of candor, good faith, loyalty, and due care to Oracle and its stockholders in at least the following ways:

(a)       Engaging in violations of federal law, including Section 10(b) and SEC Rule 10b-5, by making, disseminating, or approving false and misleading regarding cloud revenues and growth, which also resulted in the artificial inflation of the Company's share price;

(b)     Approving the Company's repurchase of Oracle common stock at times when the Company's stock were trading at artificially inflated prices; and

(c)     Abusing the Company's stock repurchase program so to blunt the decline in the Company's stock price upon partial disclosure of the truth and to financially engineer earnings per share metrics to meet or exceed Wall Street expectations.

355.    The Officer Defendants, individually and in concert, engaged in the aforementioned conduct in intentional, reckless, or grossly negligent breaches of fiduciary duties they owed to Oracle to protect its rights and interests.

356.    In breach of their duties owed to Oracle, the Officer Defendants willfully or reckless participated in misrepresentations related to the Company's cloud revenues and growth and failed to fully inform themselves prior to making decisions as officers, rendering them personally liable to the Company for breaching their fiduciary duties.

357.    The Officer Defendants had actual or constructive knowledge that they had caused the Company to improperly misrepresent its financial condition. The Officer Defendants had actual knowledge of the misstatements and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Oracle's common stock.

358.    The Officer Defendants conspired to abuse, and did abuse, the control vested in them by virtue of their positions in the Company.

359.    Oracle's certificate of incorporation contains a provision, pursuant to 8 Del. C. § 102(b)(7) ("Section 102(b)(7)"), eliminating liability of *directors* for breaches of duty of care. Section 102(b)(7) does not exculpate the Officer Defendants from any breaches of their fiduciary duty, as they are liable in their capacity as officers of the Company.

360.    As a direct and proximate result of the Officer Defendants' breaches of fiduciary obligations, Oracle has sustained significant damages and the Officer Defendants are liable to the Company.

361.     To the extent the Company does not waive its forum selection bylaw so as to permit this Court to exercise supplemental jurisdiction over state law claims, Plaintiff reserves its right to voluntarily dismiss Count III and refile it in the Court of Chancery of the State of Delaware.

## COUNT IV
### Contribution and Indemnification
### (Against All Defendants)

362.     Plaintiff incorporates by reference and realleges each of the foregoing allegations as though fully set forth in this paragraph.

363.     This claim is brought derivatively on behalf of the Company against all Defendants for contribution and indemnification.

364.     Oracle is named as a defendant in a putative stockholder class action filed in this District on August 10, 2018, asserting claims under the federal securities laws for, *inter alia*, false and misleading statements related to the Company's cloud sales, revenues, and growth as well as the Company's financial reporting.  In the event the Company is found liable for violating the securities laws, the Company's liability will arise, in whole or in part, from the intentional, knowing, or reckless acts or omissions of some or all of the Defendants as alleged herein.  The Company is entitled to receive contribution from those Defendants in connection with the securities fraud class action against the Company currently pending in this District.

365.     Accordingly, Oracle is entitled to all appropriate contribution and indemnification from Defendants.

366.     To the extent the Company does not waive its forum selection bylaw so as to permit this Court to exercise supplemental jurisdiction over state law claims, Plaintiff reserves its right to voluntarily dismiss Count IV and refile it in the Court of Chancery in the State of Delaware.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A.     Determining that this action is a proper derivative action under the law and that demand is excused as futile;

1    B.    Determining and awarding Oracle the damages sustained by it as a result of the

2    violations set forth above from each Officer Defendant, joint and severally, together with

3    prejudgment and post-judgment interest thereon;

4    C.    Declaring that Defendants have breached their fiduciary duties to Oracle;

5    D.    Directing Oracle to take all necessary actions to reform and improve its corporate

6    governance and internal procedures to comply with applicable laws and to protect the Company

7    and its stockholders from a repeat of the damaging events described herein;

8    E.    Awarding to Plaintiff costs and disbursements incurred in this action, including

9    attorneys' fees, consultant and expert fees, costs, and expenses; and

10    F.    Granting such other or further relief as the Court may deem just and proper.

11                                    **JURY DEMAND**

12    Plaintiff demands a trial by jury on all issues so triable.

13

14    Dated: May 6, 2019                          Respectfully submitted,

15                                               COTCHETT PITRE McCARTHY LLP

16

17                                               _____

18                                               Mark C. Molumphy
                                                 *mmolumphy@cpmlegal.com*
19                                               Gina Stassi (SBN 261263)
                                                 *gstassi@cpmlegal.com*
20                                               Tyson Redenbarger (SBN 294424)
                                                 *tredenbarger@cpmlegal.com*
21                                               San Francisco Airport Office Center
                                                 840 Malcolm Road, Suite 200
22                                               Burlingame, California  94010
                                                 Telephone:   (650) 697-6000
23                                               Facsimile:    (650) 697-0577

24

25                                               LABATON SUCHAROW LLP

26                                               Eric Belfi
                                                 *ebelfi@labaton.com*
27                                               David MacIsaac
                                                 *dmacisaac@labaton.com*
28                                               John Vielandi
                                                 *jvielandi@labaton.com*

140 Broadway
New York, NY 10005
Tel:      (212) 907-0700
Fax:     (212) 818-0477

*Attorneys for Plaintiff City of Providence*

## VERIFICATION

I, Jeffrey Dana, being duly sworn, declare as follows:

I am the City Solicitor of Plaintiff City of Providence ("Providence") and am authorized to act on its behalf.  Providence is a shareholder of Oracle Corporation (the "Company") and has been throughout the relevant period defined in the foregoing Verified Stockholder Derivative Complaint (the "Complaint").  Providence has retained competent counsel and is ready, willing, and able to pursue this action vigorously on behalf of the Company.  I have reviewed the Complaint, and based upon discussions with and reliance upon counsel, and as to those facts of which I have personal knowledge, the Complaint is true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and Accepted:

Dated: April 26, 2019

_____
Jeffrey Dana
City Solicitor
The City of Providence

Sworn to and subscribed before me

this 26th day of April, 2019.

_____
Notary Public

My Commission Expires: 10/15/20

WENDY A. BROWN
Notary Public, State of Rhode Island
ID # 754573

2142759-1
04/26/2019 12:24 PM